# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

ARCHIE COMIC
PUBLICATIONS, INC.,

                                  Plaintiff,

          -against-

KENNETH W. PENDERS, II,
p/k/a/ KEN PENDERS,

          Defendant.

Case No. 10-cv-8858 (RMB)

**Electronically Filed**

## DEFENDANT'S MOTION TO DISMISS
## COMPLAINT FOR LACK OF PERSONAL JURISDICTION,
## OR IN THE ALTERNATIVE TO TRANSFER PROCEEDINGS

## TABLE OF CONTENTS

<u>Page</u>

I.   INTRODUCTION ................................................................................................ 1

II.  Background ...................................................................................................... 3

III. ARGUMENT ................................................................................................... 13

   A.   Legal Standard........................................................................................ 13

      1.   Dismissal........................................................................................ 13

      2.   Transfer.......................................................................................... 13

   B.   This Action Should Be Dismissed for Lack of Personal Jurisdiction ....... 14

      1.   Penders is a resident of California and has No Particular Connection to the Southern District of New York.................................................................... 14

      2.   The Existence, and Terms, of the Contracts Containing the Forum Selection Clauses is Disputed.................................................................................. 16

   C.   In the Alternative, this Action Should Be Transferred to the Central District of California ............................................................................................... 17

      1.   This Action Could Have Been Brought in the Central District of California. 17

      2.   The Relevant Factors Weigh Strongly in Favor of Transferring This Action to the Central District of California......................................................... 17

      3.   Transfer to the Central District of California is Warranted Here, Since it is the Most Appropriate Forum ......................................................................... 24

   IV.  Conclusion .................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Amersham Pharmacia Biotech v. Perkin-Elmer Corp.*, 11 F. Supp. 2d 729
    (S.D.N.Y. 1998) ...................................................................................20

*Berman v. Informix Corp.*, 30 F. Supp.2d 653, 656 (S.D.N.Y. 1998) ........................14

*Capitol Records, LLC v. VideoEgg, Inc.*, 611 F. Supp. 2d 349 (S.D.N.Y. 2009)..........20

*Cartier v. D & D Jewelry Imps.*, 510 F. Supp. 2d 344 (S.D.N.Y. 2007).....................21

*Chase-Riboud v. Dreamworks Inc.*, 987 F. Supp. 1222 (C.D. Cal. 1997) ...................24

*Columbia Pictures Indus. v. Miramax Films Corp.*, 11 F. Supp. 2d 1179
    (C.D. Cal. 1998)..................................................................................24

*Effects Assoc., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) ...................................23

*Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 373
    (S.D.N.Y. 2006) ...................................................................................14

*Guan Gao Co. v. Acco Brands Corp.*, 2007 U.S. Dist. LEXIS 17371
    (S.D.N.Y. Mar. 8, 2007) .......................................................................18

*Henderson v. INS*, 157 F.3d 106, 123 (2d Cir. 1998) ...........................................14

*Herbert v. Elec. Arts, Inc.*, 325 F. Supp. 2d 282, 288 (S.D.N.Y. 2004) ...............17, 18

*Hoffritz for Cutlery, Inc. v. Amjac, Ltd.*, 763 F.2d 55 (2d Cir. 1985)........................15

*Hustler Magazine, Inc. v. Moral Majority, Inc.*, 606 F. Supp. 1526 (C.D. Cal. 1985)23

*Invivo Research v. Magnetic Resonance Equip. Corp.*, 119 F. Supp. 2d 433,
    436-437 (S.D.N.Y. 2000) .....................................................................17

*James W. Newton v. Diamond*, 204 F. Supp. 2d 1244 (C.D. Cal. 2002).....................24

*Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236 (2d Cir. 1999) .................................13

*L.A.Times v. Free Republic*, 98-cv-7840 (C.D. Cal. Mar. 31, 2000) ...........................23

*Maljack Productions v. UAV Corp.*, 964 F. Supp. 1416 (C.D. Cal. 1997)...................24

*Martin v. Citibank, N.A.*, 64 A.D.3d 477 (N.Y. App. Div. 1st Dep't 2009) ...............16

*Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.*, 900 F. Supp. 1287
    (C.D. Cal. 1995) ..................................................................................24

*Midas Productions, Inc. v. Baer*, 437 F. Supp. 1388 (C.D. Cal. 1977) ......................24

*Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*,

   421 F. Supp. 2d 741 (S.D.N.Y. 2006) ...................................................................22

*Thomas v. Ashcroft*, 470 F.3d 491 (2d Cir. 2006)...................................................13, 14

*Trenton v. Infinity Broadcasting Corp.*, 865 F. Supp. 1416 (C.D. Cal. 1994)............24

*Walker v. Jon Renau Collection, Inc.*, 423 F. Supp. 2d 115, 117

   (S.D.N.Y. 2005) ..................................................................14, 17, 20, 21, 22, 23, 24

*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000).........................15

### STATUTES

28 U.S.C. § 1338..........................................................................................................24

28 U.S.C. § 1404(a)..................................................................................................1, 13

Civil Practice Law and Rules § 301.............................................................................15

Civil Practice Law and Rules § 302.......................................................................15, 16

### RULES

Fed. R. Civ. P. 12(b)(2) ...........................................................................................1, 13

Fed. R. Civ. P. 45(b)(2) ................................................................................................22

## I.   INTRODUCTION

This action, filed by plaintiff Archie Comic Publications, Inc. ("Archie") should be dismissed pursuant to Fed. R. Civ. P. ("FRCP") 12(b)(2) of the Federal Rules of Civil Procedure ("FRCP") for lack of personal jurisdiction over defendant Kenneth W. Penders, II, the sole defendant ("Penders").  Alternatively, this action should be transferred to the Central District of California pursuant to 28 U.S.C. § 1404(a), for the convenience of the parties and witnesses, and in the interest of justice.

