UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARCHIE COMIC PUBLICATIONS, INC.<br><br>Plaintiff,<br><br>v.<br><br>KENNETH W. PENDERS, II,<br>p/k/a KEN PENDERS,<br><br>Defendant. | Case No. 10 CV 08858<br><br>Judge: Hon. Richard M. Berman |

**DECLARATION OF KENNETH W. PENDERS, II**

I, Kenneth W. Penders, II, hereby state as follows:

1. I submit this declaration in support of defendant's Motion to Dismiss for Lack of Personal Jurisdiction, or in the Alternative to Transfer Proceedings.

2. I have personal knowledge of the following, and if called as a witness I could and would testify competently thereto.

3. I am a California citizen presently residing at 12147 Woodley Avenue, Granada Hills, California 91344-2846.

4. From 1985 until May of 1994, I resided in New Hampshire where I lived with my wife and son at 616 Fox Hollow Drive, Hudson, NH, which I owned until I signed the deed to the property over to my ex-wife during final divorce proceedings on September 9, 1994.

5. Following my divorce, I moved on May 24, 1994 to N. Tonawanda, New York.

6. In November, 2001, I moved to Temecula, CA, eventually moving to greater Los Angeles, California in 2006, where I have resided ever since.

7. I do not now, nor have I ever, owned property in the state of New York.

8. I have no bank accounts or any other assets in New York.

9. I have no offices in New York, and I have no employees in New York.

10. I have no ongoing or current contracts with New York, and I have not solicited business in New York since late 2005.

11. I do not regularly do business in New York, solicit business in New York, derive substantial revenue from goods used or consumed or services rendered in New York, nor do I derive substantial revenue from interstate commerce or international commerce.

12. I have been a professional commercial and technical illustrator since 1974.

13. From March 6, 1976 through December 14, 1979, I served as a technical illustrator in the United States Air Force, during which period I produced charts, graphics and text slides used in briefings to the Joint Chiefs of Staff, members of both Houses of Congress, Foreign Heads of State, and the President of the United States.

14. Since September, 1986, I have been a freelance writer and illustrator in a variety of mediums, including in the comic book industry. During that time, I have worked as a freelance writer and artist for a number of different publishers in the comic book industry, including DC Comics, Marvel Comics, Image Comics, Archie Comic Publications, Hero Comics, Entertainment Publishing, Now Comics, Eclipse Comics, Malibu Comics and Disney.

15. During my career in the comic book industry I have worked on many different titles and properties, including stories involving characters owned by the comic book companies themselves, and stories involving licensed properties such as “Star Trek,” “Star Trek: The Next Generation,” “Star Trek: Deep Space Nine,” “The Man From U.N.C.L.E.,” “Advanced Dungeons and Dragons,” “Green Hornet” and “Sonic the Hedgehog”.

16. On information and belief, at some point in time during 1992, Archie Comics obtained a license to publish comic books based on the SEGA video game character "Sonic the Hedgehog."

17. The first Sonic comic book series produced by Archie was a mini-series that was published monthly from November 1992 until February 1993.

18. Starting in May 1993, Archie began publication of an ongoing Sonic comic book series, and later published the Knuckles the Echidna spin-off series, as well as a number of related mini-series, one-shots and specials (collectively, the "Sonic Comics").

19. In October 1993, my friend Mike Kanterovich came to me, telling me he was approached by Paul Castiglia, the editor at that time of the Sonic Comics, who advised that the current writer for the Sonic Comics might be leaving and Archie was looking for some inventory stories to have on hand as a back-up precaution. Kanterovich told me that Castiglia offered him the opportunity to submit story ideas for potential assignments.

20. Unfortunately for him, Kanterovich knew little or nothing about the character or the comic books, and so he reached out to me because he was aware that I knew a great deal about the character since the "Sonic the Hedgehog" video games, Sonic Comics and "Sonic the Hedgehog" television shows were favorites at that time of my young son Stephen.

21. Kanterovich and I spoke about the Sonic Comic opportunity, and I provided Kanterovich with information on the characters. As our discussions continued, Kanterovich suggested that we work together on story ideas to pitch to Archie for publication in the Sonic Comics.

22. Initially, we prepared and submitted three story ideas to Castiglia for approval during the second half of October 1993. All three stories were submitted by Archie to SEGA for approval, and two of the three were eventually approved by SEGA and Archie.

23. This method of working on a comic book was different than I was used to doing with other publishers. Specifically, rather than receiving a specific assignment, Archie invited us to pitch story ideas, which they would either accept or reject.

