UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARCHIE COMIC PUBLICATIONS, INC., | Case No.: 10-CV-8858 (RMB) |
| Plaintiff, | Judge: Hon. Richard M. Berman |
| vs. | |
| | <u>PRE-TRIAL ORDER [PROPOSED]</u> |
| KENNETH W. PENDERS, II, *a/k/a* KEN PENDERS | |
| Defendant. | |

Plaintiff/Counterclaim Defendant, Archie Comic Publications, Inc. ("Plaintiff" or "ACP"),

and Defendant/Counterclaim Plaintiff Ken Penders ("Defendant" or "Penders"), by and through

their attorneys, respectfully submit the following proposed pretrial order pursuant to the

Individual Practices of the Hon. Richard M. Berman and Fed. R. Civ. Proc. 26(a)(3).

**I.    <u>TRIAL COUNSEL</u>**

    **a.  Plaintiffs/Counterclaim Defendant:**

Matthew C. Wagner (mwagner@dmoc.com)
Scott Harrington (sharrington@dmoc.com)
Jonathan Longobardi (jlongobardi@dmoc.com)
DISERIO MARTIN O'CONNOR & CASTIGLIONI, LLP
50 Main Street, Suite 1000
White Plains, NY 10606
(914) 684-0090 Tel
(914) 684-0590 Fax

    **b.  Defendant/Counterclaimant:**

Phillip J. Daman (phillip.daman@damanllc.com)
Andre St. Laurent (andre@damanllc.com)
Daman L.L.C.
17383 Sunset Boulevard, Suite A340
Pacific Palisades, California 90272

Tel. (310) 431-9628
Fax. (462) 645-0754

II.    **SUBJECT MATTER JURISDICTION**

This Court has original jurisdiction over this action under 28 U.S.C. §1331 as it involves

claims arising under the Declaratory Judgment Act, 28 U.S.C. § 2201.  This Court has

supplemental jurisdiction over the asserted common law claims pursuant to 28 U.S.C. §1367(a),

because such claims are so related to those claims under which the Court has jurisdiction that

they form part of the same case and controversy under Article III of the United States

Constitution.

Alternatively, this Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a)(1),

as the Parties are presently citizens of different States, and the amount in controversy exceeds

the sum or value of $75,000 exclusive of interest and costs.

III.    **BRIEF SUMMARY OF THE PARTIES' CLAIMS AND DEFENSES TO BE TRIED**

a.  **Plaintiff's Claims**

ACP alleges as follows:

ACP was founded in 1939 by Maurice Coyne, Louis Silberkleit, and John L. Goldwater

and has grown into one of the most successful, longest running brands in the history of the

comic industry.  ACP is best known for its series of comics featuring the fictional characters

created by its founders: Archie Andrews, Betty Cooper, Veronica Lodge, Reggie Mantle and

Jughead Jones.  ACP's comic enterprise has developed robustly over the years and now includes

many additional characters and comics outside of the characters first created some eighty years

ago.

In 1992, ACP entered into a licensing relationship with Sega of America, Inc. ("Sega"), to produce, among other things, comic books which feature Sega's immensely popular character SONIC THE HEDGEHOG, and all related ancillary characters, such as KNUCKLES THE ECHIDNA ("Sonic Comic Book Series").  ACP's relationship with Sega continues to this day, and now includes digital distribution rights.

From 1993 to 2005, Penders worked for ACP as an independent contractor and developed for ACP, stories, scripts, artwork, and other original creative expressions fixed in tangible form (individually a "Work" and collectively "Works") as contributions to the Sega Comic Book Series.  Penders was paid in full for his work.

The relationship between Penders and ACP was memorialized in written agreements, executed in 1996.  In multiple December 2008 emails, Penders admitted he executed a "work-for-hire agreement" with ACP.  In fact he executed two agreements: Revised Newsstand Comic Independent Contractor's Agreement ("Contractor's Agreement"); and ACP Licensed Comic Books Independent Contractor's Agreement ("Licensed Comic Books IC Agreement") (the Contractor's Agreement and the Licensed Comic Books IC Agreement collectively referred to as the "ACP-Penders Agreements").[1]

As the ACP-Penders Agreements make clear, all Works supplied by Penders to ACP were commissioned by ACP from Penders as works-made-for-hire (as that term is used in the Copyright Act).  In the alternative, and to the extent that any Work fails to qualify as a work-made-for-hire under the U.S. Copyright Act, Penders agreed in the ACP-Penders Agreements to assign, and did assign, all right, title and interest in and to each Work and all of the Works to

---

[1] The ACP-Penders Agreements are attached to the Complaint (D.E. 1) as Exhibits A and B.

ACP.  The ACP-Penders Agreements also obligated Penders to execute any documents needed to confirm that any specific Work and all of the Works are works-made-for-hire and/or to effectuate the assignment of his rights, if any, to ACP, in order for ACP to obtain copyright, trademark or patent protection for any of the Works.

All Works supplied by Penders to ACP were governed by the ACP-Penders Agreements. Paragraph 5 of the Contractor's Agreement provides for a fixed sum of compensation for each assignment and clearly states that Penders would not be entitled to any additional compensation, including for reprints.  Penders was paid in full by ACP for each of the Works at the time of delivery, many years ago.

Beginning in about January 2009, a full fifteen years after he penned his first contributions to the Sonic Comic Book Series and contrary to the ACP-Penders Agreements, which contain signatures and dates that match numerous other documents signed by Penders, he began filing numerous applications with the U.S. Copyright Office to register each of the Works he supplied to ACP in his own name personally and claimed ownership of each of the Works, listing himself as the "Author" and "Copyright Claimant" for each of the Works.  Penders filed at least one-hundred-seventy-one (171) copyright registrations with the U.S. Copyright Office between 2009 and 2010.

In July 2010, Penders, through his lawyer, then accused ACP of infringing his copyrights. ACP sent Penders copies of the ACP-Penders Agreements, and demanded he cease and desist from his actions in violations of the agreements.  After written correspondence was exchanged for several months, Penders continued his charge of infringement and threats of filing a lawsuit. It became clear that unless ACP acquiesced to Penders demands, that he would file suit against

ACP.  ACP feared they would be unfairly sued for copyright infringement.  Accordingly, ACP filed this action on November 25, 2010, seeking cancellation of the registrations, declaratory judgment and remedies for breach of contract and tortious interference.

The asserted registrations were registered more than five years after first publication of the subject work.  None of the asserted registrations may be considered to be prima facie evidence of the validity of the copyright and the facts stated in the certificates.  17 USC 410(c). None of the asserted registrations include a statement that the subject work was made for hire, as required by 17 USC 409(4), and each was registered more than three (3) months after first publication of the subject work (17 USC 412).  Each of asserted registrations are for Works supplied by Penders to ACP from as early as 1993, seventeen (17) years ago; in all the years since that time until 2010, Penders never claimed any ownership in any of the works, or sought copyright registration, or made any demands upon ACP for any further compensation for use and exploitation of any of the Works.  Penders was not entitled to any ownership interest in any of the Works, or to any additional compensation for use and exploitation of any of the Works, and he knew this plainly at the time the Works were delivered to ACP and when he accepted payment from ACP in exchange for the Works.

Specifically, ACP's complaint alleges five claims for relief against Penders:

Claim 1 is for Declaratory Judgment that the ACP-Penders Agreements are valid and enforceable, and that ACP does not infringe the Works or registrations asserted by Penders in his threats of suit and accusations against ACP.  This claim arises under the Declaratory Judgment Act, 28 U.S.C. § 2201.