This court has neither "general" nor "specific" jurisdiction over Penders, who:

    (a) is not a citizen or resident of the State of New York;

    (b) owns no property in the State of New York

    (c) has no bank accounts in the State of New York;

    (d) maintains no office in the State of New York; and

    (e) has no ongoing contacts or contracts with any entities in the State of New York, "continuous and systematic" or otherwise.

Additionally, Archie asserts that personal jurisdiction is proper because of transactions, the most recent of which was over five (5) years ago, that had some minimal connection to New York but for which a substantial portion of the work performed was done in New Hampshire or in the Central District of California.

Further, the locus of the acts giving rise to the claims is California, not New York.  The license under which Archie produces the SONIC comic book titles was obtained from Sega of America, Inc., a California corporation headquartered in

California.  Since 2001, all relevant creative works by Penders were conceived and created in California, and the 170 copyright registrations in dispute (the "Penders Copyrights") were obtained by Penders while in the Central District of California. In addition, any breach of contract or tortuous interference in business alleged by Archie would necessarily have occurred in California where Penders holds title to the Penders Copyrights, and resides and conducts business.

The sole basis on which Archie may rely for personal jurisdiction is a paragraph contained in two agreements that Archie claims were signed by Penders in 1996; however, Archie acknowledges that the validity of these documents is in dispute and to date, Archie has not supplied the original of either document to allow a handwriting expert to analyze Penders's purported signature or for any other purpose.

Even assuming *arguendo* that personal jurisdiction over Penders were found to exist, a transfer of this case to the Central District of California is warranted. First, an action for all claims set forth in this case could just as easily have been brought by Archie in the Central District of California.  Second, a transfer is appropriate for the convenience of the parties, particularly as California is home to many of the relevant documents and witnesses. Finally, in the interest of justice, given the hardships to be faced by defendant should the case remain in New York, this case should be transferred to the Central District of California

## II.   BACKGROUND

### A.   Procedural History

On November 23, 2010, Archie filed the instant action seeking a declaratory judgment for non-infringement of the Penders Copyrights, for judgment holding all of the Penders Copyrights to be invalid, for an order requiring Penders to request the Copyright Office cancel all of the registrations for the Penders Copyrights, for breach of contract, and for tortuous interference in business.

The Complaint was served on defendant on Friday, January 7, 2011.  By agreed upon motion, granted by the Court, the time by which defendant must answer or otherwise plead was extended until February 8, 2011.

### B.   Facts

#### 1. Archie Comics

As set forth in greater detail in the Complaint, Archie Comics is a New York corporation involved in the production, publication, distribution and sale of comic books since 1939 and has sold over 1.5 billion comics worldwide.  Archie's publications include both characters they own and those owned by and licensed from other comic and media companies.  One such group of licensed comics centers on the SEGA video game character "Sonic the Hedgehog."  See Complaint, at ¶ 17

#### 2. Ken Penders

Penders is a California citizen presently residing at 12147 Woodley Avenue, Granada Hills, California 91344-2846.  See Declaration of Kenneth Penders ("Decl."), ¶ 3.  From 1985 until May of 1994, Mr. Penders resided in New Hampshire

3

with his wife and son.  Decl. ¶ 4.  Following his divorce, Mr. Penders moved in May

1994 to N. Tonawanda, New York.  Decl. ¶ 5.  In November, 2001, Penders moved to

California where he has resided ever since.  Decl. ¶ 6.

Starting in 1974, Penders has been a professional commercial and technical

illustrator (Decl. ¶ 12) and since September 1986, Penders has been a freelance

writer and illustrator in a variety of mediums, including in the comic book industry.

Decl. ¶ 14.  During that time, Penders worked as a freelance writer and artist for a

number of different publishers in the comic book industry, including DC Comics,

Marvel Comics, Image Comics, Archie Comic Publications, Hero Comics,

Entertainment Publishing, Now Comics, Eclipse Comics, Malibu Comics and

Disney.  Decl. ¶ 14.  During his career in the comic book industry, Penders has

worked on many different titles and properties, including stories involving

characters owned by the comic book companies themselves, and stories involving

licensed properties such as "Star Trek," "Star Trek: The Next Generation," "Star

Trek: Deep Space Nine," "The Man From U.N.C.L.E.," "Advanced Dungeons and

Dragons," "Green Hornet" and "Sonic the Hedgehog".  Decl. ¶ 15.