24. Unlike my experience of submitting scripts at any other comic book publisher, Castiglia insisted we submit our scripts in full panel page layout form, clearly depicting everything in a rough visual format rather than in normal text format. We were paid no additional money for producing these story layouts, despite the additional time and effort it required, and received no credit or acknowledgement for them in the published works.

25. Once the two story ideas were approved by SEGA and Archie, we worked together on full story scripts for those ideas. The first two stories authored by me and Kanterovich appeared in issue #11, cover dated June 1984, released in March 1994.

26. Following acceptance of the first group of story ideas, Kanterovich and I began to work on additional story synopses for submission to Castiglia, which additional stories similarly were approved by Archie and SEGA.

27. Shortly thereafter, we met with Castiglia in person for the first time at the Archie Comics offices. During the visit, we bumped into Archie Comics publishers Michael Silberkleit and Richard Goldwater. When Castiglia introduced us, they joked that Kanterovich and I would be the new regular writers for the Sonic Comics.

28. Despite any statements made during that visit, there was at no time any official undertaking by Archie to formalize our working arrangements, and no guarantee of future work for the Sonic Comics.

29. Further, there was no written understanding between Archie and either myself or Kanterovich concerning our freelance work on the Sonic Comics.

30. In early 1994, Castiglia was promoted at Archie and thus replaced as editor on the Sonic Comics by Scott Fulop.

31. One of the first assignments offered to us by Fulop was to write a story introducing the “Knuckles the Echidna” video game character into the Sonic Comics continuity, intended to be a try-out for such character.

32. The Knuckles story appeared in issue #13, cover dated August 1994, released in May 1994. Although SEGA was initially skeptical of the idea, the story proved popular. Eventually, I would be given the chance to script and illustrate many more stories featuring the Knuckles character, eventually leading to a Knuckles mini-series and then a full monthly Knuckles comic book series that continued for nearly 3 years.

33. In or around March, 1994, I convinced Fulop to allow the Sonic Comics to more closely align with the “Sonic the Hedgehog: The Animated Series” Saturday morning cartoon series, which series aired on ABC from September 1993 until May 1995.

34. As a result of this change, the stories in the Sonic Comics took a new direction, introducing new characters and new worlds. Additionally, the stories were structured to establish and build an ongoing logic and continuity. The series also began to use a new format, namely book-length stories and eventually multi-issue storylines.

35. In late 1994, Kanterovich advised me he was no longer interested in working on every one of the Sonic Comics stories, and so I began to work on solo scripts for the Sonic Comics. Although we continued to collaborate on stories, I began to write solo stories with increasing frequency.

36. In addition, in mid-1995, I began to provide full pencil artwork for the Sonic Comics, at first for covers and then interior artwork.

37. At all times through this period, I was working for Archie as a freelancer with no contract. The only Archie-generated documents that were being signed by me that pertained to the work I created were pay vouchers and checks which I endorsed.

38. None of the Archie pay vouchers contained any legal language, or made any reference to ownership or transfer of copyright rights in the materials that I was producing for the Sonic Comics.

39. Additionally, none of the checks that I received from Archie in payment for my work contained any legal language concerning copyright rights or a transfer of my rights to Archie.

40. The only other Archie Comics document that I was asked to sign in 1996 was a group health care election document whereby I elected to waive group health care coverage. The health care election document was a single page document that did not include any other legal language. The document I received had not yet been signed on behalf of Archie Comics.

41. Because the manner in which Archie Comics treated the submission of creative works was entirely different than any other comic book publisher for whom I had worked, I understood that there was no transfer of my rights in the stories I pitched, whether or not they were accepted by Archie Comics for publication. As a result, my enthusiasm for working on the

Sonic Comics continued to grow as I introduced new concepts, story ideas and characters, all of which I believed I owned as their creator.

42. In the summer of 1995, Fulop advised me that both the Saturday morning animated series and the syndicated weekday Sonic animated television series were being cancelled. Because comic books licensed from another media (such as television) historically were cancelled within 8-12 months once the original media was no longer in the public spotlight, Fulop told me that Archie expected the Sonic Comics comic book series would be cancelled within the next year.

43. Undeterred, I continued to innovate with my work on the Sonic Comics, creating additional new characters and storylines, including perhaps the most renowned storyline for the entire series titled “Endgame”, which appeared in issues 47-50. This storyline was initially conceived as the last story in the series, featuring the character’s final battle against his greatest enemy.