Claim 2 is for Declaratory Judgment, again arising under 28 U.S.C. § 2201, that the asserted registration should be canceled, and other relief consistent with the terms of the ACP-Penders Agreements.  Penders' acts and conduct were in derogation of the contractual terms of the ACP-Penders Agreements, and he made false statements in the applications, claiming to have written transfer agreements with co-authors, when in fact he did not.  The registrations are therefore invalid and should be canceled.  "[W]hen a court is convinced that a registration should be canceled, it should hold the registration invalid, and order the holder of the certificate to request the Copyright Office to cancel the registration.  Such an action does not require an affirmative action by the Copyright Office.  If the holder of the certificate fails to request cancellation by the Copyright Office, that party may be held in contempt."  5 *Patry on Copyright* § 17:108.

Claims 3 and 4 are for breach of the Contractor's Agreement and Licensed Comic Books IC Agreement (the ACP-Penders Agreements) under New York law.  The ACP-Penders Agreements both grant to ACP all right, title and interest in any Works supplied by Penders to ACP as a work-made-for-hire, or in the alternative, to the extent any Work fails to qualify as a work-made-for-hire, Penders agreed to, and did, assign all right, title and interest in each Work to ACP under the terms of that agreement.  By virtue of the acts and conduct described above, Penders has materially breached the ACP-Penders Agreements.  Penders' claims of ownership, authorship, or of any copyright right in the Works, applications for and maintenance of the copyright registrations constitute material breaches of his obligations.  Penders has used or reproduced the Works, prepared works which are substantially similar to the Works, and parodied the Works.  These are all in breach of the agreements.

Furthermore, any compensation for reprints under the ACP-Penders Agreements are to be paid at ACP's sole discretion, and Penders' demand for information from ACP relating to reprints of the Works and any ancillary products based on the Works is a violation of the terms of the agreements.

ACP has requested Penders to cease all acts and conduct in derogation of the ACP-Penders Agreements, and take such actions which he is required to do, but Penders has refused to do so. ACP has no adequate remedy at law to redress Penders' continued breaches. On this basis, ACP requests relief in the form of damages for breach of the ACP-Penders Agreements (respectively in Claims 3 and 4) and specific performance from Penders in compliance with the terms thereof.

Claim 5 was for intentional interference with contractual relations, namely Sega. Since the time discovery closed in this matter, Sega and ACP have renewed their agreement. ACP has therefore agreed to withdraw this claim.

**b. Defendant's Defenses**

The basic premise of Defendant's defense is that he retains ownership of the copyright and associated rights to all of the Works and that he, not ACP, is the true, rightful and legal owner of the copyrights at issue in this matter. Both the Newsstand and Licensed Comic Book Agreements fail in whole or pertinent part because:

(1) The documents do not meet the basic standards of offer, acceptance, consideration and mutual assent of the parties required for contract formation

(2) The documents purport to control subject matter which is beyond the scope of the "work for hire" exception as defined by the Copyright Act, 17 U.S.C. § 101

(3) The documents fail to comply with the requirements necessary to validly create a "work for hire contract" to the extent retroactive, "blanket assignments" lack specificity, are ambiguous and are unenforceable;

(4) The documents fail to comply with requirements necessary to create a valid assignment.

Lastly, and again assuming *arguendo* that these two contracts Plaintiff ACP are deemed valid and enforceable, Penders maintains that he is still the rightful copyright owner of a large subset of the work he submitted to ACP to the extent  such work:

(1)  Pre dates the purported dates of execution on these agreements (all work from

1993- 1996 work) and/or ;

(2)  He was never paid for this subset of the work he produced.

Penders further maintains that any arguable copyright ACP may have are cancellable under section 203 of the Copyright Act.

The Revised Newsstand Independent Contractor's Agreement and the ACP Licensed Comic Books Independent Contractor's Agreement are Not Authentic.

Archie is relying on the two above-noted documents, the validity and enforceability of these documents are disputed for a number of reasons.

*Penders Never Signed the Documents*

First, these documents are not authentic as they were never executed by Penders. Despite ACP's current argument and the language of the proffered documents, it was not common practice at ACP during this time to require Penders nor any other of the SONIC Freelancers to sign such documents.  In fact, several of Penders' witnesses are similarly

situated freelance employees who worked on SONIC, and will state, like Penders, that they all worked as freelancers without contracts for many years, and overlapping with the time that Penders worked on Sonic.

Despite its assertions that the above referenced independent contractor's documents are genuine, ACP has been unable to produce any original copies of the either contract. Initially, Penders contacted Justin Gabrie, his editor at the time the documents were allegedly executed, who stated in writing that he had sent no such documents to either Penders or any other freelancer submitting work to the Sonic titles at the time.  Gabrie also went on to state that he had approached the publishers of ACP regarding the placement of work-for hire language on the vouchers and back of the checks which freelancers routinely signed, but was rebuffed by the publishers as being an unnecessary action required on their part.  Furthermore, Penders repeatedly followed up on this by reaching out to ACP's Co-President, Mr. Gorelick, in December 2008 to ascertain whether any such documents existed and in an effort to clarify the scope of any purported rights ACP may have claimed to his submissions and library of work. Mr. Gorelick initially ignored Penders' requests for information, but ultimately acknowledged that no such documents existed. Penders then proceeded to file his copyright registrations to protect his interests.  Although the Copyright Office notified ACP of the pending registration and solicited any response or object as it is statutorily required to do, ACP did not respond or otherwise indicate any objection to Penders' copyright registrations, and the Copyright Office registered the copyrights.

Accordingly, Penders maintains that ACP-Penders documents are forgeries or, if actually signed, signed under false pretenses and the documents are therefore not authentic and

provide no authority.  Penders further maintains that, even assuming *arguendo* that  the

purported ACP-Penders documents are genuine, they are not valid, binding or otherwise

enforceable work-for hire or assignment agreements and therefore they cannot be used by

ACP to claim copyright ownership in the work Mr. Penders produced.

Although ACP has produced numerous Revised Newsstand Agreements that were

entered into between ACP and creators who worked on Archie character books, no evidence

has been produced showing that any of Penders or his contemporary Sonic Creators signed

either the Revised Newsstand Agreements or the  ACP Licensed Comic Book Agreement.  Nor

has ACP produced any evidence documenting any requests on their part with any creator of

comic books or related artwork regarding the transfer to ACP of any such creator's rights to a

specific work at any time during the entire period Penders was submitting his works to ACP.

In addition, after consultation with numerous creators and editors who worked on the

Sonic comic book series or related books (the "Sonic Titles"), the evidence shows that Archie

did not utilize any standard operating procedure when it came to the creators working on the

Sonic Titles during the 1990s.  Specifically, Penders has not yet found a creator who worked on

the Sonic Titles prior to 1997 who had been required to sign an Independent Contractor's

Agreement or a Licensed Comic Books Independent Contractor's Agreement.  Penders also

located a number of other creators who worked either on Archie-core titles or other licensed

properties who had never signed any agreements with ACP.  One such creator, Elliot S! Maggin,

has been described to this court as having no connection whatsoever with ACP by ACP

President Michael Pellerito (See Pellerito Declaration, filed with the court on March 3, 2011),

and yet his name is prominently featured on the first issue cover in bold lettering on an Archie

title.  Thus, the assertion by Archie that it obtained signed agreements from Penders, but never sought nor obtained similar agreements from the remaining creators, is again highly suspect, and enhances the questionable nature of those documents.

Documents Did Not Exist Prior to July 2010

Finally, and as alluded to above, Penders had in the past repeatedly requested copies from Archie of any and all contracts or agreements that he might have signed during his many years as a freelancer for Archie.  These requests were made more than 2 years ago, and on more than one occasion, and each time Archie informed Penders that no agreements or contracts between Archie and Mr. Penders existed.

Only after Archie received Penders' July 2, 2010 letter were these documents allegedly discovered in Archie's files.  The sudden appearance of these "lost" documents is thus highly suspicious. Further, Archie's repeated refusal to allow inspection of the original documents not only seriously brings into question their authenticity, but has also prevented Penders from taking actions to document the forgery (though the burden to show the validity of the document rests with ACP as proponent of the document).