### 3.  <u>Sonic the Hedgehog Comics</u>

In 1992, Archie Comics acquired a license to publish comic books based on

the SEGA video game character "Sonic the Hedgehog."  See Complaint, at ¶ 17;

Decl. ¶ 16.  The first Sonic comic book series produced by Archie was a mini-series

that was published monthly from November 1992 until February 1993.  Decl. ¶ 17.

Starting in May 1993, Archie began publication of an ongoing Sonic comic book

series, and later published the Knuckles the Echidna spin-off series, as well as a number of related mini-series, one-shots and specials (collectively, the "Sonic Comics").  Decl. ¶ 18.

In October 1993, a friend of Penders, Mike Kanterovich, was approached by Paul Castiglia, the editor at that time of the Sonic Comics, who advised Kanterovich that the current writer might be leaving the title and that Archie was therefore looking to obtain inventory stories as a precaution in the event of the writer's departure.  Decl. ¶ 19.  Castiglia invited Kanterovich to submit story ideas for potential assignments should the ideas be accepted.  Decl. ¶ 19.  Kanterovich, who knew little or nothing about the Sonic character or the comic books, knew that Penders had some degree of knowledge due to the Sonic video games, comic books and television shows being favorites at that time of Penders' son.  Decl. ¶ 20.  Kanterovich therefore contacted Penders to discuss the Sonic Comics opportunity, and Penders provided Kanterovich with information on the character.  Decl. ¶ 21.  Kanterovich suggested to Penders that the two work together on story ideas to pitch to Archie for publication in the Sonic Comics.  Decl. ¶ 21.

Initially, the two prepared and submitted three story ideas to Castiglia for approval during the second half of October 1993.  Decl. ¶ 22.  Two of the three story ideas were approved by SEGA and Archie (Decl. ¶ 22), after which the two writers worked on full story scripts for those two stories.  Decl. ¶ 25.  The first story authored by Penders and Kanterovich appears in issue #11, published in March 1994.  Decl. ¶ 25.

Following acceptance of the first group of story ideas, Penders and Kanterovich began to work on additional story synopses for submission to Castiglia, that were also approved by Archie and SEGA. Decl. ¶ 26. Shortly thereafter, the two writers visited Castiglia at the Archie Comics offices, and during the visit were briefly introduced to Archie Comics publishers Michael Silberkleit and Richard Goldwater, who joked that Kanterovich and Penders would be the new regular writers for the Sonic Comics. Decl. ¶ 27. At no time, however, was there an official undertaking by Archie to formalize Penders' working arrangement, and no actual promise or guarantee of future work on Sonic Comics. Decl. ¶ 28. Further, there was no written understanding between Archie and either Penders or Kanterovich concerning their freelance work. Decl. ¶ 29.

In early 1994, Castiglia was promoted at Archie and thus replaced as editor on the Sonic Comics by Scott Fulop. Decl. ¶ 30. One of the first assignments offered by Fulop to Penders and Kanterovich was to prepare a story idea introducing the "Knuckles the Echidna" character into the Sonic Comics continuity, and intended to be a try-out for such character. Decl. ¶ 31. The Knuckles story appears in issue #13, released in May 1994, and although SEGA was initially skeptical of the idea, the story proved popular. Decl. ¶ 32. Penders would go on to script and illustrate many more stories featuring the Knuckles character, eventually leading to a Knuckles mini-series and then a full monthly Knuckles comic book series that continued for nearly 3 full years. Decl. ¶ 32.

In or around May, 1994, Penders convinced Fulop to allow the Sonic Comics to align more closely with the "Sonic the Hedgehog: The Animated Series" Saturday morning cartoon series, which series aired on ABC from September 1993 until May 1995. Decl. ¶ 33. As a result, the stories in the Sonic Comics took a new direction, introducing new characters, new worlds and were structured to establish and build an ongoing logic and continuity. Decl. ¶ 34. The series also began to use a new format, namely book-length stories and eventually multi-issue storylines. Decl. ¶ 34.

In late 1994, after Kanterovich advised Penders he was no longer interested in working on every one of the Sonic Comics stories, Penders began to work on scripts for the Sonic Comics by himself. Decl. ¶ 35. Although they continued to collaborate on stories, Penders began to write solo stories with increasing frequency (Decl. ¶ 35), and in mid-1995, Penders began to provide cover and interior artwork for the several of Sonic Comics. Decl. ¶ 36. At all times through this period, Penders was working for Archie as a freelancer with no contract. Decl. ¶ 37.