44. Despite Archie’s fears, however, the Sonic Comics proved to be the exception to the licensed comic book rule, and actually saw sales increase after the animated shows were taken off the air. As a result, I rewrote the original conclusion of the “Endgame” story thereby allowing the series to move forward rather than terminating.

45. I continued to work on the Sonic the Hedgehog comic book series and related titles until late 2005. My last story for the Sonic Comics appeared in issue 159, published in early 2006.

46. During my many years of working for comic book companies such as Marvel Comics and DC Comics, I came to understand the industry-standard method undertaken by publishers working with freelancers on company-owned and licensed titles.

47. Specifically, freelancers were advised in advance by those companies that they were being hired to produce creative works on a "work made for hire" basis, and that any work created and submitted to the publisher (each a "Work") was understood to be "work made for hire". Once each Work (or portion thereof) was completed and submitted to the publisher that had commissioned the work, a creator was required to sign a voucher for payment, and that voucher (or at one time the backs of the paychecks) contained agreement language whereby the creator confirmed that (i) the Work which had been created was a "work made for hire" and (ii) in the event such Work did not qualify as a "work made for hire," the creator was thereby assigning all copyright rights in such Work to that publisher.

48. At no time while I worked on the various Sonic Comics titles did Archie follow this manner of doing business.

49. When I first submitted stories ideas to Castiglia in 1993, there was no discussion with him or anyone else at Archie concerning the issue of ownership or the concept of "work made for hire". This was understandable since there was no guarantee that any of my story ideas would be accepted by Archie and SEGA for use in the Sonic Comics. In fact, a number of my story ideas were rejected.

50. Additionally, the pay vouchers used by Archie and which I signed and submitted for payment for each of the Sonic Comic stories I worked on contained no legal language whatsoever.

51. Neither the payment vouchers nor the checks issued by Archie contained any language pertaining to copyright, ownership, assignment, transfer or "work made for hire". Nor did any correspondence concerning any of my story ideas or the approvals for the same refer to such terms or language.

52. Further, none of the artwork returned to me between 1995 and 2006 contained any copyright notice or copyright language stamped on them to indicate ownership by any entity other than the creator(s) of such artwork, namely, me. It was only after I ceased working on the Sonic Comics that artwork was returned to me containing any copyright notice or copyright language stamped on the back.

53. During the time that I was primarily associated as a freelancer for Archie Comics, I completed several assignments for other publishers including Malibu and Disney, all of whom submitted written contracts prior to my commencing any work. The multi-page documents I signed required my initials on each page of the contract and a full signature on the final page, which were then initialed and counter-signed by the publisher or editor.

54. I have also conversed with numerous creators involved in the first few years of publication of the Sonic Comics and I have been advised by each of these creators that they had never been asked to execute any "work made for hire" agreements nor asked to sign any assignment documents.

55. I have also spoken with former editor Justin Gabrie, who was editor on the Sonic Comics from 1996 until 2004, and he advised me that he had approached the publishers of Archie Comics with the suggestion that "work-for-hire" language be included in both the pay vouchers and checks, and was told by the publishers such action was not necessary.

56. In the fall of 2008, I became aware of a video game produced under license from SEGA titled "SONIC CHRONICLES: THE DARK BROTHERHOOD" which contained and/or referenced a number of my characters, settings and stories from the Sonic Comics (hereinafter, the "Infringing Game").

57. After seeing that my characters and other intellectual property were being used without my permission, I consulted with an attorney about my rights and any possible remedies relating to the Infringing Game.

58. I came to understand that in order to seek remedies through the courts, it would be necessary to obtain copyright registrations for my works. In November 2008, I therefore began the process of compiling the information and materials necessary to undertake the registration of my numerous Sonic Comics works.

59. Before undertaking these Copyright Office filings, I wanted to make absolutely certain of my position as the owner of all rights in the works I created which were published in the Sonic Comics. I therefore telephoned Victor Gorelick, editor-in-chief of Archie Comics, in December 2008. During that conversation, I requested that Archie (i) return to me original artwork still in its possession, and (ii) provide me with copies of any agreement I may have signed with Archie Comics relating to any of the freelance work I did for them. Gorelick told me that no such documents existed.

60. Following our December 2008 telephone conversation, I reached out to Gorelick several more times by e-mail and telephone seeking written confirmation that no documents existed, but Gorelick never provided the requested written confirmation, nor returned my original art to me.

61. Nonetheless, with Gorelick's confirmation that there were no agreements between myself and Archie Comics that impacted on my ownership of all copyrights in the works I created for the Sonic Comics, I proceeded with the copyright application filings.