The Independent Contractor Agreement and the Licensed Comic Books Independent

Contractor's Agreement are Not Valid Contracts.

Even if authentic, it is clear that the documents produced are not valid, legally binding and enforceable work-for-hire contracts or assignments, for the reasons set forth below

Comic Books Not Within Work for Hire Category

Although work for hire agreements are used in any number of industries, including the comic book industry, comic books in general do not fall within any of the statutory categories of

works eligible for consideration.  For example, Knuckles the Dark Legion #1 is a single 22 page story with a single creative team; it is neither a compilation nor a collective work, nor does it fit within any of the other 7 categories of qualifying works.  These documents, therefore, do not constituted valid work for hire agreements even if they are deemed to be authentic.

<u>Documents Lack Sufficient Particularity</u>

Even assuming *arguendo* that certain of the works are found to qualify for one of the 7 enumerated categories, they fail with respect to the writing requirement.  Specifically, the statute states that a "work made for hire" is "a work specially ordered or commissioned" and requires that "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."  The documents produced by Archie, however, fail to identify the specific works (or even comic book series) which are expected to be the subject of work made for hire status.

Between 1993 and 2005, Penders worked on more than one Archie comic book title, and created works involving a variety of different characters, including Archie Andrews, Jughead, Betty and Sabrina, as well as non-Archie Andrews-related characters such as The Jaguar.  In addition to the SONIC and KNUCKLES series, Penders also worked as a freelancer on other Archie comic books based on licensed properties, such as NIGHT INTO DREAMS and PRINCESS SALLY.  However, the documents provided make no reference to any specific title(s) or property(s), and do not identify any specific work (or works) that were specially ordered or commissioned by Archie.

Documents are Subsequent to Penders' Creation

As noted above, one of the requirements for a work to qualify as a "work made for hire" is that there be a written agreement between the parties stating that any eligible work is considered a work made for hire.  Under controlling 2nd Circuit law, such agreement must be reached prior to creation of the work in question; one cannot require a work to become "work made for hire" retroactively.  It is undisputed that Penders, however, began submitting story proposals to the Sonic Titles in 1993.  Thus, the alleged Archie contracts (even if validly executed) would fail to meet the statutory requirements, and cannot be relied upon as evidence that Mr. Penders' works published in the Sonic Titles were works made for hire.

Failure to Form a Valid Contract

Again, even assuming that the documents provided were validly executed by both parties, there is clearly a failure of the parties to form a valid contract under relevant contract law.

No Consideration

The documents lack any valid consideration, a necessary element for the formation of any contract.  First, the contracts do not contain any actual promise of monetary in exchange for execution of the documents themselves.  In fact, the contract specifically identifies numerous forms of compensation which the contractor is not entitled to receive, but no actual compensation is identified.

The only compensation discussed is based on potential future employment, which employment is not guaranteed or promised.  This is, at best, an illusory promise, and thus cannot be considered adequate consideration.  Further, under the terms of these documents, a

contractor could be asked to perform work but not be paid for it should the work not be

acceptable to Archie; yet, the contracts would grant Archie rights in any such work.

Thus, if a person signing either of the documents were to receive no future work from

Archie, or Archie were to refuse to accept work created by that contractor, then Archie would

have received benefits under the contract without requirement to compensate the creator.  In

fact, Penders often produced work on speculation, and in numerous instances was not paid for

the work he created, including works that were then used by Archie in published works.  Absent

valid consideration, there can be no enforceable contract.  Incentivising such work is the very

reason why, absent a clear document, Work for Hire is circumscribed and artists are

encouraged to develop works to put into the free market on their own volition with their own

talents.

Ambiguity

Additionally, the Licensed Comic Books Independent Contractor's Agreement contains a

number of blanks and un-selected cross-outs.   The Licensed Comic Books Independent

Contractor's Agreement fails to identify any particular series or any particular licensor.  As

noted above, Penders worked on more than one title, and on more than one licensed property.

Thus, there is no way to ascertain from the face of this document what licensed property is

intended to be covered by such contractor's agreement.  Without such an understanding, there

can be no meeting of the minds, and thus no means for forming a valid, enforceable contract

between the parties.

Does Not Reflect Standard Practices in the Comic Book Industry

Finally, the contracts relied upon by Archie do not comport with the standard practices found in the comic book industry.  Within the industry, creators are required to sign separate work for hire agreements with each assignment submitted to a publisher for publication.  Historically, this has generally been done by use of a pay voucher filled out by the creator, where such voucher contains the work made for hire agreement and assignment language, or by placement of similar language on checks, the endorsement of which confirmed the status and/or transfer of rights.

In conclusion, Penders continues to dispute (i) that the document copies produced by Archie were validly entered into by the parties, and (ii) even if the originals are found and it is determined that they had, in fact, been validly entered into, that the agreements themselves constitute enforceable contracts.  Thus, Penders properly obtained his copyright registrations and the same are valid, and that Archie's activities constitute an infringement of his copyright rights in the registered works.

**c.  Defendant's Counterclaims**

Penders alleges as follows:

Penders and Michael Kanterovich, who has assigned all of his rights relevant to the instant matter to Penders in signed writings, prepared, approached and submitted three "Sonic" story ideas to ACP for approval during the second half of October 1993. ACP in turn, submitted all three stories to Sega for approval, and Sega and ACP eventually approved two of the three stories.

This method of working on a comic book was different than Penders was used to doing with other publishers. Specifically, rather than receiving a specific assignment, Archie invited the writers to pitch story ideas, which ACP would submit to Sega for acceptance or rejection.

Unlike Penders' experience of submitting scripts at any other comic book publisher, ACP insisted scripts be submitted in full panel page layout form, clearly depicting everything in a rough visual format rather than in normal text format. Penders was paid no additional money for producing these story layouts, despite the additional time and effort it required, and received no credit or acknowledgement for them in the published works.

Once Sega and ACP approved the two story ideas, , ACP would act as a conduit and relay the selected story submissions to Penders, wh, along with the other contributor, worked together on full story scripts for those ideas. The first two stories authored by Penders and Kanterovich appeared in issue No. II, cover dated June I994, released in March 1994. Following acceptance of the first group of story ideas, Penders and the other contributor began to work on additional story synopses for submission to ACP, which additional stories similarly were approved by ACP and Sega.

Though Penders and his fellow contributor were soon identified by ACP as the new regular writers for the Sonic Comics, there was at no time any official undertaking by ACP to formalize Penders' working arrangements, and no guarantee of future work for the Sonic Comics.  More significantly, there was no Work for Hire agreement or arrangement.  Penders and the other party created the works on their own and at their own risk, and retained all rights to the works.  It is undisputed that there was no agreement entered into at this time.

Early in the Penders/ACP relationship, Penders was presented with the opportunity to write a story introducing the "Knuckles the Echidna" video game character into the Sonic Comics continuity, intended to be a try-out for such character.  The Knuckles story appeared in issue #13, cover dated August 1994, released in May 1994. Although Sega was initially skeptical of the idea, the story proved popular. In the ensuing years, Penders would be given the chance to script and illustrate many more stories featuring the Knuckles character, eventually leading to a Knuckles mini-series and then a regular, ongoing Knuckles comic book series that continued for nearly three years.

Starting in late 1994, Penders began to write solo stories with increasing frequency.  In addition, in mid-1995, Penders began to provide full pencil artwork for the Sonic Comics, at first for covers and then interior artwork.

At all times through this period, it is undisputed that Penders was working for ACP as a freelancer with no contract.  Moreover, the only ACP-generated documents that were being provided to and signed by Penders and that pertained to the work Penders created were pay vouchers and checks that Penders endorsed.