In the summer of 1995, Fulop advised Penders that both the Saturday morning animated series and the syndicated weekday Sonic animated television series would be cancelled. Decl. ¶ 42. Penders was told that Archie expected to cancel the comic book series within the next year, because historically comic books licensed from another media (such as television) never lasted more than 8-12 months once the original media was no longer in the public spotlight.. Decl. ¶ 42. Undeterred, Penders continued to innovate, creating additional new characters and

storylines, including perhaps the most renowned storyline for the entire series titled "Endgame," which appeared in issues 47-50 and was conceived as the series finale, featuring Sonic's final battle against his greatest enemy. Decl. ¶ 43. Despite Archie's initial fear of cancellation, the Sonic Comics proved to be the exception to the licensed comic book rule, and actually saw sales increase after the animated shows stopped airing. Decl. ¶ 44. As a result, Penders rewrote the original conclusion of the "Endgame" story so as to allow the series to move forward rather than end. Decl. ¶ 44. Penders thereafter continued to work on the Sonic comic book series and related titles until late 2005, and his final story for the Sonic Comics appeared in issue 159, published in early 2006. Decl. ¶ 45.

### 4. How Archie Comics Conducted Business for Sonic Comics

#### a. Submissions

The submission method used by Archie for the Sonic Comics was different than that used by other publishers. Decl. ¶ 23. Specifically, rather than receiving a specific assignment, Archie invited Penders and Kanterovich to pitch story ideas, which they would either accept or reject. Decl. ¶ 23. Once story ideas were accepted, Archie required that Kanterovich and Penders submit their scripts in full panel page layout form, clearly depicting everything in a rough visual format rather than in normal text format. Decl. ¶ 24. This requirement for accompanying script submissions with story visuals roughs differed from all other comic book publishers for whom Penders has worked, and required additional time and effort for which they were never compensated or credited. Decl. ¶ 24.

b.  <u>Written Agreements</u>

Because of his many years of working for comic book companies such as Marvel Comics and DC Comics, Penders understands the industry-standard method undertaken by publishers working with freelancers on company-owned and licensed titles.  Decl. ¶ 46.  Specifically, freelancers were advised in advance that they were being hired to produce creative works on a "work made for hire" basis, and that any work created and submitted to the publisher (each a "Work") was understood to be "work made for hire."  Decl. ¶ 47.  Once each Work (or portion thereof) was completed and submitted to the publisher, a creator was required to sign a voucher for payment, and that voucher (or at one time the backs of the paychecks) contained agreement language whereby the creator confirmed that (i) the Work which had been created was a "work made for hire" and (ii) in the event such Work did not qualify as a "work made for hire," the creator was thereby assigning all copyright rights in such Work to that publisher.  Decl. ¶ 47.

At no time while Penders worked on the Sonic comic books did Archie follow this manner of doing business.  Decl. ¶ 48.  During the entire time he worked on the Sonic Comics, Penders was working for Archie as a freelancer with no contract.  Decl. ¶ 37.  When Penders first submitted stories ideas to Castiglia, there was no discussion with Archie concerning the issue of ownership or the concept of "work made for hire".  Decl. ¶ 49.  This was understandable since there was no guarantee that any story idea would be accepted by Archie and SEGA for use in the Sonic Comics; and in fact, a number of Penders' story ideas were rejected.  Decl. ¶ 49.

During the time that Penders was primarily associated as a freelancer for Archie Comics, he completed several assignments for other publishers including Malibu and Disney, all of whom submitted written contracts prior to Penders commencing any work. Decl. ¶ 53. The multi-page documents Penders signed in those instances required his initials on each page of the contract and a full signature on the final page, which were then required to be initialed and counter-signed by the publisher or editor. Decl. ¶ 53. The only Archie-generated documents signed by Penders that pertained to the works he was creating were pay vouchers and checks that he endorsed.[1] Decl. ¶ 37. None of the Archie pay vouchers or checks contained any legal language, or made any reference to ownership or transfer of copyright rights in the materials Penders produced for the Sonic Comics. Decl. ¶¶ 38, 39.

Before undertaking his copyright registration filings, Penders sought confirmation from Archie that there was no issue regarding his claim of ownership in the works he had created for the Sonic Comics. Decl. ¶ 59. Accordingly, Penders called Archie in December 2008 and spoke to Victor Gorelick, editor-in-chief of Archie Comics, requesting, *inter alia*, copies of any agreement Penders may have had with Archie Comics relating to any of the freelance work he did for them. Decl. ¶ 59. Gorelick told him that no such documents existed. Decl. ¶ 59. Penders sought written confirmation of Gorelick's statement on several occasions, but was unsuccessful in obtaining the same. Decl. ¶ 60.

---

[1] In 1996, Penders was also given a group health care election document whereby Penders elected to waive group health care coverage. Decl. ¶ 40. The document Penders received contained no other legal language, and had not yet been signed on behalf of Archie Comics. Decl. ¶ 40.

Because the manner in which Archie Comics treated the submission of creative works was entirely different than any other comic book publisher for whom he had worked, Penders understood that there was no transfer of his rights in the stories he pitched, whether or not they were accepted by Archie Comics for publication. Decl. ¶ 41. As a result, Penders' enthusiasm for working on the Sonic Comics continued to grow as he introduced new concepts, story ideas and characters, all of which he believed he owned as their creator. Decl. ¶ 41.