62. I have reviewed the documents attached to the Complaint as Exhibit A and Exhibit B and do not believe them to be authentic for a number of reasons. First, the signatures

are not believed by me to be authentic. Second, I have no record of ever receiving documents in 1996 from Archie, nor any recollection of the same. Third, I have no copies of these signed documents in my records – when I receive a document that has already been signed by the other party, it is my normal business practice to make a copy of the fully-executed agreement before returning the document to them.

63. I also don't believe these are authentic because I would never have signed a document that had blanks, such as Exhibit B. Additionally, while I did receive a waiver of group medical insurance, that waiver was a single page document and had no additional pages or legal language concerning ownership or transfer of rights.

64. These documents are also suspect because they were not previously produced. First, when I requested copies of any contracts or documents, I was told none exist. Then during the copyright application process, the Copyright Office sent a notice to Archie Comics and SEGA advising them of my copyright claims, but Archie took no steps to object to the applications, and failed to provide the Copyright Office with copies of any agreements that would dispute my ownership. This was confirmed to me via e-mail on May 21, 2010 by William J. Briganti, Assistant Chief of the Visual Arts and Recordation Division at the Copyright Office.

65. On information and belief, I never knowingly signed either of the documents attached to the complaint as Exhibits A and B.

66. My discussions with other creators that worked on the either the Sonic Comics or other licensed comic book series for Archie Comics, such as the Teenage Mutant Ninja Turtles series, reveals that all or most of the freelance creators who worked on the Sonic Comics during the period when I worked for Archie Comics did not sign work-for-hire agreements with Archie Comics.

67. Among the likely witnesses that would testify that Archie Comics did not routinely require its freelance creators to sign work-for-hire agreements or assignments of their copyright rights are the following individuals who reside in California or on the West Coast:

| **Name** | **Location** | **Subject of Testimony** |
|---|---|---|
| Larry Houston | Moorpark, CA | Pender's ownership and attempts to exploit the Copyrighted Works |
| Amber Greenlee | Murrieta, CA | Archie's standard practices with regards to contracts, especially pertaining to the SONIC titles |
| Bernadette Shahin | Granada Hills, CA | Particulars of document(s) executed between Penders and Archie |
| Scott Shaw | Sherman Oaks, CA | Archie's standard practices with regards to contracts, including those pertaining to the SONIC titles |
| Patrick Luque | Laguna Niguel, CA | Penders' creation / ownership of the Copyrighted Works |
| Elliot Maggin | West Hills, CA | Standard industry practices with respect to copyright ownership and contracts |
| Garrett Ho | Pasadena, CA | Archie's standard practices with regards to contracts |
| Ken Mitchroney | Los Angeles, CA | Archie's standard practices with regards to contracts |
| Mike Kazaleh | Los Angeles, CA | Archie's standard practices with regards to contracts |
| One or more SEGA representatives | San Francisco, CA | License agreements pertaining to Sonic character, including publishing agreement with Archie Comics; Penders' creation / ownership of the Copyrighted Works; other ownership and licensing of SONIC elements |
| Michael Gallagher | Arizona | Penders' creation / ownership of the Copyrighted Works; Archie's standard practices with regards to contracts, |

| | | |
|---|---|---|
| | | especially pertaining to the SONIC titles |
| Jim Valentino | Portland, OR | Penders' creation / ownership of the Copyrighted Works; Archie's standard practices with regards to contracts, especially pertaining to the SONIC titles |

68. There are additional witnesses in and around Los Angeles that I am in the process of contacting, including several that currently do work for Archie Comics, who I expect will be sought for deposition or subpoenaed to testify and who likewise can speak to Archie Comics' standard practices with regards to contracts, including those contracts pertaining to the Sonic Comics publications.

69. All of my documents, materials and things pertinent to this case, including freelance contracts, payment vouchers from Archie, payment vouchers from other comic book publishers, correspondence, copyright application files, copyright registrations and deposit materials, original works of authorship, scripts, outlines, story layouts, sketches, receipts, shipping records, phone records, physical artwork, models, and related documents are located in Granada Hills, California.

70. In addition, the relevant documents, materials and physical things in the possession of the witnesses identified above would be located in California or along the West Coast.

71. As an independent contractor and creator, I currently find myself with limited liquid assets and with limited means to fund or participate in litigation in New York. I currently have less than $500 in my bank accounts, and I currently have no form of income other than

unemployment. The costs associated with having to travel to and stay New York City connected to this lawsuit would pose a hardship to me under my current financial circumstances.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of February, 2011 in Granada Hills, California.

Kenneth W. Penders, II