None of the ACP pay vouchers tendered by ACP contained any legal language, or made any reference to ownership or transfer of copyright rights in the materials that Penders was producing for the Sonic Comics. None of the checks that Penders received from ACP in payment for his work contained any legal language concerning copyright rights or a transfer of his rights to ACP.  Penders understood that there was no transfer of his rights in the stories Penders pitched, whether or not they were accepted by ACP for publication.  As a result, his enthusiasm

for working on the Sonic Comics continued to grow as Penders introduced new concepts, story ideas and characters, all of which Penders believed he owned as their creator.

Penders' Counterclaim 1 is for declaratory judgment, seeking a judicial determination of the validity of his copyrights, both registered and unregistered, with respect to his creations and his ownership thereof, and thus that ACP's use of any such material constitutes impermissible infringement on Penders' copyrighted property.  Penders further seeks a declaration that Penders' own use of his properties does not constitute breach of contact or any other violation of ACP's rights.  Lastly,  Penders seeks declaration that ACP does not own "All works submitted by Mr. Penders", contrary to ACP's assertion in its November 23rd , 2010 letter to Penders' then counsel.

Penders' Counterclaim 2 is for the direct infringement of his exclusive rights of reproduction, distribution, and the preparation of derivative works in these works, specifically, ACP's compilation and reprinting of Penders' copyrighted works within various issues of Sonic Archives, the use of Penders' storylines and/or characters in other Sonic comic books, and the creation of derivative works in the form of electronic media versions of the Penders Copyrighted Works for distribution via electronic channels.

Penders' Counterclaim 3 is for the vicarious infringement of Penders' works by ACP as the result of the direct infringement of his works by others, believed to include, without limitation, Apple, Inc., Sony Computer Entertainment Europe, Diamond Comics Distributors, Graphicly.com,  Worldcolor Press (formerly Quebecor), Toys R Us, Barnes and Nobles, Jazwares, Comixolgy, Kablenews, and iVerse Media LLC, directly infringing activities which ACP receives a direct financial benefit from and has the right and ability to supervise.

Penders' Counterclaim 4 is for the contributory infringement of Penders' works by ACP as the result of the direct infringement of his works by others, believed to include, without limitation, Apple, Inc., Sony Computer Entertainment Europe, and iVerse Media LLC, where ACP had knowledge of Penders' rights and induced, caused, and/or materially contributed to the directly infringing activities.

### d.  Plaintiff's Defenses to Counterclaims

#### 1.    First Counterclaim:

Penders' First Counterclaim is duplicative of ACP's first party claims, and should be dismissed for all the reasons stated in ACP's Rule 12 Motion to Dismiss, which remains pending before the Court and is fully incorporated herein by reference.   *See* D.E. 39 and 40.  Notably, Penders made no effort to oppose ACP's motion to dismiss the First Counterclaim in his response. *See* D.E. 42.  Accordingly, for all the reasons advanced in support of its first party claims, recited above, Penders is not entitled to the relief sought in this counterclaim.  In addition, Penders, for the first time, seeks declaratory judgment that "his own use of his properties does not constitute breach of contact or any other violation of ACP's rights" and that "ACP does not own "All works submitted by Mr. Penders", contrary to ACP's assertion in its November 23rd , 2010 letter to Penders' then counsel."  These claims for relief are not pled in the counterclaim or in the prayer for relief.

#### 2.    Second Counterclaim:

Penders' second counterclaim is for direct copyright infringement "of his exclusive rights of reproduction, distribution, and the preparation of derivative works in these works."  The Defendant bears the burden of proving two elements: (1) ownership of the copyright and (2)

unauthorized copying by the defendant.  Penders is unable to prove either element, and

therefore cannot support a claim for copyright infringement.  The party alleging infringement

"must necessarily establish the content of the copyrighted work that it contends was

infringed." *Airframe v. L-3 Communications Corp.*, 658 F.3d 100 (1st Cir. 2011).  As a threshold

matter, Defendant has failed to provide any evidence of the specific works that he claims have

been infringed, and the "content of the copyrighted work."  Although Penders may have *filed*

copyright registrations, those registrations are not evidence of ownership of a copyright.

Copyright registration is a precondition to filing suit for copyright infringement; registration has

been called an additional element of infringement.  *See Reed Elsevier, Inc. v. Muchnik*, 130 S.Ct.

1237, 1241-9 (2010); *Cosmetic Ideas, Inc. v. IAC/InteractiveCorp,* 606 F.3d 612, 615 (9th Cir.

2010).  Penders has failed to obtain registration for works he claims have been infringed, failed

to produce the works he alleges to have been infringed that are subject to purported

registrations, and has even failed to produce the registrations he has obtained.  The

registrations he has obtained are invalid for a multitude of reasons.

     First, ACP and Penders entered into two binding and enforceable contracts, where

Penders agreed to assign and did assign, all right, title and ownership interest in and to each

Work and all of the Works to ACP.  Despite Penders claims to the contrary, the ACP-Penders

Agreements are valid contracts and comport with the requirements for a binding contract.  A

valid contract requires "an offer, acceptance, consideration**,** mutual assent and intent to be

bound."  *Arakelian v. Omnicare, Inc.*, 735 F. Supp.2d 22 (S.D.N.Y. Aug. 18, 2010).  In 1996,

Penders and ACP entered into the Contractor's Agreement and the Licensed Comic Books IC

Agreement.  The Agreements were supported by valid consideration in the form of ACP's

promise to give Penders compensation for his work on stories, scripts, artwork and other

creative expressions for the Sega Comic Book Series.  Penders claims that the contracts do not

contain any actual promise of money (consideration) in exchange for the work provided is

nonsensical.  The terms clearly state in Paragraph 5 of the Contractor's Agreement that work

commissioned by ACP and acceptable to ACP shall be compensated by a fixed sum. In fact, the

parties conducted this course of conduct for many years.  "A benefit to a promisor or a

detriment to the promisee is sufficient consideration for a contract."  *Kinley Corp. v. Ancira*, 859

F. Supp. 652, 657 (W.D.N.Y. July 25, 1994).  ACP would be receiving the benefit of Works from

Penders, and Penders would receive the benefit of compensation for those works.

Both agreements were signed and dated by Penders.  Penders once again makes the

tired and uncorroborated argument that the ACP-Penders agreements are forgeries, despite

there being no evidence to support such a claim, and despite his admission he has no proof

Archie forged the documents.  Archie did not forge these documents.  It is incumbent upon a

party claiming a nongenuineness of a signature to produce firsthand proof of the forgery.

*Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fennder & Smith, Inc.*, 622 F.Supp. 208

(S.D.N.Y. 1985).  Penders has failed to produce any evidence that the agreements were forged

(because they are not forged) nor has he ever identified a handwriting expert to testify as to

nongenuineness of the documents.  Penders' admission that he has no proof of any forgery

should be dispositive on this issue.  This argument is unfounded and contradicts Penders' own

sworn testimony.

Penders' claims that he was not paid for all of his work, yet he worked for ACP for over

twelve (12) years, and was paid in full for all of his work, in accordance with the Agreements (he

was even paid for work which was not acceptable to ACP and which was never published by

ACP).  Similarly, Penders never claimed any ownership of the works or made any demands for

additional compensation for use of the works.  Penders argues that "under the terms of these

documents, a contractor could be asked to perform work but not be paid for it."  This is simply

not the case.  The terms of the Contracts very clearly provide for compensation to Penders for

work commissioned by ACP and acceptable to it; equally clear in this relationship (as in any

business relationship) is that ACP would not pay for work which was not acceptable to it.  *See*

D.E.1,at Exhibit A and B ("Contractor's full and complete compensation for each assignment

that is completed on time and in a manner that is acceptable to Archie, will be a fixed sum

based on a rate to be mutually agreed upon.").  Moreover, the ACP-Penders Agreements that

Penders alleges are invalid are the very same Agreements that were enforced by this Court in

litigation in this district with another writer and ACP, deciding the same issues in this case.  *See*,

DeCarlo v. Archie Comic Publications, Inc., 127 F. Supp.2d 497 (S.D.N.Y.), *aff'd*, 11 F. App'x 26

(2d Cir. 2001), *cert. denied,* 534 U.S. 1056 (2001); Archie Comic Publications v. DeCarlo, 258 F.