### c. Exhibits A and B to Complaint

Penders never knowingly signed either of the documents attached to the complaint as Exhibits A and B. Decl. ¶ 65. Penders disputes the authenticity of the documents attached to the Complaint as Exhibit A and Exhibit B for a number of reasons. Decl. ¶ 62. First, Penders believes the signatures are not authentic; Penders has no record of ever receiving documents of this kind in 1996 from Archie, nor any recollection of the same; and Penders has no copies of these signed documents in his records, which is in contrast to his normal business practices. Decl. ¶ 62. Second, Penders would never have signed a document that had blanks, such as Exhibit B. Decl. ¶ 63. The waiver Penders recalls receiving and signing in 1996 was a single page health care election document that had no additional pages or legal language concerning ownership or transfer of rights. Decl. ¶ 63.

Exhibits A and B are also suspect because they were not previously produced by Archie despite repeated requests by Penders. Decl. ¶ 62. In addition to being told no such contracts existed (Decl. ¶¶ 59, 64), Archie failed to identify such

documents even after receipt of notice from the Copyright Office concerning Penders' copyright claims.  Decl. ¶ 64.

### 5.  <u>Corroboration and Supporting Evidence</u>

Penders has conversed with numerous creators who have worked for Archie on licensed comic book titles, including creators involved in the first few years of publication of the Sonic comic books, and has been advised be each of these creators that they had never been asked to execute any "work made for hire" agreements or assignment documents.  Decl. ¶ 54.  Penders has also spoken with Justin Gabrie, who was editor on the Sonic Comics from 1996 until 2004, and Gabrie advised Penders that he had approached the publishers of Archie Comics with the suggestion that "work-for-hire" language be included in both the pay vouchers and checks, and was told by the publishers such action was not necessary.  Decl. ¶ 55.

Among the witnesses that Penders would call to testify to the fact that Archie did not routinely request freelancers working on the licensed properties — including the various Sonic comic book titles — to sign any agreements including assignment or "work made for hire" agreements, are many individuals that reside in California or on the West Coast.  Decl. ¶ 67.  There are additional witnesses in and around Los Angeles, including a number that currently do work for Archie Comics, who Penders expects will be sought for deposition or subpoenaed to testify and who likewise can speak to Archie Comics' standard practices with regards to contracts, including those contracts pertaining to the Sonic Comics publications.  Decl. ¶ 68.

All of Penders' documents, including freelance contracts, payment vouchers from Archie, payment vouchers from other comic book publishers, correspondence, copyright application files, registrations and deposit materials, original works of authorship, scripts, outlines, story layouts, sketches, receipts, shipping records, phone records, physical artwork, and models, are located in Granada Hills, California. Decl. ¶ 69. In addition, the relevant documents, materials and physical things in the possession of the witnesses identified above would be located in California or along the West Coast. Decl. ¶ 70.

## III.   ARGUMENT

### A.   Legal Standard

#### 1. Dismissal

To survive a motion to dismiss for lack of personal jurisdiction brought under FRCP 12(b)(2), "a plaintiff must make a *prima facie* showing" and bears the ultimate burden of establishing that the court has personal jurisdiction over each defendant. *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006). *See also Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999).

#### 2. Transfer

The Court may transfer a civil action "[f]or the convenience of the parties and witnesses [and] in the interests of justice," to any other district court "where it might have been brought." 28 U.S.C. § 1404(a). "A motion to transfer venue requires a two-part inquiry: first, 'whether the action to be transferred "might have been brought" in the transferee court'; and second, whether 'considering the

13

"convenience of parties and witnesses," and the "interest of justice," a transfer is appropriate.' " *Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (citing *Berman v. Informix Corp.*, 30 F. Supp.2d 653, 656 (S.D.N.Y. 1998)).

When analyzing the second part of that inquiry, the courts generally weigh nine factors: "(1) the convenience of witnesses; (2) the location of relevant documents and relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interest of justice, based on the totality of the circumstances." *Walker v. Jon Renau Collection, Inc.*, 423 F. Supp. 2d 115, 117 (S.D.N.Y. 2005).

### B. This Action Should Be Dismissed for Lack of Personal Jurisdiction

#### 1. Penders is a resident of California and has No Particular Connection to the Southern District of New York

"The breadth of a federal court's personal jurisdiction is determined by the law of the state in which the district court is located." *Thomas v. Ashcroft*, 470 F.3d at 495 (citing *Henderson v. INS*, 157 F.3d 106, 123 (2d Cir. 1998)). In the State of New York, that law is codified at Civil Practice Law and Rules §§ 301-302.

As Archie itself sets forth (see Complaint, ¶2), Penders resides in California. While the address stated by Archie, 4526 Coldwater Canyon Avenue #303, Studio

City, CA, 91604-1066, is no longer correct, both that previous address and Penders' current address, 12147 Woodley Avenue, Granada Hills, CA 91344-2846, are located within the Central District of California.  Penders has resided in California since 2001, and in greater Los Angeles since 2006.  Decl. ¶6.  Prior to residing in California, Penders resided in Tonawanda, New York in the Western District of New York. Decl. ¶ 5.  Prior to that, Penders lived in the state of New Hampshire. Decl. ¶ 4.  Penders has never, at any time relevant hereto, resided in the Southern District of New York.