Supp.2d 315 (S.D.N.Y. Apr. 23, 2003), *memorandum opinion* (citing DeCarlo v. Archie Comic

Publications, Inc., 127 F. Supp.2d 497 (S.D.N.Y.)) (noting that ACP had previously been

determined to own copyrights in the properties and an order to quiet title is proper), *final*

*judgment and permanent injunction,* 2003 WL 21354692 (S.D.N.Y. June 11, 2003), *aff'd*, 88 F.

App'x 468 (2d Cir. 2004).

      Contrary to the *DeCarlo* case law, Defendant argues that the ACP-Penders Agreements

are not enforceable contracts because the documents are ambiguous.  Under the applicable

law, **"**ambiguity requires more than one reasonable interpretation of the contract**.**"  AIU North

America Inc. v. Caisse Franco Neerlandaise de Cautionnements, 72 F.Supp.2d 350 (S.D.N.Y. Oct.

28, 1999).  Penders does not and cannot establish that there is more than one reasonable

interpretation of the agreements.  The ACP-Penders Agreements clearly state, on their face, the

subject matter of the agreement.  For example, the Revised Newsstand Comic Independent

Contractor's Agreement ("Contractor's Agreement") states in all capital letters that it is an

INDEPENDENT CONTRACTOR'S AGREEMENT.  The next paragraph of the Agreement further

states that it is a "work for hire agreement."  The Contractor's Agreement contains no blanks,

was signed and executed by Penders and is filled out in its entirety.  The ACP Licensed Comic

Books Independent Contractor's Agreement (Licensed Comic Books IC Agreement"), signed and

executed by Penders on December 12, 1996, does contain two blank spaces, which is clearly

explained by ACP's President Michael Pellerito, and also served as the basis of the parties

relationship for many years, which established a course of performance under its terms.

However, even if the Court accepts Defendant's argument that the Licensed Comic Books IC

Agreement is ambiguous, extrinsic evidence is admissible to establish that the parties intended

to enter into this contract and established a course of performance over many years according

to the terms of the agreement.  Indeed, Penders never claimed ownership of the works he

supplied to ACP and ACP paid Penders for all work acceptable to it and that was published.

Accordingly, the terms of the agreements are binding and enforceable.

  In the event that the Licensed Comic Books IC Agreement is unenforceable due to these

two blanks, then the Contractors Agreement, which contains no blanks, controls all of Penders'

submissions and similarly provides that Penders is an independent contractor of ACP and "all

works and properties are and shall be works for hire owned by and for the benefit of Archie."

The Contractors Agreement clearly states that Penders' work on all "Licensed Properties" (there is no dispute in this case that the work at issue is a "Licensed Property" of ACP) shall be governed by that agreement unless and until the contractor signed the Licensed Comic Books IC Agreement.  That agreement also contains terms under which all works are assigned to ACP.

Defendant argues that the ACP-Penders Agreements "do not comport with the standard practices in the comic book industry."  The standard practices at other publishers is irrelevant.  The ACP-Penders Agreements conformed to the standard practice for ACP's dealings with its Independent Contractors.  Indeed, the *DeCarlo* cases show that the 1996 agreement is a form used by ACP regularly.  ACP is one of the most successful and longest running brands in the history of the comic book industry and has executed hundreds of contracts with independent contractors.  In 1996, ACP's practice was to send out two signed copies of the contract to sign to the independent contractor, and have the independent contractor return one copy to ACP and keep one for his or her own personal use and record.  In conformance with this policy, ACP sent Penders two contracts to sign, which he testified during his deposition that he received those contracts.  Penders signed both agreements and returned a copy of each to ACP, in accordance with ACP's long standing policies and procedures.  Defendant cites no evidence to support his argument that the Agreements do not comport with practices in the comic book industry, and there is no expert disclosure for testimony to establish any purported "standard practices" in the comic book industry.[2]

---

[2] Defendant has identified Elliot S! Maggin to testify "as to the industry standards regarding work for hire agreements and assignments." It appears that Defendant plans to call Maggin to provide expert testimony yet no Rule 26 expert disclosure was ever made in this case.  This testimony is or will be subject of a Motion in Limine and to Exclude.

Defendant also argues that the ACP-Penders Agreements did not exist prior to July 2010. This is completely false.  These documents were signed and executed by Penders more than fifteen years ago.  Contrary to Defendant's claims, ACP never informed Penders that "no agreements or contracts between Archie and Mr. Penders existed" and there is no evidence to the contrary. In fact, Penders emails to ACP (Gorelick) in 2008 admit and request copies of the "agreements I [Penders] signed" with ACP.  ACP undertook a diligent search for the Agreements when Penders requested copies of the Agreements he signed.  There is ample evidence that the ACP-Penders Agreements produced to Penders are true and accurate copies of the documents that Penders executed and submitted to ACP in 1996.  The copies that ACP has provided to Defendant that were found in the files that the original agreements would have been maintained, and are evidence of the contents of the original documents and are admissible under the Federal Rules of Evidence in lieu of the lost originals. FRE 1003-1004.  ACP undertook a diligent search of its regularly kept business records and files, and the copies of the ACP-Penders Agreements were located and produced to Defendant. ACP and Penders entered into a valid and binding contract where Penders agreed to assign and did assign all right and interest in each Work to ACP.  Penders is not the legal or rightful owner of the copyright to the works.

Second, Penders' registrations are not prima facie proof of validity of the copyrights under 17 U.S.C. § 410 because they were not filed within five years of the date of first publication of the work.  The presumption of validity of the Copyright's Office's registrations only applies when the registration "was made before or within five years after the first publication of the work."  All of Penders copyrights registrations were filed more than five years after the first publication of the work, and therefore are not entitled to a presumption of

validity.[3]  Similarly, none of the asserted registrations include a statement that the subject work was made for hire, as required by 17 U.S.C. § 409(4).  Therefore, Penders cannot use the registrations to prove the first element of copyright infringement.

Third, Penders is equitably estopped from asserting his claims for copyright infringement.  Under applicable federal law, a party can be estopped from pursuing a claim where: (1) plaintiff had knowledge of defendant's conduct; (2) plaintiff either (a) intended that defendant rely on plaintiff's acts or omissions or (b) acted or failed to act in such a manner that defendant had a right to believe it was intended to rely on plaintiff's conduct; (3) defendant was ignorant of the true facts; and (4) defendant relied on plaintiff's conduct to its detriment. *DeCarlo*, 127 F. Supp.2d 497, *aff'd*, 11 F. App'x 26 (2d Cir. 2001), *cert. denied,* 534 U.S. 1056 (2001); Archie Comic Publications v. DeCarlo, 258 F. Supp.2d 315 (S.D.N.Y. Apr. 23, 2003), *memorandum opinion* (citing DeCarlo v. Archie Comic Publications, Inc., 127 F. Supp.2d 497 (S.D.N.Y.)) (noting that ACP had previously been determined to own copyrights in the properties and an order to quiet title is proper), *final judgment and permanent injunction,* 2003 WL 21354692 (S.D.N.Y. June 11, 2003), *aff'd*, 88 F. App'x 468 (2d Cir. 2004).  Penders knew that ACP considered itself the owner of the Works, yet he testified in his deposition that he told his attorney he claimed ownership of works to his attorney when he filed for Bankruptcy in 1994. He also testified that he believed ACP infringed his works in 1997, more than ten years prior to the commencement of this lawsuit, yet he testified that he never attempted to register the works with the Copyright Office (nor did he ever attempt to register his works until 2010) or contact ACP and tell them that he believed ACP to be infringing his works.  Despite believing

---

[3] For further support and case law, *see* Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motions in Limine, D.E. 60.