Penders is not subject to general jurisdiction in the State of New York, as he does not "do business in New York . . . with a fair measure of permanence and continuity." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000). Penders has no office in New York (Decl. ¶ 9), solicits no business in New York (Decl. ¶ 10), has no bank account or other property in New York (Decl. ¶¶ 7, 8), and has no employees in New York (Decl. ¶9). *Hoffritz for Cutlery, Inc. v. Amjac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985).

Additionally, Penders is not subject to specific jurisdiction under NY CLS CPLR § 302, because he does not currently transact, and for the past five (5) years has not transacted, any business within the State of New York, nor has he contracted anywhere to supply goods or services in the state. NY CLS CPLR § 302(a)(1).  See Decl. ¶ 10. Nor does Penders own, use, or possess any real property situated within the state. NY CLS CPLR § 302(a)(4); Decl. ¶ 7.

Further, Archie has not alleged that Penders committed a tortious act within the State of New York. NY CLS CPLR § 302(a)(2); see Complaint, ¶¶ 124-133.  Even assuming, *arguendo*, that Archie was correct in its claim that Penders had committed a tortious act without the state causing injury to Archie within the state, Penders does not regularly do or solicit business in New York, engage in any other persistent course of conduct in New York, derive substantial revenue from goods used or consumed or services rendered, in New York, nor does he derive substantial revenue from interstate or international commerce. NY CLS CPLR § 302(a)(3)(i)-(ii), see Decl. ¶ 11.

### 2. The Existence, and Terms, of the Contracts Containing the Forum Selection Clauses is Disputed

Archie asserts that Penders consented to personal jurisdiction in two agreements that Archie alleges exist between it and Penders, but Archie itself acknowledges that the validity of these agreements is in dispute. See Complaint, ¶¶ 39(a), 60.  Penders contends that these agreements are not authentic and were not knowingly executed by him.  See Decl. ¶¶ 62-65. Where such a factual dispute as to the existence and/or terms of a contract exists, the provisions of such a contract should not be enforced by the Court without the opportunity for additional discovery.  See, e.g., *Martin v. Citibank, N.A.*, 64 A.D.3d 477 (N.Y. App. Div. 1st Dep't 2009).

C.   **In the Alternative, this Action Should Be Transferred to the Central District of California**

1.   **This Action Could Have Been Brought in the Central District of California.**

In determining whether an action "'could have been brought' in another forum," the proper inquiry is whether "the defendant would have been amenable to personal jurisdiction in the transferee forum at the time the action was commenced and venue is proper there." *Invivo Research v. Magnetic Resonance Equip. Corp.*, 119 F. Supp. 2d 433, 436-437 (S.D.N.Y. 2000). Penders is a resident of California, within the personal jurisdiction of the Central District of California, and was such a resident at the time this action was filed, and therefore this action could have been brought in the Central District of California.

2.   **The Relevant Factors Weigh Strongly in Favor of Transferring This Action to the Central District of California**

a.   **The Central District of California is the Most Convenient Forum for the Witnesses Since Most of the Key Witnesses are Located in California or on the West Coast**

In evaluating a motion to transfer venue, "[t]he convenience of the witnesses is generally viewed as the most important factor." *Walker v. Jon Renau Collection, Inc.*, 423 F. Supp. 2d at 117. Nearly all of the likely key witnesses Penders has identified reside within the Central District of California, as set forth below. Even those witnesses who do not reside in the Central District of California reside in either a neighboring District, or in an adjacent state. While it is true that those witnesses will "have to travel regardless of the venue," *Herbert v. Elec. Arts, Inc.*, 325 F. Supp. 2d 282, 288 (S.D.N.Y. 2004), the Court is urged to consider the

17

considerable difference in convenience in traveling hundreds of miles, versus traversing the continent and several time zones; for example, witnesses from Oregon and Arizona would be more inconvenienced traveling to New York than to Los Angeles. See, e.g., *Guan Gao Co. v. Acco Brands Corp.*, 2007 U.S. Dist. LEXIS 17371 (S.D.N.Y. Mar. 8, 2007).

Additionally, "the court must qualitatively evaluate the materiality of the testimony that the witnesses may provide," and the "convenience of non-party witnesses generally carries more weight than the convenience of party witnesses." *Herbert*, at 286.

In this action, key issues include the existence and/or contents of the alleged contracts between Archie and Penders (Compl. ¶¶ 85-123), as well as ownership and/or infringement of the Copyrighted Works (Compl. ¶¶ 74-85). Thus, the key witnesses are those persons who can testify as to the existence and/or terms of the alleged contracts, and the creation and ownership of the Copyrighted Works.