ACP to be infringing his work as early as 1997 Penders remained silent in order to gain more work from ACP and in fact ACP continued to commission work from Penders and Penders supplied ACP with works for more than fifteen (15) years.  He did not begin seeking to register copyrights until 2009.  Penders did not list any intellectual property or copyrights in his Bankruptcy Petition.

The second element of equitable estoppel is also clearly satisfied.  ACP was unaware that Penders fashioned himself as the owner of any rights in any works he supplied to ACP.  ACP relied on Penders' silence and relied on the Agreements Penders signed when it began reprinting materials in which Penders now claims rights.  "Silence in the face of an explicit contrary assumption by an innocent party may constitute a concealment of facts or a false misrepresentation for estoppel purposes." *Gen. Elec. Capital Corp. v. Armadora, S.A.*, 37 F. 3d 41, 46-47 (2d Cir. 1994).  ACP relied on Penders' behavior to their detriment, and had no reason to believe that Penders considered himself to be the owner of the works, especially considering Penders' long employment with ACP and the two agreements he executed.

Fourth, Penders cannot prove a copyright infringement claim because at least five of the fifteen allegedly infringing reprint materials clearly exceed the three year statute of limitations. 17 U.S.C. § 507 (b).  Penders is barred from recovery of any damages for any reprint materials occurring in 1994, 2007 and April of 2008 because the claims accrued more than three years prior to the commencement of this action.  Penders recovery and damages are also limited solely to the acts, if any, occurring within three years of this suit.  Each alleged act of infringement claimed by Penders is a "distinct harm that gives rise to an independent claim for

relief", therefore each harm and claim for relief is limited to the three year statute of limitations of 17 U.S.C. § 507(b).

Fifth, the seventeen (17) registrations Penders filed prior to May 8, 1995, the date of his bankruptcy discharge, are invalid and cannot be used to establish ownership of a valid copyright.  Penders filed for Chapter (7) Bankruptcy on December 12, 1994. Notably, he stated on his bankruptcy petition that he has no rights to any "patents, copyrights, and other intellectual property."  Penders swore under oath and penalty of perjury that he had no rights to intellectual property or copyrights.  He is barred from now claiming that he had rights in any copyright prior to his bankruptcy discharge.

Sixth, Penders registrations listing a co-author by written transfer agreement are invalid. The Copyright Act requires that a transfer of a copyright be in writing and signed by the conveyor of the rights.  Penders listed a co-author on at least sixteen (16) registrations.  Those registrations were obtained without the requisite written transfer agreement.  The assignments Penders produced to ACP are defective, do not assign all the works, and were executed in the Summer of 2011, after the registrations were obtained.  A copyright registration is invalid when it is shown that the Copyright Office received false information from the applicant that may have resulted in the rejection of the application.  Penders supplied the Copyright Office with false information, and told the Copyright Office that he had obtained written transfer assignments from co-authors, when in fact he had not and knowing that his application would not be approved without a written transfer assignment.  These registrations are invalid, and would never have been granted but for the fraudulent information regarding the assignments.

### 3.     Third and Fourth Counterclaims:

Penders Third and Fourth Counterclaims for vicarious and contributory copyright infringement both lack any legal or factual support.  In order to prove a claim for vicarious infringement, Penders must prove three elements by a preponderance of evidence: (1) A party other than ACP directly infringed on his copyright; (2) ACP profited from or had a financial interest in the infringing activities of the third party; and (3) ACP had the right and ability to supervise or control the infringing activities of the third party.  For both vicarious and contributory copyright infringement "there must be the direct infringement of a third party." *Artista Records LLC v. Usenet.com, Inc.*, 633 F. Supp.2d 124 (S.D.N.Y. June 3, 2009).

Penders now states that he "believes" Apple, Inc., Sony Computer Entertainment Europe, Diamond Comics Distributors, Graphicly.com,  Worldcolor Press (formerly Quebecor), Toys R Us, Barnes and Nobles, Jazwares, Comixolgy, Kablenews, and iVerse Media have directly infringed on Penders works.  This allegation is entirely unsupported by the evidence in this case and Penders is unable to meet even the threshold requirement for both vicarious and contributory infringement.  Penders' belief that "Apple, Inc., Sony Computer Entertainment Europe, Diamond Comics Distributors, Graphicly.com,  Worldcolor Press (formerly Quebecor), Toys R Us, Barnes and Nobles, Jazwares, Comixolgy, Kablenews, and iVerse Media" may be infringing his works does not conclusively establish that there is "direct infringement of a third party." *Id*.  Penders does not identify which works, specifically, these parties are infringing, when this alleged infringement occurred, and the financial benefit ACP received for these infringing activities.  This counterclaim stands entirely unsupported by the record, and is

meritless.  Penders cannot meet his burden of proof on even one of the three elements required for a vicarious infringement claim.

Equally meritless is Penders' Counterclaim 4 for contributory infringement.  To prove contributory infringement, Penders must prove by a *preponderance of evidence* three elements: (1) A party other than ACP directly infringed Penders copyright; (2) ACP should have known of the infringing activity of the third party; and (3) ACP induced, caused or materially contributed to the infringing activity of the third party.  Not only is there no evidence that a third party infringed on Penders' alleged copyrights, but there is no evidence that ACP should have known about the infringing activity – a required element of a contributory infringement claim.  Penders is not even sure *if* a third party infringed on his works, yet, he expects ACP to have knowledge of the alleged infringing activity.  Penders never notified ACP that he even "believed" third parties to be infringing on his works.  Instead, based on Penders' fifteen year silence and the ACP-Penders Agreements, ACP believed that it was the owner of all of the works.

### 4.    Defenses to Penders' Miscellaneous Arguments:

Without any factual or legal support, Penders makes the novel argument that "any arguable copyright ACP may have are [sic] cancelable under section 203 of the Copyright Act." A requisite condition for termination under Section 203(a)(3) provides:

> Termination of the grant may be effected at any time during a period of five years **beginning at the end of thirty-five years from the date of execution** of the grant; or, if the grant covers the right of publication of the work, the period **begins at the end of thirty-five years from the date of publication** of the work under the grant **or at the end of forty years from the date of execution** of the grant, whichever term ends earlier.

17 U.S.C. § 203 (emphasis added).

This provision is not applicable to the facts of this case.  First, all works supplied by

Penders to ACP were commissioned by ACP as works made for hire, therefore the provision is

inapplicable in its entirety.  Alternative, and to the extent that any work fails to qualify as a

work made for hire under the Copyright Act, Penders did not begin supplying works to ACP until

1993.  The Act requires that termination cannot occur until the end of thirty five (35) years from

the date of publication of the work.  Each of Penders' asserted registrations are for Works that

were supplied beginning in 1993 and are not subject to termination under Section 203.Penders

also argues that the ACP-Penders Agreements fail to meet the work for hire requirements

because "one cannot require a work to become work made for hire retroactively" and "comic

books [are] not within the work for hire category."  These arguments are of no consequence

because the ACP-Penders Agreements clearly provide that in the event that any work fails to

qualify as a work made for hire under the U.S. Copyright Act, Penders agreed to assign, and did

assign, all right, title and interest in and to each Work and all of the Works to ACP.  Penders

argues that the "documents provided make no reference to any specific title(s) or property(s)"

and there is "no way to ascertain from the face of the document what licensed property is

intended to be covered by such contractor's agreement."  An agreement to transfer or assign a

copyright need not specifically identify each particular work at the time of the agreement.  An

agreement that transfers or assigns all copyright during the term of the agreement is sufficient.