To date, Penders has identified the following likely witnesses:

| Name | Location | Subject of Testimony |
|------|----------|----------------------|
| Larry Houston | Moorpark, CA | Pender's ownership and attempts to exploit the Copyrighted Works |
| Amber Greenlee | Murrieta, CA | Archie's standard practices with regards to contracts, especially pertaining to the SONIC titles |
| Bernadette Shahin | Granada Hills, CA | Particulars of document(s) executed between Penders and Archie |
| Scott Shaw | Sherman Oaks, CA | Archie's standard practices with regards to contracts, including those pertaining to the SONIC titles |

| Ken Mitchroney | Los Angeles, CA | Archie's standard practices with regards to contracts |
|---|---|---|
| Mike Kazaleh | Los Angeles, CA | Archie's standard practices with regards to contracts |
| Patrick Luque | Laguna Niguel, CA | Penders' creation / ownership of the Copyrighted Works |
| Elliot Maggin | West Hills, CA | Standard industry practices with respect to copyright ownership and contracts |
| Garrett Ho | Pasadena, CA | Archie's standard practices with regards to contracts |
| One or more SEGA of Amecia, Inc. representatives | San Francisco, CA | License agreements pertaining to Sonic character, including publishing agreement with Archie Comics; Penders' creation / ownership of the Copyrighted Works; other ownership and licensing of SONIC elements |
| Michael Gallagher | Arizona | Penders' creation / ownership of the Copyrighted Works; Archie's standard practices with regards to contracts, especially pertaining to the SONIC titles |
| Jim Valentino | Portland, OR | Penders' creation / ownership of the Copyrighted Works; Archie's standard practices with regards to contracts, especially pertaining to the SONIC titles |

There are a number of additional witnesses located within California, and in particular within the greater Los Angeles region, that are expected to testify about the standard practices of Archie Comics with respect to contracts; however, they have not been listed above because Penders is still in the process of identifying the full list of their names and addresses.

Because most of the key witnesses necessary for this litigation reside in the Central District of California, the most important factor – the convenience of non-party witnesses – warrants transfer of venue to the Central District of California.

19

### b.   Most Relevant Documents are Located in the Central District of California

The Court may also consider the location of the relevant documents in this case. In a situation where, as here, the current forum and the transferee forum are separated by thousands of miles, "'the location of relevant documents and relative ease of access to sources of proof,' loom[s] large." *Amersham Pharmacia Biotech v. Perkin-Elmer Corp.*, 11 F. Supp. 2d 729, 730 (S.D.N.Y. 1998).

In the instant case, all: (a) original works of authorship including preliminary materials; (b) copyright applications, registrations, and related documents; (c) physical artwork; (d) receipts; (e) payment vouchers from Archie and other companies; (f) relevant correspondence; and (g) the documents in the possession, custody, and control of the witnesses residing in California, are all located within the Central District of California. Decl. ¶¶ 69-70.

Accordingly, this factor also weighs in favor of transferring venue to the Central District of California.

### c.   The Locus of Operative Facts is in California

An additional factor the Court may consider is "the locus of operative facts." *Walker*, 423 F. Supp. 2d at 117. Injury in copyright matters occurs "where the copyrights are owned," *Capitol Records, LLC v. VideoEgg, Inc.*, 611 F. Supp. 2d 349, 368 (S.D.N.Y. 2009). Archie does not allege ownership, but describes its "licensing relationship with Sega of America, Inc." Compl. ¶ 17. Sega of America, Inc. is a California corporation, located in San Francisco.

Additionally, because Penders' "allegedly infringing activities, occur[red] largely in California, [and Penders] is located in California," the locus of operative facts is in California. *Cartier v. D & D Jewelry Imps.*, 510 F. Supp. 2d 344, 346-347 (S.D.N.Y. 2007).

This factor should weigh in favor of transferring this matter to the Central District of California.

### d.    The Central District of California is a Convenient Forum for the Parties

A further factor the Court may weigh is the "the convenience of the parties." *Walker*, 423 F. Supp. 2d at 117. Here, Penders will be severely inconvenienced by the matter remaining with the Southern District of New York and not being transferred to the Central District of California.

### e.    There Are Important Non-Party Witnesses Who Reside in the Central District of California Who Are Outside the Subpoena Power of the Southern District of New York

Another factor the Court should consider is "the availability of process to compel the attendance of unwilling witnesses." *Walker*, 423 F. Supp. 2d at 117.  As set forth in greater detail in §5b, *supra*, there are a significant number of non-party witnesses who reside in the Central District of California.  These witnesses are outside the subpoena power of this Court because they do not live within the Southern District of New York and do not reside "within 100 miles" of the Southern District of New York, per the requirements of FRCP 45(b)(2).  However, these witnesses could be subpoenaed for trial should venue be transferred to the Central District of California, as the witnesses would then reside within the district.

21

Given that "[t]he Second Circuit has held that a witness's live in-court testimony is the preferred method of presenting his or her testimony," *Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 769 (S.D.N.Y. 2006), and given the large number of non-party witnesses Penders has already identified, this factor weighs heavily towards a transfer of venue to the Central District of California.

> **f.   Archie has the Means to Litigate in the Central District of California; Penders does not have the Means to Litigate in the Southern District of New York**

An additional factor the Court should weigh is "the relative means of the parties." *Walker*, 423 F. Supp. 2d at 117.  In the instant matter, the plaintiff describes itself as "one of the most successful, longest running brands in the history of the comic industry," Compl. ¶ 10.  Archie has operated for "many decades," Compl. ¶¶ 11-12, has amassed a "vast library of [invaluable] intellectual property," Compl. ¶¶ 13, 16, and "has sold over 1.5 billion comics . . . all over the world," Compl. ¶ 15.