NASCAR v. Scharle, 356 F. Supp.2d 515 (E.D.P.A. Feb. 11, 2005) (*citing* Mellencamp v. Riva Music

Ltd., 698 F. Supp. 1154 (S.D.N.Y. Nov. 2, 1988) (enforcing written publishing agreement in which

a singer transferred worldwide copyrights in and to *all works to be composed* during the term

of the agreement.); *see also DeCarlo*, 127 F. Supp.2d 497, *aff'd*, 11 F. App'x 26 (2d Cir. 2001),

*cert. denied,* 534 U.S. 1056 (2001); Archie Comic Publications v. DeCarlo, 258 F. Supp.2d 315 (S.D.N.Y. Apr. 23, 2003), *memorandum opinion* (citing DeCarlo v. Archie Comic Publications, Inc., 127 F. Supp.2d 497 (S.D.N.Y.)) (noting that ACP had previously been determined to own copyrights in the properties and an order to quiet title is proper), *final judgment and permanent injunction,* 2003 WL 21354692 (S.D.N.Y. June 11, 2003), *aff'd*, 88 F. App'x 468 (2d Cir. 2004).

Like the singer in *Mellencamp*, the sculptor in *NASCAR*, and the writer in *DeCarlo*, *supra,* Penders assigned his rights in all past, pending and future works to ACP.  The ACP-Penders Agreements are not required to reference the "specific title(s) or property(s), rather an agreement to transfer copyright in a group of works is sufficient to reasonably identify the subject matter."  *Id*.  Contracts identifying groups of work are commonplace in the art and entertainment industries.  *Id*.  In accordance with applicable law and ACP policies and procedures, Penders agreed to transfer, and did transfer, all rights in the Works to ACP.

**IV.      DESCRIPTION OF CLAIMS PREVIOUSLY ASSERTED BUT NOT TO BE TRIED**

Plaintiff ACP's Claim 5 (tortious interference), which the parties have settled, is pled but not to be tried.  A motion to dismiss Defendants' Counterclaims and Affirmative Defenses remains pending with the Court, *sub judice.  See* D.E. 39 and 40.

**V.      JURY TRIAL**

Plaintiff and Defendant anticipate trial in this matter will require 5-7 trial days, including jury selection and charge conference.

**VI.      CONSENT TO PROCEED BEFORE A MAGISTRATE JUDGE**

All Parties have <u>not</u> consented to trial of the case by magistrate judge.

VII.     **STIPULATIONS OF AGREED FACT OR LAW**

    a.  **Stipulations of Fact**

       1.     Penders is an individual residing in California, at 12147 Woodley Avenue, Granada Hills, California 91344-2846.  Penders is formerly a resident of New York whose address was 1144 Oliver Street, North Tonawanda, NY 14120.

       2.     ACP is a corporation duly organized under the laws of the State of New York, with a business address of 325 Fayette Avenue, Mamaroneck, NY.

       3.     Defendant created works as an independent contractor for Plaintiff between 1993 and 2005.  Defendant created stories, scripts, artwork and related original works of authorship while working as an independent contractor for Plaintiff.

       4.     Beginning in February 2009, Penders began filing copyright applications with the U.S. Copyright Office to register all of the works which he supplied to Plaintiff.

       5.     On or about July 7, 2010 Penders stated on his blog that the U.S. Copyright Office began issuing registration certificates for the applications he filed.

       6.     A letter from Penders' attorney Michael Lovitz was sent to Plaintiff on July 2, 2010, and included with this letter were copies of 14 U.S. copyright registrations (attached to the Complaint as Exhibit D).

       7.     The date of registration for each of the fourteen registrations contained in Exhibit D to the Complaint is more than five years after the date of first publication for each subject work.

8.      The date of registration for each of the fourteen registrations contained in Exhibit D to the Complaint is more than three months after the date of first publication for each subject work.

9.      None of the fourteen registrations contained in Exhibit D to the Complaint include a statement that the subject work was made for hire.

10.     Plaintiff responded to Defendant's July 2, 2010 letter (attached as Exhibit E to the Complaint) on July 13, 2010 and attached copies of the ACP-Penders Agreements (attached as Exhibits A and B to the Complaint).

11.     Plaintiff's July 13, 2010 letter contained notice language and demands, including a demand that Defendant cancel the fourteen registrations attached to his July 2, 2010 letter.

12.     Exhibit C to the Complaint, at page 1, contains Penders' blog post of October 19, 2010.

13.     None of Penders' copyright registrations contained in Exhibit J to the Complaint include a statement that the subject work was made for hire.

**b.  Stipulations of Law**

None at this time.

**VIII.   <u>WITNESS LISTS, DEPOSITION DESIGNATIONS AND DESCRIPTION OF TESTIMONY</u>**

**a.  Plaintiff's Witness List For Case in Chief**

1.      Mike Pellerito, President of ACP, will appear as live witness. 11 Somerset Dr., Yonkers NY 10710, 914-316-8973.  Allegations and issues raised by Plaintiff in the Complaint; Plaintiff's defenses to counterclaims; information concerning witness's interactions

with Defendant.  Among other things, Mr. Pellerito has worked on the Sonic titles, and was

Editor of Sonic products from 2003-2009.  He will testify about document retention and file

maintenance, the existence and authenticity of the ACP-Penders Agreements, and the terms of

the ACP-Penders Agreements and Penders' breach thereof.  Penders' work for ACP, ACP's

publication and reprints of Sonic titles, ACP's damages, negotiations with licensor Sega, ACP's

expectation of ownership in all works supplied by Penders and its reliance on Penders' silence

and his written agreements with ACP, and Penders' threats of litigation and ACP's fear of suit.

     2.  Victor Gorelick, co-President and Editor-in-Chief of ACP, will appear as

live witness.  24 Ray Place Apt 3-2, Scarsdale, NY 10583, 914-723-3751.  Allegations and issues

raised by Plaintiff in the Complaint; Plaintiff's defenses to counterclaims; information

concerning witness' interactions with Defendant.  Mr. Gorelick has worked for ACP for more

than 50 years.  He is responsible for maintaining various files, including those in which the ACP-

Penders Agreements were located.  He will testify that he recalls receiving the signed

agreements in to ACP from Penders in 1996, and that, when requested to do so after Penders

threatened to sue ACP, he found copies of the ACP-Penders Agreements in the files at ACP

where they were supposed to be.  He will testify that ACP undertook a diligent search for the

original "wet" signature documents that were received more than 15 years ago, but that these

could not be located, and are presumed to be lost or destroyed.  The copies were located in

several places.  He will testify about the terms of the ACP-Penders Agreements.  He will also

testify about Penders' work for ACP, ACP's publication and reprints of Sonic titles, ACP's

damages, negotiations with licensor Sega, ACP's expectation of ownership in all works supplied

by Penders and its reliance on Penders' silence and his written agreements with ACP, as well as

Penders' threats of litigation and ACP's fear of suit.

        3.      Robert Lisanti, Accounting Manager of ACP, will appear as live witness.  4

Meadowlark Circle, Peekskill, NY 10566, 914-843-3717.  Allegations and issues raised by Plaintiff

in the Complaint; accounting and financial information.

        4.      Jon Goldwater, co-CEO of ACP, will appear as live witness.  325 Fayette

Avenue, Mamaroneck, NY 10543-2318, 914-381-5155.  Allegations and issues raised by Plaintiff

in the Complaint; Plaintiff's defenses to counterclaims.  Mr. Goldwater has been co-CEO at ACP

since 2009.  He will testify about ACP's damages, negotiations with licensor Sega, ACP's

expectation of ownership in all works supplied by Penders and its reliance on Penders' silence

and his written agreements with ACP, the terms of the ACP-Penders Agreements and Penders'

breach thereof, as well as ACP's damages as a result of the breaches by Penders.