Conversely, Penders works as "an independent contractor," Compl. ¶ 19, is currently unemployed and is a man of extremely limited means. Decl. ¶ 71.  Penders' net worth is less than five hundred dollars (<$500.00).  Decl. ¶ 71.  Although his financial situation may change if he obtains new work assignments, as a freelancer Penders has no guarantee of steady work.  Further, comic book freelancers are generally not well compensated as the comic book industry has seen steady declines in sales over the past 2 decades.  Litigating this matter in the

Southern District of New York would be significantly more inconvenient and expense, and would impose a financial hardship on Penders due to the added costs for travel, lodging and local counsel's involvement.  See *Walker v. Jon Renau Collection, Inc.*, 423 F. Supp. 2d at 118.  Unlike Archie Comics, a substantial company, such added expenses cannot easily be borne by Penders.

As the relative means of the respective parties are so starkly contrasted, this factor must weigh in favor of a transfer to Penders' home forum, the Central District of California.

### g.   The Central District of California Has Experience Handling Copyright Lawsuits

The Court should also consider each "forum's familiarity with the governing law" at issue in this matter.  *Walker*, 423 F. Supp. 2d at 117. Because copyright law is federal, and, pursuant to 28 U.S.C. § 1338, exclusively handled by federal district courts, every district court is *per se* capable of hearing this matter.

However, the Central District of California is particularly experienced in copyright law, and possesses a familiarity that is as wide as it is deep. Because the Central District of California includes the principal places of business of each of the major motion picture studios, as well as those of a wide variety of other content producers, the Central District of California routinely interprets copyright law in highly technical and nuanced matters. See, e.g., *Effects Assoc., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990); *L.A.Times v. Free Republic*, 98-cv-7840 (C.D. Cal. Mar. 31, 2000); *Chase-Riboud v. Dreamworks Inc.*, 987 F. Supp. 1222 (C.D. Cal. 1997); *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 606 F. Supp. 1526 (C.D. Cal. 1985);

*Columbia Pictures Indus. v. Miramax Films Corp.*, 11 F. Supp. 2d 1179 (C.D. Cal. 1998); *Maljack Productions v. UAV Corp.*, 964 F. Supp. 1416 (C.D. Cal. 1997); *Trenton v. Infinity Broadcasting Corp.*, 865 F. Supp. 1416 (C.D. Cal. 1994); *Midas Productions, Inc. v. Baer*, 437 F. Supp. 1388 (C.D. Cal. 1977); *James W. Newton v. Diamond*, 204 F. Supp. 2d 1244 (C.D. Cal. 2002); and *Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.*, 900 F. Supp. 1287 (C.D. Cal. 1995).

Accordingly, the Central District of California is a compelling forum for hearing a copyright case, and this factor should be weighed appropriately.

### h.   Transferring the Case to the Central District of California Would Promote Judicial Efficiency

A final factor the Court should consider is that of "trial efficiency and the interest of justice, based on the totality of the circumstances." *Walker*, 423 F. Supp. 2d at 117.  As Archie has only just served its complaint against Penders, the Court has not yet made "'a significant investment . . . in this case in terms of either time or work,'" as "this case is still in the beginning stages." *Walker*, at 119.  As there would be no duplication of effort if the instant case were to be transferred to the Central District of California, this factor also weighs in favor of such a transfer.

### 3. Transfer to the Central District of California is Warranted Here, Because it is the Most Appropriate Forum

It is within the Court's discretion to weigh the factors discussed herein, *supra*, to determine whether to transfer this matter to the Central District of California.  Penders performed a substantial portion of the acts of creation, and all of the acts of registration, that are at issue in this matter, in California, and that is

where many of the key witnesses and most of the documents are located.  Moreover, Penders is an individual of extremely limited means, whereas Archie is a corporation of substantial means.  Absent a transfer to the more appropriate and convenient venue, Penders likely will not be able to continue in this litigation, thus denying him the access to justice § 1404 seeks to preserve.

## IV.    CONCLUSION

For the foregoing reasons, Penders respectfully requests that the Court grant his motion to dismiss or, in the alternative, to transfer venue to the United States District Court for the Central District of California.

Dated: February 8, 2011                              LYSAGHT, LYSAGHT & ERTEL LLP

New York, New York

By     
Michael R. Ertel (ME-7146)
230 Park Avenue, Tenth Floor
New York, NY 10169
Tel:    (212) 808-3004
Fax:   (212) 808-3020
mertel@lysaghtlaw.com

*Attorneys for Defendant*
*Kenneth W. Penders, II*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of February, 2011, a copy of the foregoing Motion to Dismiss Complaint for Lack of Personal Jurisdiction, or in the Alternative to Transfer Proceedings, the Memorandum in support, the Declaration of Kenneth Penders, and the proposed Order, were sent via first-class mail to:

Matthew C. Wagner
Diserio Martin O'Connor & Castiglioni LLP
50 Main Street, Suite 1000
White Plains, NY 10606

Counsel for Plaintiff