        5.      Kenneth Penders, will appear as live witness.  Defendant (to be contacted

through counsel).  Mr. Penders is expected to testify about, among other things, allegations and

issues raised by Plaintiff in the Complaint; allegations and issued raised by Defendant in the

Amended Answer, Affirmative Defenses, and Counterclaims, and purported copyright

registrations and alleged infringement thereof; Defendant's work for ACP; his bankruptcy; his

execution of the ACP-Penders Agreements; his work for ACP; his request for royalties in 1997

which was refused by ACP; his silence while working for ACP and never placing ACP on notice of

his claim to any rights in the work commissioned by ACP; ACP's payment for all work provided

to it by Penders; the purported registrations at issue; his communications with the Copyright

Office; his statements under oath that he had a written transfer agreement from co-authors

named in applications, when in fact he did not; his work as compared to the published product; and his silence about his claim to own rights in the works he provided to ACP for more than 15 years, and his admission to receipt of documents from ACP and signing a work made for hire agreement in an email from December 2008.  ACP expects Penders to verify his signature and handwriting on numerous documents.

Plaintiff also reserves the right to call any witness identified by any party to this action, and rebuttal witnesses.

**b.  Defendant's Witness List**

1.    Daryl Edelman will appear as live witness.  West Street, Apartment 1905, New York, New York 10004, telephone 212-742-1972.  Mr. Edelman was the very first Sonic editor.  He hired Michael Gallagher, Sonic's first writer and Scott Shaw and Dave Maneck, the first artists.  Mr. Edelman will testify as to ACP standard business practices and to the fact that contracts were not sent to Sonic freelancers.  He will also testify as to ACP's dealing with Sega.

2.    Scott Fulop will appear as live witness.  #1 Top of the Ridge, Mamaroneck, New York 10543, telephone 914-584-4357.  Mr. Fulop will testify as to Penders' transformative contributions to Sonic, that storylines originated from Penders, ACP business practices, lack of any contracts sent, dealings with Sega and freelancers, that he himself never signed any Work for Hire contract with ACP before or after he left their employ.

3.    Victor Gorelick will appear as live witness (will be called by Defendant only if not called by Plaintiff as contemplated in Plaintiff's list above and issues are not addressed on direct testimony or cross examination).  Mr. Gorelik will testify as to ACP practices with respect to contracts and treatment of creators, dealings with Sega and freelancers, and

that he had no involvement with Penders on Sonic titles, though he was involved with Penders regarding Archie core titles.

    4.    Ed Spallone will appear as live witness.  c/o Marvel Entertainment, 135 W. 50th Street, 7th Floor, New York, New York 10020, telephone 212-576-4000.  Mr. Spallone will testify regarding the scope of his duties and ACP's standard business practices during his tenure with ACP.   Mr. Spallone will further testify as to the authenticity of the purported contracts and his signature thereon, the instructions he was given before sending out the contracts.

    5.    Justin Gabrie will appear as a live witness.  107 Fern Court Easton, Pennsylvania 18045, telephone 610-730-4193.  Mr. Gabrie will testify that he, as editor on the Sonic title, did not send out contracts to any freelancers while an editor from 1996-2004.  Mr. Gabrie will also testify that Penders' pitched new ideas and stories and was not told what to write.   He will also testify as to ACP's dealings with Sega and freelancers and the way he conducted business with creators during the relevant period.

    6.    Karl Bollers will appear as live witness.  c/o Boca Group East, 200 Park Avenue, New York, New York, telephone 917-653-3932.  Mr. Bollers will testify as to ACP standards with regards to Sonic works from 1996 -2004.  Mr. Bollers will testify that he himself never signed any Work for Hire contract with ACP and that ACP did not customarily assign stories for him or the other Sonic writers to create but, rather, approved pitches brought to ACP by freelance creators.

    7.    Mike Kanterovich will appear as live witness.  59 Jewett Lane, Hollis, NH 03049, telephone 603-546-8096.  Mr. Kanterovich will testify that ACP did not assign himself or

Penders stories to write but rather that they, as a team, consistently approached ACP with ideas for publication from 1993-1995.  Mr. Kanterovich will also testify that there was never any guarantee of future work and that he himself never signed any Work for Hire contract with ACP.  Mr. Kanterovich will also rebut ACP's testimony as necessary to the extent relevant to his first-hand knowledge and will also testify that he transferred his co-ownership in specific copyrights to Penders.

        8.     Bernadette Shahin will appear as live witness.  12147 Woodley Avenue, Granada Hills, CA 91344 323-632-9483.  Ms. Shahin will testify as to Penders' 1996 dealings with ACP, including with respect to the presentation of a health care election document.  Ms. Shahin will also testify regarding Penders-Gorelick discussions circa 2008 to the extent she has firsthand knowledge due to her presence with respect to the same and will speak to Penders' dealings with Sega based on her first hand involvement as a business representative for Mr. Penders.

        9.     Scott Shaw will appear as a live witness.  7903 Kester Avenue, Sherman Oaks, California 91423, telephone 818-642-1967.  Mr. Shaw was the first artist on Sonic and will testify that he worked from 1993-1996 without a contract.

        10.     Elliot S! Maggin will appear as a live witness.  24048 Highlander Road, West Hills, California 91307, telephone 818-429-4236.  Mr. Maggin will testify from his personal experiences as a former editor who supervised numerous projects on which Mr. Penders worked for various companies over the years who assigned and reviewed work to and by Penders prior to Penders submitting work to ACP.  Mr. Maggin will also testify as to his personal experience as a freelancer working for ACP during the relevant time period.

11.     Jim Valentino will appear as a live witness.  3306 SE 78th Avenue, Portland, Oregon 97206, telephone 503-705-4384.  Mr. Valentino is a publisher and owner of Image Comics.  Mr. Valentino will testify as to his business dealings with Penders, particularly with respect to joint projects, including Sonic Super Special No. 7.  Mr. Valentino will also testify that he never was asked to, nor did he, sign any written agreements regarding his work for ACP.

12.     Ken Penders will appear as a live witness.   12147 Woodley Avenue Granada Hills, CA 91344 323-632-9483.  Penders will testify as to the ownership of his copyrights, his dealings with Sega, his business relationship with ACP and other industry publishers and the fact that he only conveyed a right of first publication to ACP for work which they paid him for.

13.     William Briganti:  Assistant Chief, Visual Arts and Recordation Division, U.S. Copyright Office, Washington, D.C., will appear as a live witness.  Briganti will testify as to the registration process for Penders' copyrights, process insofar as he was involved in his official capacity, including letters sent to potential counter-claimants, his communications with Penders, Sega and ACP regarding Penders' Copyright Applications, and will offer evidence which refutes Plaintiff's allegations of Defendant's fraud.

**IX.     EXHIBIT LISTS**

Pursuant to FRCP 26(a)(3)(A)(iii), attached as Exhibit A is Plaintiff's Exhibit List, and Exhibit B is Defendant's Exhibit List.  The Parties shall separately file and serve within 14 days of the date this proposed pretrial order is filed any objections to the Exhibits, in compliance with FRCP 26(a)(3)(B).

Respectfully submitted, by the Parties:


/s/                    Dec 16, 2011      /s/                    Dec 16, 2011
_____      _____
Matthew C. Wagner (MW 9432)   (Date)   Phillip J, Daman (admitted *pro hac vice*)
mwagner@dmoc.com                      phillip.daman@damanllc.com
DISERIO MARTIN                         Daman L.L.C.
50 Main Street, Suite 1000             17383 Sunset Boulevard, Suite A340
White Plains, NY 10606                 Pacific Palisades, California 90272
(914) 684-0090 Tel                     Tel. (310) 431-9628
(914) 684-0590 Fax                     Fax. (462) 645-0754
*Attorneys for Plaintiff*              *Attorneys for Defendant*


***IT IS SO ORDERED this _____ day of _____, 20___:***


_____
Hon. Richard M. Berman, USDJ