UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ARCHIE COMIC PUBLICATIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 10-cv-08858 (RMB) |
| v. | ) | |
| | ) | Electronically Filed |
| KENNETH W. PENDERS, II, | ) | |
| p/k/a/ KEN PENDERS, | ) | |
| | ) | ORAL ARGUMENT REQUESTED |
| Defendant. | ) | |
| ——————————————————X | | |

MEMORANDUM OF LAW IN SUPPORT OF
ARCHIE COMIC PUBLICATIONS' MOTION FOR SUMMARY JUDGMENT

Table of Contents

I.  INTRODUCTION..................................................................................................... 1

II.  FACTUAL BACKGROUND .................................................................................. 2

  A.  Control Over Creation of the Works By ACP and Sega............................... 7

  B.  Penders' Contributions to the Works............................................................ 8

  C.  ACP First Began Reprinting Copies of the Sonic Comic Book Series in 1997 ........... 9

III.  ARGUMENT ......................................................................................................... 9

  A.  The Legal Standard on a Motion for Summary Judgment............................. 9

  B.  This Court has Already Held that the Contractor's Agreement is Valid and Enforceable with Regard to All "past, pending and future" works supplied to ACP and this includes all characters that appear in any of ACP's comic books, comic strips or licensed prducts. ................................................................................................ 10

  C.  The ACP-Penders Agreements were executed by Ed Spallone as VP of Finance for ACP and Penders, the agreements are authentic and Penders signature is obviously of his own hand. ............................................................................................................... 11

  D.  The duplicate ACP-Penders Agreements are admissible to the same extent as the originals because Penders has admitted he has no evidence that his signature was forged and ACP did not lose or destroy the originals in bad faith............................. 13

    1.  Penders has admitted there is no evidence to support his claim that the ACP-Penders Agreements are forged. ...................................................................... 14

    2.  The original ACP-Penders Agreements are not required because there is no evidence that ACP lost or destroyed the originals in bad faith............................. 15

    3.  Penders has also admitted that he signed work made-for-hire agreements with ACP..................................................................................................................... 15

  E.  As between ACP and Penders, the undisputed record evidence establishes that ACP is the lawful rights-holder of the works and entitled to summary judgment on all remaining claims in this case. ................................................................................ 17

    1.  ACP is Entitled to Summary Judgment on its Claim for Declaratory Judgment of Non-Infringement of the Works Because Penders Cannot Prove Ownership of the Works. ................................................................................................... 17

      a.  All Works were "made-for-hire" under the U.S. Copyright Act and owned by ACP..................................................................................................................... 17

        i.  The ACP-Penders Agreements satisfy the requirement of a Signed Written Instrument. ........................................................................................... 19

        ii.  All Works were created at ACP's "Instance."................................ 20

        iii.  All Works were created at ACP's "Expense." ................................ 21

      b.    To the extent the Works are not works made-for-hire, Penders assigned all right, title and interest to ACP. ......................................................................................... 21

          2.   ACP is Entitled to Summary Judgment on its Claim for Declaratory Judgment that Penders' Copyright Registrations Should Be Held Invalid and Ordered Canceled Because Penders is Not the Owner of the Works. ................................ 22

          3.   ACP is Entitled to Summary Judgment on its Breach of Contract Claims Because Penders Breached the ACP-Penders Agreements by Claiming Ownership of the Works and Challenging ACP's Rights to the Works................................. 23

          4.   The Court should grant summary judgment in favor of ACP on each of Penders' counterclaims......................................................................................... 24

IV.        **CONCLUSION** ....................................................................................... **25**

## <u>Table of Authorities</u>

**Federal Cases**

Archie Comic Publications v. DeCarlo, 258 F. Supp.2d 315 (S.D.N.Y. Apr. 23, 2003)　　passim

Baroor v. New York City Dept. of Educ., 362 F. App'x 157 (2d Cir. 2010)　　16

Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,

　　622 F.Supp. 208 (S.D.N.Y. 1985)　　14

Brand v. RMM, 10 Civ. 0287, 2011 WL 1496344 (S.D.N.Y. Apr. 18, 2011)　　9, 14

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)　　9

Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995)　　14

DeCarlo v. Archie Comic Publications, Inc., 127 F. Supp.2d 497 (S.D.N.Y.),　　10, 19

Ely-Cruikshank Co. v. Bank of Montreal,

　　81 N.Y.2d 399, 599 N.Y.S.2d 501, 615 N.E.2d 985 (1993)　　21

Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.,

　　2002 WL 398696 (S.D.N.Y. Mar. 15, 2002)　　18

Estate of Hamilton v. City of New York, 627 F.3d 50 (2d Cir. 2010)　　14

Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,

　　375 F.3d 168 (2d Cir. 2004)　　22, 23

Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340 (1991)　　17

Fletcher v. Atex, Inc., 68 F.3d 1451 (2d Cir. 1995)　　9

Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.,

　　08 CIV. 1533 KBF JCF, 2011 WL 6817709 (S.D.N.Y. Dec. 28, 2011)　　23

Getty Images (US) Inc. v. Advernet, Inc., 797 F. Supp.2d 399 (S.D.N.Y. June 29, 2011)　　17

Guilbert v. Gardner, 480 F.3d 140 (2d Cir. 2007)　　21

Hicks v. Baines, 593 F.3d 159 (2d Cir. 2010)      9, 15

Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005)      16

Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v Star Mark Mgt., Inc.,

    2007 WL 74304 (E.D.N.Y. Jan. 8, 2007)      13

Logicom Inclusive, Inc. v. W.P. Stewart & Co., 2004 WL 1781009 (S.D.N.Y. Aug. 10, 2004)  17

Marvel v. Kirby, 777 F. Supp.2d 720 (S.D.N.Y. July 28, 2011)      18

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)      9

Mellencamp v. Riva Music Ltd., 698 F. Supp. 1154 (S.D.N.Y. Nov. 2, 1988)      19

Mgt. Intern., Inc. v Labyrinth Bus. Solutions, LLC,

    05 Civ. 6738, 2009 WL 790048 (S.D.N.Y. Mar. 24, 2009)      9, 17

NASCAR v. Scharle, 356 F. Supp.2d 515 (E.D.P.A. Feb. 11, 2005)      19

National Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur, 85 Civ.,

    8024, 1994 WL 75421 (S.D.N.Y. Mar. 8, 1994)      14, 15

Ocean Group LLC v. Marcal Mfg., LLC,

    09 Civ. 7679, 2010 WL 4963155 (S.D.N.Y. Dec. 2, 2010)      9

PepsiCo, Inc. v. Coca–Cola Co., 315 F.3d 101 (2d Cir. 2002)      9

Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549      17, 18, 19, 20

Stadt v. Fox News Network LLC, 719 F. Supp.2d 312 (S.D.N.Y. June 22, 2010)      22

Trophy & Co., 326 Fed. App'x. 575 (2d Cir. 2009)      17

Twentieth Century Fox Film Corp. v. Entertainment Distributing,

    429 F.3d 869 (9th Cir. 2005)      18

U.S. v. Chang An-Lo, 851 F.2d 547 (2d Cir. 1988)      13

Wiggins v Hain Pure Protein Corp.,

    10 CIV. 4098, 2011 WL 5428955 , fn 2 (S.D.N.Y. Nov. 9, 2011)              14, 15

**Statutes**

17 U.S.C. § 101            17, 22

17 U.S.C. § 201(b)            17

17 U.S.C. § 408(a)            22

17 U.S.C. § 409(4)            7

17 U.S.C. § 410(c)            6

17 U.S.C. § 412            7

N.Y. C.P.L.R. § 203(a)            21

N.Y. C.P.L.R. § 213(2)            21

**Rules**

Fed. R. Civ. P. 56(a)            9

Fed. R. Evid. 1003            13

Fed. R. Evid. 1004            13, 15

**Regulations**

37 CFR 201.7(b)(1)            22

In support of its Motion for Summary Judgment, Plaintiff Archie Comic Publications, Inc. ("ACP") submits this memorandum of law.

## I.   INTRODUCTION

The issue before the Court is whether the "ACP-Penders Agreements" are valid and enforceable, as these agreements dictate the outcome of all claims in this action in ACP's favor. One of the two agreements at issue – the Contractor's Agreement - has already been reviewed recently by this Court in another dispute with a former ACP contractor, Dan DeCarlo. As discussed below, Judge Kaplan of this Court granted summary judgment in ACP's favor, and held that all "past, present and future" submissions by the DeCarlo to ACP were in fact covered by the agreement, works for hire and/or assigned to ACP. Other cases in the District have also recently enforced similar agreements between artists/writers and other comic book companies, such as in *Marvel*, discussed below. The law in this District and in this Circuit provides that the agreements at issue are proper, supported by consideration and effective to cover the type of relationship that existed between ACP and Penders.

Yet, as the Court is aware, "Penders maintains that ACP-Penders documents are forgeries or, if actually signed, signed under false pretenses and the documents are therefore not authentic and provide no authority." *See* Joint Pretrial Order at 9 (D.E. 103). Penders has never articulated what these "false pretenses" may be, never pled with any particularity what these "false pretenses" are, and has never produced in discovery any evidence of any "false pretenses" which led to Penders signing the agreements. Indeed, if Penders now claims that he did sign the agreements under false pretenses he would have to admit that he indeed signed the documents, which is inconsistent with his claim that he never in fact signed the agreements.

Throughout this litigation, the most that Penders has been able to muster is that he does not recall signing the ACP-Penders Agreements. Statement of Material Facts Not in Dispute ("SOF") SOF ¶ 72. This does not entitle him to rewrite history. Without any evidence, Penders has claimed that these agreements somehow did not exist and that ACP fabricated them – yet in his deposition he admitted he has no proof that ACP or anyone else forged his signature on the documents. SOF ¶ 71. Penders' argument is mere speculation and conjecture at best, and at worst it is a perversion of our judicial system. The Court should not condone Penders' arguments and, finally, enter summary

judgment in ACP's favor on its claims for declaratory judgment (Claims 1 and 2) and breach of contract (Claims 3 and 4).[1]

Lastly, in the event the Court enters judgment in ACP's favor on these claims, then it should also enter judgment in favor of ACP on Penders' counterclaims for declaratory relief and copyright infringement. While ACP has additional defenses to these claims, such as equitable estoppel and statute of limitations, these defenses will not be argued here, and are reserved for trial if necessary. If the Court finds the ACP-Penders Agreements valid and enforceable, Penders' counterclaims for declaratory judgment and copyright infringement must be dismissed. This will resolve all claims and counterclaims in this action.

## II.    FACTUAL BACKGROUND

For a detailed recitation of the factual background for ACP and its Sonic the Hedgehog comic book series, please see the Statement of Material Facts Not in Dispute, filed in support hereof. The Statement of Facts is supported by deposition testimony (including that of Penders), other discovery in this case, sworn affidavits from ACP's co-CEO Jon Goldwater (SOF, Ex. 1), Presdient Mike Pellerito (SOF, Ex. 3), Editor-in-Chief and co-President Victor Gorelick (SOF, Ex. 2), and former VP of Finance Ed Spallone (SOF, Ex. 4). Ed Spallone signed the ACP-Penders Agreements on behalf of ACP in 1996 (SOF Ex. 4, ¶ 11); Spallone now works at Marvel Comics in New York as Assistant Controller, having left ACP in 2002 (SOF Ex. 4, ¶ 1-3).

In 1992, ACP entered into a licensing relationship with Sega of America, Inc. ("Sega"), to produce, among other things, comic books which feature Sega's immensely popular character SONIC THE HEDGEHOG, and all related ancillary characters, such as KNUCKLES THE ECHIDNA ("Sonic Comic Book Series"). SOF ¶ 5. ████████████████████ ██████████████████████████████████████████████████ ACP's relationship with Sega continues to this day, and now includes digital distribution rights. The 1992 license agreement with Sega was renewed repeatedly until 2010. SOF ¶ 6-7. As the agreement between ACP and Sega came up for renewal over the years, they would enter into routine renewals prior to the expiration of the then-current term of the license. SOF ¶ 7. For nearly two decades ACP

---

[1] As noted in the Proposed Pretrial Order ACP has withdrawn its fifth claim for tortious interference. (D.E. 103, § IV at 32 of 41). After a protracted and lengthy negotiation with Sega to renew its license to the Sonic properties as a result of Penders' acts and conduct, ACP and Sega have entered an agreement which continues their relationship under which ACP maintains its license to the Sonic properties. However, this new agreement came at a price which, was the direct and proximate result of Penders' breach of the ACP-Penders Agreements. *See, infra*, Page 25; SOF Ex. 1.

maintained a continuous licensing relationship with Sega. SOF ¶ 6-7.  However, in 2010, when Penders began filing for registration of his purported rights in the Works, and asserting infringement

From 1993 until 2005, Penders worked for ACP as an independent contractor, and developed stories, scripts, artwork, and other original creative expressions fixed in tangible form (individually a "Work" and collectively "Works") as contributions to the Sega Comic Book Series.  SOF ¶ 17.  The relationship between Penders and ACP was memorialized in written agreements, executed in 1996. SOF ¶ 28. Penders executed two agreements with ACP: Revised Newsstand Comic Independent Contractor's Agreement ("Contractor's Agreement"); and ACP Licensed Comic Books Independent Contractor's Agreement ("Licensed Comic Books IC Agreement") (the Contractor's Agreement and the Licensed Comic Books IC Agreement collectively referred to as the "ACP-Penders' Agreements"). SOF Ex. B of Ex. 4; SOF Ex. C of Ex. 4.

Each of the ACP-Penders Agreements provide that New York and United States law will govern, and that the "parties consent to the exclusive jurisdiction and venue of any State or Federal court of competent jurisdiction in Manhattan, New York with respect to any proceedings arising under or relating to this Agreement."  SOF, Ex. 4, Ex. B, ¶ 27 and Ex. C, ¶ 11.

Paragraph 1 of the Contractor's Agreement (SOF, Ex. 4, Ex. B) defines "Properties" as all of ACP's comic strips and comic books that include characters, artwork, stories and other creative expressions that are used in any of ACP's publications or licensed products:

> 1.   Archie is in the business of producing and/or publishing comic strips and comic books that include characters, artwork, stories, plots, trademarks, logos, and other creative expressions ("Properties").  All references to "Properties" in this Agreement will include existing and future-created Properties that are commissioned by Archie and/or used in any of Archie's publications or licensed products.

SOF Ex. B of Ex. 4 at ¶ 1.

Paragraph 2 of the Contractor's Agreement (SOF, Ex. 4, Ex. B) defines "Works" as "[a]ll past, pending, and future uses of all Properties," which includes all characters, artwork, stories, plots, trademarks, logos, and other creative expressions.  Notably, paragraph 4 of the Contractor's Agreement clearly identifies that Properties also includes those produced by ACP for third party

3

Licensors and that Penders will execute an agreement under which all contributions are "Works for Hire," and until such time all contributions would be governed by this agreement:

> 4.   In addition to producing and publishing its own comic books, Archie produces and/or publishes comic books ("Licensed Comics") for third party property-owners ("Licensors"). Prior to contributing to any Licensed Comics, Contractor agrees to execute a Licensed Comic Contractor's Agreement including confirmation that his/her contributions to such Licensed Comics are Works for Hire for the Licensor, if applicable.   Unless and until such a Licensed Comic Contractor's Agreement is executed with respect to a particular series of Licensed Comics, Contractor's contributions to such Licensed Comics will be considered Properties and/or Works governed by this Agreement.

SOF Ex. B of Ex. 4 at ¶ 4.

Paragraph 5 of the Contractor's Agreement provides for a fixed sum of compensation for each assignment and clearly states that Penders would not be entitled to any additional compensation, including for reprints:

> 5.   Contractor's full and complete compensation for each assignment that is completed on time (time being of the essence) and in a manner that is acceptable to Archie, will be a fixed sum based on a rate to be mutually agreed upon (e.g., page rate, hourly rate, etc.). Contractor's bills should be submitted on the form attached to this Agreement.   Contractor will not be entitled to royalties, to income derived from licensing or merchandising, or to additional compensation for the creation of new Properties.   Reprint fees will be paid at Archie's sole discretion.

SOF Ex. B of Ex. 4 at ¶ 5.

Among other contractual obligations, paragraph 17 of the Contractor's Agreement provides that Penders will not use any of the Properties or reproduce any of the Works, or prepare works that are substantially similar to the Properties or Works, or prepare any works that parody the Properties or Works.  SOF Ex. B of Ex. 4 at ¶ 17.

Paragraph 18 of the Contractor's Agreement provides that **"all past, pending and future contributions of [Penders] to the Works and Properties are and shall be Works for Hire owned by and for the benefit of Archie [ACP]."**  SOF ¶ 18. This paragraph references the Licensed Comic Books IC Agreement, and confirms that Penders' **"past and pending contributions to the Properties and/or Works, if any, were … Works for Hire."** SOF Ex. B of Ex. 4 at ¶ 18.

In an effort to be as certain as possible with regard to ownership of the work commissioned by ACP from Penders, paragraph 19 of the Contractor's Agreement also provides that:

4

> 19.  To the extent that any past, pending or future contributions by Contractor to the Works or Properties do not qualify as a Work for Hire, Contractor will and hereby does assign to Archie any right, title and interest that he/she has or may obtain therein, including all copyrights, patents, trademarks and other proprietary rights. Contractor will sign, upon request, any documents needed to confirm that any specific Works or Properties are Works for Hire, to effectuate the assignment of his/her rights in any Works or Properties to Archie and/or to obtain copyright, trademark and/or patent protection for any of the Works or Properties.

SOF Ex. B of Ex. 4 at ¶ 19.

ACP further protected its ownership interest and rights in and to all contributions made by Penders in paragraphs 20 and 23 of the Contractor's Agreement: Penders is contractually obligated **"not [to] take any action that inconsistent with or that limits or challenges [ACP's] exclusive right to exploit the Works and/or the Properties and will not use the Properties or the Works in any manner without Archie's prior written consent"** (SOF Ex. B of Ex. 4 at ¶ 20); and Penders **"may not directly or indirectly publish or reproduce any artwork that was prepared for Archie and/or that incorporates any of the Properties or the Works".** SOF Ex. B of Ex. 4 at ¶ 23.

Importantly, and consistent with the legal obligations between the parties, paragraph 33 of the Contractor's Agreement provides that Penders "SHALL HAVE ABSOLUTELY NO RIGHT TO AUDIT [ACP] OR TO RECEIVE COPIES OR HAVE ANY ACCESS TO THE BOOKS AND RECORDS OF [ACP]." SOF Ex. B of Ex. 4 at ¶ 33. If the written and fully executed Contractor's Agreement were not enough, Penders also entered into the Licensed Comic Books IC Agreement. SOF Ex. C of Ex. 4.

The Licensed Comic Books IC Agreement defines "Licensed Works" in paragraph 3, as "[a]ll past, pending and future uses of the Licensed Properties, including the Licensed Comics." SOF Ex. C of Ex. 4 at ¶ 3.

The Licensed Comic Books IC Agreement further provides in paragraph 5 that "[a]ll provisions of the Contractor's Agreement will apply to [Penders'] work on the Licensed Comics" but that if any provision is inconsistent with the Contractor's Agreement, the terms of the Licensed Comic Books IC Agreement will control. SOF Ex. C of Ex. 4 at ¶ 5.

Of paramount importance, and wholly consistent with paragraph 18 of the Contractor's Agreement, the Licensed Comic Books IC Agreement provides that **"all past, pending and future contributions of [Penders] to the Licensed Works are and shall be Works for Hire"** and "acknowledge[s] that [Penders and ACP] have entered into previous oral and written Work for Hire agreements, including the [Contractor's Agreement]…, and that **[Penders'] past and pending**

contributions to the Properties and/or the Works, if any, were created pursuant to such earlier agreements and are Works for Hire." SOF Ex. C of Ex. 4 at ¶ 7. And, just like paragraph 19 of the Contractor's Agreement, Penders agreed in the Licensed Comic Books IC Agreement to assign any right, title and interest in any past, pending or future contributions, to the extent they do not qualify as a Work for Hire. SOF Ex. C of Ex. 4 at ¶ 7. Many other provisions of the Licensed Comic Books IC Agreement are exactly the same or substantially similar to the Contractor's Agreement. *See* Ex. B of Ex. 4; Ex. C of Ex. 4. Penders supplied Works to ACP pursuant to the ACP-Penders' Agreements as contributions to the Sonic Comic Book Series, from 1993-2005. SOF ¶ 17.

Sega was and remains a Licensor, as that term is defined in the ACP-Penders' Agreements, and all the Works supplied by Penders are included in the Works and Properties subject to those agreements. SOF Ex. A of Ex. 1; SOF Ex. B of Ex.1.

Beginning on or around January 2009, without authorization from ACP, contrary to the ACP-Penders' Agreements and unbeknownst to ACP, Penders began filing numerous applications with the U.S. Copyright Office to register each of the Works in his own name personally and claimed ownership of each of each of the Works, listing himself as the "Author" and "Copyright Claimant" for each of the Works. SOF ¶ 60. Unbeknownst to ACP, commencing on or about July 7, 2010, Penders began to assert his purported ownership in each of the Works publicly. SOF ¶ 60. D.E. 1 at Ex. C (blog post dated Wednesday July 7, 2010, 10:37 am, at Penders' website, http://www.kenpenders.com, claiming he is "the owner of every single SONIC and KNUCKLES story I ever created..."); *See also*, http://www.kenpenders.com/forums/viewtopic.php?f=9&t=133.

Each of the published works in the Sonic Comic Book Series contains a clear copyright notice as follows:

SONIC THE HEDGEHOG, (ISSN 10705090) No. 49, Aug., 1997 Published monthly by Archie Comic Publications, Inc., 325 Fayette Avenue, Mamaroneck, NY 10543. Richard H. Goldwater, President and Co-Publisher, Michael I. Silberkleit, Chairman and Co-Publisher. Single copies $1.50 in the U.S.; $1.65 in Canada. Subscription rate: U.S. $18.00 for 12 issues; $19.80 in Canada. SEGA is registered with the U.S. Patent and Trademark Office. Sonic The Hedgehog and all related characters and indicia are trademarks of SEGA. ©1997 SEGA. All rights reserved. Used with permission. Any similarities between characters, names, persons, and/or institutions in this book and any living, dead, or fictional characters, names, persons, and/or institutions are not intended and if they exist, are purely coincidental. Periodicals postage paid at the post office at Mamaroneck, New York and at additional mailing offices. Title registered in U.S. patent office. POSTMASTER, send address changes to SONIC THE HEDGEHOG, c/o Archie Comic Publications, Inc., 325 Fayette Avenue, Mamaroneck, NY 10543. Printed in Canada

SOF ¶ 73.

Penders never disputed any of these copyright notices throughout the years, was paid for all Works published by ACP, and never claimed ownership of any rights at any time in the more than 15 years since he first penned his first contribution to the Sonic Comic Book Series in 1993. SOF ¶¶ 18, 54. (Gorelick and Pellerito decl.). In fact, in 1997, when ACP first reprinted one of the works, Penders asked ACP for reprint fees, and was told he was not entitled to reprint fees and ACP would

not pay him any reprint fees; the agreements specifically provide that such reprint fees would only be paid at ACP's discretion. SOF ¶ 52; SOF Ex. B of Ex. 4; SOF Ex. C of Ex. 4.

In July 2010, Penders, through his lawyer, then accused ACP of infringing his copyrights. SOF ¶ 65. In response to this charge of infringement, ACP immediately sent Penders copies of the ACP-Penders Agreements, and demanded he cease and desist from his actions in violations of the agreements. SOF ¶ 68. After written correspondence was exchanged for several months, Penders continued his charge of infringement and threats of filing a lawsuit. SOF ¶ 69. It became clear that unless ACP acquiesced to Penders demands, that he would file suit against ACP. ACP feared they would be unfairly sued for copyright infringement. Accordingly, ACP filed this action on November 25, 2010, seeking cancellation of the registrations, declaratory judgment and remedies for breach of contract and tortious interference.

The asserted registrations were filed more than five years after first publication of the subject work. SOF ¶ 61. None of the asserted registrations may be considered to be prima facie evidence of the validity of the copyright and the facts stated in the certificates. 17 U.S.C. § 410(c). None of the asserted registrations include a statement that the subject work was made for hire, as required by 17 U.S.C. § 409(4), and each was registered more than three (3) months after first publication of the subject work (17 U.S.C. § 412). SOF ¶ 62. Each of the asserted registrations are for Works supplied by Penders to ACP from as early as 1993, almost two decades ago; in all these many years until 2010, Penders never claimed any ownership in any of the works, or sought copyright registration, or made any demands upon ACP for any further compensation for use and exploitation of any of the Works. SOF ¶ 53. Penders was never entitled to any ownership interest in any of the Works, or to any additional compensation for use and exploitation of any of the Works, and he knew this plainly at the time the Works were delivered to ACP and when he accepted payment from ACP in exchange for the Works. SOF ¶ 46.

## A. Control Over Creation of the Works By ACP and Sega

To create the Sonic Comic Book Series, ACP commissions writers and artists to write a plot outline of the proposed story. SOF ¶ 10. ACP and Sega controlled the content and publication of the Sonic Comic Book Series at all times. SOF ¶ 16. ACP and Sega would review the plot outline submitted by the artist and approve or reject the outlines. SOF ¶ 10. Artists whose plot outlines were approved by ACP and Sega were paid for their contributions in their entirety. SOF ¶ 11. Artists were not paid for any plot outlines that were rejected. SOF ¶ 11.

An excellent example of this process from as early as 1993 appears in SOF Exhibit 9 where it can plainly be seen that ACP and Sega exercised complete control over the editorial process. SOF ¶ 16.

For most approved plot outlines, ACP and Sega would each provide instructions and comments to the artist of varying substance depending on how close the plot outline was to what ACP and Sega wanted. SOF ¶ 12. By way of example, the instructions and comments ranged from removal or addition of characters, visual material, dialogue, and story concepts to page or panel limitations. SOF ¶ 13. Certain plot outlines gained approval by ACP and Sega without substantive comments but, nevertheless, all plot outlines submitted were required to be approved by ACP before moving forward with the publication process, and this is undisputed. SOF ¶ 14.

The plot outlines were one of many steps in the Sonic Comic Book Series publication process. SOF ¶ 15. ACP engaged various artists to complete various steps in the process which culminated in the final product, a published comic book. SOF ¶ 15. ACP engaged different people to produce the plot outline, penciling, dialogue, lettering, inking, and coloring of the comic. SOF ¶ 15. Each was paid for his contribution to the work. SOF ¶ 11.

**B. Penders' Contributions to the Works**

Penders was first approached in 1993 to contribute to the Sonic Comic Book Series by Mike Kanterovich, another writer who was contacted by ACP to submit story proposals for the Sonic Comic Book Series. SOF ¶ 19. Penders and Kanterovich worked together on plot outlines submitted to ACP which outlined possible story ideas. SOF ¶ 20. ACP and Sega reviewed these submissions and rejected some and approved others with comment and instructions. SOF ¶ 21. Penders and Kanterovich would then prepare visual layouts for the approved submissions which would go through yet another review by ACP and Sega. SOF ¶ 22. ACP and Sega's instructions, comments, and suggestions would in turn be provided to Penders and Kanterovich who would revise the visual layouts in accordance with ACP and Sega's instructions. SOF ¶ 23. Penders was informed that ACP and Sega had to approve every story proposal before it was published. SOF ¶ 24.

Once the final visual layouts were approved, ACP would engage various artists to pencil, write dialogue, letter, ink, and color the layouts. SOF ¶ 25. Penders was involved at various steps in the process depending on the comic. SOF ¶ 26. Penders would often provide the visual layouts and written dialogue while penciling, lettering, inking, and/or coloring would be performed by other artists engaged by ACP. SOF ¶ 26. Penders was, at most, a co-author of any given Sonic comic.

8

Further evidence of the kind of control exerted over Penders in the creative process appears in ACP's correspondence with Penders, a selection of which is attached as SOF Exhibit 9.  SOF Ex. 9.

Penders continued to contribute to the Sonic Comic Book Series until 2005 when Penders informed ACP of his intentions to part ways.  SOF ¶ 46.  Penders had contributed to many issues of Sonic Comics, and these were all logged by ACP in the ordinary course.  SOF ¶ 47.

### C. ACP First Began Reprinting Copies of the Sonic Comic Book Series in 1997

ACP began reprinting certain issues of the Sonic Comic Book Series in 1997, first in paper form and later digitally.  SOF ¶ 51.  In 1997 Penders approached Victor Gorelick, regarding the possibility of payment for reprinted materials Penders contributed to.  SOF ¶ 52.  Gorelick informed Penders that ACP would not pay Penders any additional fee for any reprinted material because he was not entitled to reprint fees under his agreements with ACP.  SOF ¶ 52.  At no point in time during the conversation with Gorelick or at any time thereafter did Penders inform him (or anyone else at ACP) that he believed ACP was infringing his rights.  SOF ¶ 53.  Throughout the remainder of Penders working relationship with ACP there was no further discussion of reprint fees or potential copyright infringement.  SOF ¶ 54.

### III.   ARGUMENT

### A. The Legal Standard on a Motion for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted by the court "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brand v. RMM, 10 Civ. 0287, 2011 WL 1496344, at *2 (S.D.N.Y. Apr. 18, 2011).  "If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim."  Bus. Mgt. Intern., Inc. v Labyrinth Bus. Solutions, LLC, 05 Civ. 6738, 2009 WL 790048, at *5 (S.D.N.Y. Mar. 24, 2009) *citing Celotex*, 477 U.S. at 322–23, 325 ("[T]he burden on the moving party may be discharged by "showing" – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."); PepsiCo, Inc. v. Coca–Cola Co., 315 F.3d 101, 105 (2d Cir. 2002).

The party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts" in order to defeat the motion.  *Brand*, 2011 WL 1496344, at *3 *citing* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)

(*internal quotes omitted*).  The non-moving party must show that sufficient evidence exists upon which a reasonable jury could return a verdict in its favor.  *See* Ocean Group LLC v. Marcal Mfg., LLC, 09 Civ. 7679, 2010 WL 4963155, at *10 (S.D.N.Y. Dec. 2, 2010).  A non-moving party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment .... [M]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) *citing* Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995).

**B.  This Court has Already Held that the Contractor's Agreement is Valid and Enforceable with Regard to All "past, pending and future" works supplied to ACP and this includes all characters that appear in any of ACP's comic books, comic strips or licensed products.**

Ordinarily, the written agreements between the parties in this case would necessarily dictate the outcome of the claims in this dispute.  Judge Kaplan of this Court has recently had the occasion of assessing the Contractor's Agreement (one of the two agreements at issue in this case) between ACP and another of its artists, Dan DeCarlo, who similarly claimed rights in works he submitted to ACP years ago.  Also similar to this case, DeCarlo had submitted works to ACP both before and after he executed his agreement with ACP.  The Court concluded that the Contractor's Agreement controlled the disposition of all claims to ownership of all the works in favor of ACP, and entered judgment in favor of ACP. *See*, DeCarlo v. Archie Comic Publications, Inc., 127 F. Supp.2d 497 (S.D.N.Y.), *aff'd*, 11 F. App'x 26 (2d Cir. 2001), *cert. denied*, 534 U.S. 1056 (2001); Archie Comic Publications v. DeCarlo, 258 F. Supp.2d 315 (S.D.N.Y. Apr. 23, 2003), *memorandum opinion* (citing DeCarlo v. Archie Comic Publications, Inc., 127 F. Supp.2d 497 (S.D.N.Y.)) (noting that ACP had previously been determined to own copyrights in the properties and an order to quiet title is proper), *final judgment and permanent injunction,* 2003 WL 21354692 (S.D.N.Y. June 11, 2003), *aff'd*, 88 F. App'x 468 (2d Cir. 2004).

The Contractor's Agreement in *DeCarlo* was also signed by Ed Spallone, then-VP of Finance for Archie,[2] is identical to the Contractor's Agreement between ACP and Penders in this case (except the name of the artist), and this Court found the agreement to be valid, enforceable and dispositive.

---

[2] A copy of the DeCarlo agreement was produced to Penders in this litigation as ACP 1085-1090, and appears as the last agreement in the composite Exhibit A to Spallone's Declaration filed in support of this motion.  SOF Ex. A of Ex. 4.  Spallone executed the DeCarlo agreement on the same day he signed Penders' agreement, November 25, 1996!  And, the DeCarlo agreement also has an unfilled blank in paragraph 18 (ACP 1088), as does Penders' agreement, and was enforced by the Court.

*See DeCarlo,* 258 F. Supp.2d at 332, fn 107.  Similarly, the Court entered an injunction in favor of ACP and against DeCarlo for relief similar to that which ACP requests in this case against Penders. *Id.* at 335.  In *DeCarlo,* the Court held that the 1996 agreement entered into by ACP and DeCarlo "conveyed to ACP any rights that DeCarlo had in any of the comic strips and pages that he previously had submitted to Archie" because DeCarlo had "assigned to ACP any of his past, pending or future contributions ... to the Works or Properties." *Id.* at 332, fn 107 (internal quotes omitted). Significantly, in this case, this also includes any characters used by ACP that were in Works submitted by Penders.  As the DeCarlo Court observed:

> "Properties" is defined to include all characters that appear in any of ACP's comic books, comic strips or licensed products. A character becomes a "Property" if it is "commissioned by Archie and/or used in any of Archie's publications or licensed products." Thus, once a character is used by ACP and thereby becomes a "Property," all "past, pending and future uses" of that character become "Works" subject to the Agreement.

Archie Comic Publications, Inc. v. DeCarlo, 258 F. Supp.2d 315, 332 (S.D.N.Y. 2003) *judgment entered,* 00 CIV. 5686(LAK), 2003 WL 21354692 (S.D.N.Y. June 11, 2003) *aff'd,* 88 F. App'x 468 (2d Cir. 2004).

### C. The ACP-Penders Agreements were executed by Ed Spallone as VP of Finance for ACP and Penders, the agreements are authentic and Penders signature is obviously of his own hand.

More than 15 years ago, in November of 1996, the ACP-Penders Agreements were signed by Edward G. Spallone, then-Vice President of Finance for ACP. SOF ¶ 28-29.  Spallone recalls specifically writing Penders' name in the opening paragraph of each agreement and signing and dating the Agreements on behalf of ACP. SOF ¶ 28-29.  Spallone then submitted the ACP-Penders Agreements, along with many other such agreements he signed, to the business office at ACP, which then mailed two copies of the Agreements to Penders with a cover letter instructing Penders to counter-execute the documents and return one copy to ACP and keep one copy for his files. SOF ¶ 30-31.  Victor Gorelick, Editor-in-Chief of ACP, recalls receiving via mail the ACP-Penders Agreements counter-signed by Penders which contain signatures and dates that match numerous other documents signed by Penders. SOF ¶ 32. As was standard practice for ACP at the time, Gorelick photocopied the fully executed agreements, circulated copies to relevant offices, such as accounting, and in ACP's files where multitudes of other such agreements countersigned by other independent contractors were typically stored in the ordinary course of business. SOF ¶ 33.

Penders' signatures on the ACP-Penders Agreements are true and genuine signatures. SOF ¶ 71. In fact, Penders' signature and method of dating his documents is very distinct. SOF ¶ 70. The examples of Penders' signature confirmed by Penders' sworn testimony evidence a series of signatures and dates that remain constant. SOF ¶ 70. Penders confirmed hundreds of examples of his signature, a sample of which is provided below. SOF ¶ 70.

Below is an exemplar of Penders' signature from his military papers dated in 1979, the authenticity of which was confirmed by Penders in his deposition:



SOF ¶ 70.

And, below are two exemplars from Penders' bankruptcy filing in 1994, which he also confirmed as authentic in his deposition:



SOF ¶ 70.

Here are two exemplars of Penders' signature from the multitude of invoices he submitted to ACP, which he also confirmed as authentic in his deposition:



SOF ¶ 70.

Most recently, Penders submitted a declaration to this Court with his signature in support of his Motion to Dismiss and Transfer Venue (D.E. 11-2):

Executed this 7th day of February, 2011 in Granada Hills, California.

Kenneth W. Penders, II

D.E. 11-2.

The above exemplars make it plainly obvious that signatures on the ACP-Penders Agreements (shown below) are in fact his, as can be seen by simple comparison to the above:

INDEPENDENT CONTRACTOR

BY:
Name: KENNETH W PENDERS II
Date: 12 DECEMBER 1996

INDEPENDENT CONTRACTOR

BY:
Name: KENNETH W PENDERS II
Date: 12 DEC 1996

SOF Ex. B of Ex. 4 Ex. C of Ex. 4.

In addition, it should be noted that Penders has disclosed no expert testimony to support a claim of forgery or refute the authenticity of his signature on the ACP-Penders Agreements, and no expert testimony has been disclosed to suggest that this was somehow thwarted by unavailability of the original wet-signatures.

**D. The duplicate ACP-Penders Agreements are admissible to the same extent as the originals because Penders has admitted he has no evidence that his signature was forged and ACP did not lose or destroy the originals in bad faith.**

Penders has, at all times up to the present, failed to produce evidence of any genuine dispute regarding the authenticity of the ACP-Penders Agreements and has admitted he has no evidence that ACP or anyone else forged his signature. SOF ¶ 71. Instead, Penders has rested his laurels on Fed. R. Evid. 1003. He asserts that ACP must come forward with the wet-signature originals in order to enforce the agreements, but this is simply not mandated by the Rules. Under the Federal Rules of Evidence, the duplicate ACP-Penders Agreements are admissible to the same extent as the original signature documents. D.E. 56.

Under Fed. R. Evid. 1003 "a duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." FED. R. EVID. 1003. "The party opposing the introduction of a duplicate has the burden of demonstrating 'a genuine issue as to the authenticity of the unintroduced original, or as to the trustworthiness of the duplicate, or as to the fairness of substituting the duplicate for the original.'" Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v Star Mark Mgt., Inc., 2007 WL 74304, *4 (E.D.N.Y. Jan. 8, 2007) citing U.S. v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir. 1988).

Pursuant to Fed. R. Evid. 1004, an original is "not required, and other evidence of the contents of a writing ... is admissible" if "[a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith." Fed. R. Evid. 1004. There is no evidence in this case that ACP lost or destroyed the originals in bad faith.

For summary judgment purposes, the mere "suspicion of forgery ... does not overcome the presumption of authenticity." National Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur, 85 Civ. 8024, 1994 WL 75421, *3 (S.D.N.Y. Mar. 8, 1994) citing Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 622 F.Supp. 208, 211 (S.D.N.Y. 1985) ("It is incumbent upon a party claiming the non-genuineness of a signature to produce firsthand proof of the forgery."), aff'd, 805 F.2d 49 (2d Cir. 1986). In addition, "[i]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." Wiggins v Hain Pure Protein Corp., 10 CIV. 4098, 2011 WL 5428955, *2, fn 2 (S.D.N.Y. Nov. 9, 2011) citing Estate of Hamilton v. City of New York, 627 F.3d 50, 54 (2d Cir. 2010) (citation omitted). The Second Circuit has recognized that where circumstantial evidence represents the sum total of a non-moving party's proof, the Court is inclined to affirm summary judgment. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

### 1. Penders has admitted there is no evidence to support his claim that the ACP-Penders Agreements are forged.

By Penders' own admission he has no evidence whatsoever to support his claim that his signatures on the ACP-Penders Agreements are forgeries:

Q:   **You have no evidence that Archie forged your signature, do you?**
A:   **I have no evidence.** That doesn't mean they're not capable.
Q:   Do you have any evidence to support such a claim?
A:   I don't have any evidence that a business that's been in the graphic reproduction for 70 years committed forgery, no."

14

SOF ¶ 71.  Penders cannot controvert this prior sworn testimony to defeat summary judgment, and any attempt to do so through affidavit or otherwise, filed in response to this Motion, must be disregarded by the Court.  *Wiggins,* 2011 WL 5428955, at *2, fn 2.

Second and importantly, the Southern District has held that "suspicion of forgery" by itself "does not overcome the presumption of authenticity."  *National Union Fire Ins. Co.*, 1994 WL 75421, at *3.  Penders' argument challenging the authenticity of the ACP-Penders Agreements amounts to nothing more than "some metaphysical doubt as to the material facts" and, as recognized by the *Brand* court, Penders must show more in order to defeat a motion for summary judgment. *Brand*, 2011 WL 1496344, at *3.  Merely denying the authenticity of the Agreements cannot by itself "create a genuine issue of material fact where none would otherwise exist" and relying on "speculation or conjecture as to the true nature of the facts" is insufficient to overcome a motion for summary judgment and any attempt to contradict Penders' admission that he has no proof of forgery should be disregarded.  *Hicks,* 593 F.3d at 166; *Wiggins,* 2011 WL 5428955, at *2, fn 2.  The signatures are further validated by comparing them to other examples of Penders' signatures spanning more than 30 years. SOF ¶ 70.

### 2.  *The original ACP-Penders Agreements are not required because there is no evidence that ACP lost or destroyed the originals in bad faith.*

Pursuant to Fed. R. Evid. 1004, an original is "not required, and other evidence of the contents of a writing ... is admissible" if "[a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith."  Fed. R. Evid. 1004.  ACP did not lose or destroy the original ACP-Penders Agreements in bad faith nor has Penders alleged bad faith. SOF ¶ 66-67.  As Gorelick's affidavit makes clear, ACP undertook a diligent search for the original wet signature documents.  SOF ¶ 66-67.  Despite reasonable efforts, ACP was unable to locate the 15 year old wet original signature documents in its business records.  SOF ¶ 66.  However, ACP has in its possession, and has had in its possession at all relevant times, duplicates of the ACP-Penders Agreements, and these were found in the place where such documents were kept in the ordinary course of business. SOF ¶ 67.  These documents were kept among a large cache of duplicate agreements between ACP and its artists and produced to Penders without delay upon ACP's receipt of Penders' initial demand letter.  SOF ¶ 67.  These are business records of ACP.

### 3.  *Penders has also admitted that he signed work made-for-hire agreements with ACP.*

Penders claims that he "has no record" of ever receiving the ACP-Penders Agreements "nor any recollection of signing" the Agreements.  D.E. 1, Ex. G.  However, in his deposition Penders admits "receiving documents from Scott Fulop [on behalf of ACP].  I don't remember what happened to those documents."  SOF ¶ 72.  Lack of memory or record is insufficient to overcome the presumption of authenticity of the ACP-Penders Agreements.  *National Union Fire Ins. Co.,* 1994 WL 75421, *3 ("Turtur's statement that a particular signature "does not appear" to be his ... does not overcome the presumption of authenticity.").

Penders' assertions are also belied by the record.  Contrary to Penders' records and recollection, or lack thereof, a series of emails written by Penders to Victor Gorelick of ACP in late 2008 and early 2009 admit that Penders did, in fact, sign work-for-hire agreements with ACP.  SOF ¶ 56.  Penders affirmatively stated, in no less than four separate email communications, that he signed a "work-for-hire" agreement with ACP.  SOF ¶ 56.  The emails are referenced by Penders in his Amended Counterclaims (D.E. 27, at 63) and Penders has never questioned the authenticity of the emails.  SOF ¶ 59.  Penders only excuse for these damning admissions is to state that these were "inartfully worded."  SOF ¶ 59.  Thus, Penders' position in this lawsuit, given his prior statements, admissions, and prior sworn testimony is dubious at best, and perjurious at worst.

Penders has also acknowledged that he received a healthcare election form with ACP, but he has never produced any such form.  SOF ¶ 37.  The only healthcare election that Penders ever signed with ACP appears just above his signature in the Contractor's Agreement, further validating the authenticity of this agreement and his execution thereof. SOF ¶ 35.

Penders cannot overcome summary judgment because he has no specific, particularized facts or expert testimony to support his claims that the executed ACP-Penders Agreements are not authentic.  *Baroor v. New York City Dept. of Educ.*, 362 F. App'x 157, 161 (2d Cir. 2010) (granting summary judgment in favor of defendant, finding that plaintiff failed to offer any "specific, particularized facts, or expert testimony, to support her claim that the retirement application form-which bears her signature and was notarized by a notary public-was a product of forgery.") *citing Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("To defeat summary judgment ... nonmoving parties must do more than simply show that there is some metaphysical doubt as to the material facts, and they may not rely on conclusory allegations or unsubstantiated speculation." (internal citations and quotations omitted)).  Thus, without any specific, particularized facts, or expert testimony, to demonstrate that his signature on the ACP-Penders Agreements are forged, Penders' claims amount to nothing more than some metaphysical doubt as to the material facts of this case,

and this is insufficient to defeat summary judgment in ACP's favor on this issue, which is dispositive of the claims in this case.

   **E.  As between ACP and Penders, the undisputed record evidence establishes that ACP is the lawful rights-holder of the works and entitled to summary judgment on all remaining claims in this case.**

   Once this Court finds the ACP-Penders Agreements valid and enforceable, this Court should grant ACP summary judgment on both its claims for declaratory relief and breach of contract, and Penders' counterclaims. All Works were "made-for-hire" or assigned to ACP, and the agreements provide that Penders can take no act to challenge ACP's ownership of the Works, or claim ownership of the Works. Penders therefore cannot prove a necessary element of his infringement claim – namely, that he is the owner of the Works - and thus a declaratory judgment of ACP's non-infringement of the Works is appropriate. Similarly, without valid proof of ownership of the Works Penders' copyright registrations are invalid and should be canceled.

   *1.  ACP is Entitled to Summary Judgment on its Claim for Declaratory Judgment of Non-Infringement of the Works Because Penders Cannot Prove Ownership of the Works.*

   ACP bears the initial burden of demonstrating the absence of evidence in support of one or more essential elements of Penders' claim of copyright infringement. *See Bus. Mgt. Intern., Inc.,* 2009 WL 790048, at *5. In order to prevail on a claim for copyright infringement, the party claiming infringement must first establish valid ownership of the copyrights at issue. *See* Crown Awards, Inc. v. Disc. Trophy & Co., 326 Fed. App'x. 575, 576 (2d Cir. 2009); Getty Images (US) Inc. v. Advernet, Inc., 797 F. Supp.2d 399, 413 (S.D.N.Y. June 29, 2011) (reconsideration denied) *citing* Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991) ("To establish copyright infringement, a plaintiff must prove: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.") (internal quotes omitted).

   **a.  <u>All Works were "made-for-hire" under the U.S. Copyright Act and owned by ACP.</u>**

   All of Penders contributions to the Works qualify as works made-for-hire under Sec. 201(b) of the 1976 U.S. Copyright Act (the "Act") and ACP is the rightful owner of such Works. 17 U.S.C. § 201(b). The Act defines a work made-for-hire made outside of an employer-employee relationship as "a work specially ordered or commissioned for use as a contribution to a collective work [or eight

other enumerated categories]… if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. Penders contributions are works made-for-hire because the Works constitute contributions to a collective work[3] that were specially ordered or commissioned by ACP and expressly agreed to by both parties in signed written instruments.

In determining the "specially ordered or commissioned" requirement of the Act, the Second Circuit has held that the requirement has "essentially the same meaning as the instance and expense test of its predecessor, the Copyright Act of 1909." *Logicom Inclusive, Inc. v. W.P. Stewart & Co.*, 2004 WL 1781009, *8 (S.D.N.Y. Aug. 10, 2004) (internal quotes omitted) *citing Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 560–63 (2d Cir.1995). In *Playboy Enterprises*, the Second Circuit explained that under the two-pronged *instance and expense* test of the 1909 Act, in examining the *instance* prong of the test "the district court must determine … whether Playboy was the 'motivating factor' in the creation of the works." *Playboy Enterprises*, 53 F.3d at 563.

In determining the "motivating factor" for the creation of a work the Court must analyze the relationship between the parties, specifically with a "focus on the degree to which the hiring party had the right to control or supervise the artist's work …." *Marvel v. Kirby*, 777 F. Supp.2d 720, 738 (S.D.N.Y. July 28, 2011) *citing Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 2002 WL 398696, at *18 (S.D.N.Y. Mar. 15, 2002). Of particular relevance to whether the work was created at the *instance* of the commissioning party is "[w]hether the hiring party had the power to accept, reject, modify, or otherwise control the creation of the work …." *Id.* at 738-39. Complete control over the creation of the work is not necessary. *Id.*; *see also DeCarlo*, 258 F. Supp.2d at 334 ("Although the hiring party often retains artistic control over the work, such control is not an absolute requirement of the work for hire test."). "Instead, 'the greater the degree of supervisory power and control a commissioning party has over an independent contractor, the more likely it is that the work was created at the commissioning party's instance.'" *Kirby*, 777 F. Supp.2d at 738 *citing Twentieth Century Fox Film Corp. v. Entertainment Distributing*, 429 F.3d 869, 880 (9th Cir. 2005).

---

[3] "Comic strips arguably qualify as works for hire under the contribution to a collective work eligible category. A collective work is defined as a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." *Archie Comic Publications, Inc. v DeCarlo*, 258 F. Supp.2d 315, 334 (S.D.N.Y. 2003), *memorandum opinion* (internal quotes omitted), *final judgment and permanent injunction*, 2003 WL 21354692 (S.D.N.Y. June 11, 2003), *aff'd*, 88 F. App'x 468 (2d Cir. 2004), *cert. denied*, 125 S.Ct. 50 (2004).

To determine the *expense* requirement of the test, satisfaction of the requirement occurs "where a hiring party simply pays an independent contractor a sum certain for his or her work." *Kirby*, 777 F. Supp.2d at 741 *citing Playboy Enterprises*, 53 F.3d at 555 (citing Second Circuit precedent). Whether the independent contractor "provided his own tools, worked his own hours, paid his own taxes and benefits, and used his own art supplies" has no bearing in determining the *expense* requirement of the test. *Id.* Such costs are relevant only to the artist's status as an independent contractor and not whether such costs were incurred at the commissioning party's *expense. Id.*

Here, Penders' contributions to the Works meet the requirements for works made-for-hire because the Works were specially ordered or commissioned by ACP, ACP maintained ultimate control over the Works, Penders was paid a sum certain for approved and published contributions to the Works, and Penders and ACP agreed that Penders' contributions were to be considered works made-for-hire by signed written instrument.

### i. *The ACP-Penders Agreements satisfy the requirement of a Signed Written Instrument.*

Turning first to the signed "written instrument" requirement, Penders signed two agreements with ACP executed in 1996 (the ACP-Penders Agreements) which clearly denotes that any and all contributions Penders made to the works shall be "made-for-hire". SOF ¶ 38-40. While Penders began submitting work to ACP in 1993, the ACP-Penders Agreements executed in 1996 are inclusive of all "past, pending, and future contributions" Penders made to the Works which were commissioned by ACP as works-made-for-hire. SOF ¶ 38-40; *See also*, DeCarlo v. Archie Comic Publications, Inc., 127 F. Supp.2d 497 (S.D.N.Y.), *aff'd*, 11 F. App'x 26 (2d Cir. 2001), *cert. denied,* 534 U.S. 1056 (2001); Archie Comic Publications v. DeCarlo, 258 F. Supp.2d 315 (S.D.N.Y. Apr. 23, 2003), *memorandum opinion* (citing DeCarlo v. Archie Comic Publications, Inc., 127 F. Supp.2d 497 (S.D.N.Y.)) (noting that ACP had previously been determined to own copyrights in the properties and an order to quiet title is proper), *final judgment and permanent injunction,* 2003 WL 21354692 (S.D.N.Y. June 11, 2003), *aff'd*, 88 F. App'x 468 (2d Cir. 2004).

Penders has claimed in this litigation that somehow the ACP-Penders Agreements do not convey to ACP all interests in the Works because the "documents provided make no reference to any specific title(s) or property(s)" and there is "no way to ascertain from the face of the document what licensed property is intended to be covered by such contractor's agreement." D.E. 103 at 14. An agreement to transfer or assign a copyright need not specifically identify each particular work at the time of the agreement. An agreement that transfers or assigns all copyright during the term of the

agreement or past work is sufficient. NASCAR v. Scharle, 356 F. Supp.2d 515 (E.D.P.A. Feb. 11, 2005) (*citing* Mellencamp v. Riva Music Ltd., 698 F. Supp. 1154 (S.D.N.Y. Nov. 2, 1988) (enforcing written publishing agreement in which a singer transferred worldwide copyrights in and to *all works to be composed* during the term of the agreement.); *see also DeCarlo*, 127 F. Supp.2d 497, *aff'd*, 11 F. App'x 26 (2d Cir. 2001), *cert. denied*, 534 U.S. 1056 (2001); Archie Comic Publications v. DeCarlo, 258 F. Supp.2d 315 (S.D.N.Y. Apr. 23, 2003), *memorandum opinion* (citing DeCarlo v. Archie Comic Publications, Inc., 127 F. Supp.2d 497 (S.D.N.Y.)) (noting that ACP had previously been determined to own copyrights in the properties and an order to quiet title is proper), *final judgment and permanent injunction*, 2003 WL 21354692 (S.D.N.Y. June 11, 2003), *aff'd*, 88 F. App'x 468 (2d Cir. 2004).

Like the singer in *Mellencamp*, sculptor in *NASCAR*, and writer in *DeCarlo, supra,* Penders assigned his rights in all past, pending and future works to ACP. The ACP-Penders Agreements are not required to reference the "specific title(s) or property(s), rather an agreement to transfer copyright in a group of works is sufficient to reasonably identify the subject matter." *Id.* Contracts identifying groups of work are commonplace in the art and entertainment industries. *Id.* In accordance with applicable law and the ACP-Penders Agreements, Penders conveyed to ACP all right, title and interest in all past, pending and future Works submitted to ACP.

### ii. *All Works were created at ACP's "Instance."*

All Works were clearly created at the *instance* of ACP and ACP was undoubtedly the motivating factor in the creation of the Works. Throughout the working relationship between Penders and ACP, ACP maintained the right to control and supervise Penders' work. SOF ¶ 16, 24. At the request of ACP, and under ACP's authority as licensee of Sega with rights to create derivative works based on the wildly popular SONIC characters and video games, Penders would submit potential stories to ACP for ACP's approval or rejection. SOF ¶ 19-21, 24. Without the rights granted to ACP under its license from Sega, Penders' work would merely have been infringements of Sega-owned property, namely the SONIC properties.

Penders was paid for submissions that were approved and eventually published and not paid for submissions that were rejected (although he was paid for some work that was not published). SOF ¶ 11, 18. For approved submissions, ACP would provide Penders with instructions and comments on how to proceed with the story. SOF ¶ 12, 23. Instructions would range from determining use of certain characters to the plotline to coloring to format. SOF ¶ 13. In his deposition, Penders complained that the control ACP exerted over his work was akin to working with

one hand tied behind his back in his creative process and the development of the creative works. SOF ¶ 16. The ultimate power to accept, reject, modify and otherwise control the creation of the Works was ACP's and not Penders. SOF ¶ 16.

### iii. *All Works were created at ACP's "Expense."*

It is without dispute that ACP paid Penders a sum certain for his contributions to the Works, as provided in paragraph 5 of the Contractor's Agreement. SOF ¶ 18. ACP does not dispute that Penders may have used his own tools, art supplies, and worked his own hours pursuant to certain deadlines established by ACP, however, as established in *Playboy Enterprises*, such costs are irrelevant to this prong of the *instance and expense test. Playboy Enterprises,* 53 F.3d at 555.

Penders' last submitted work for ACP that was published in 1995; accordingly, and to the extent that Penders may argue he was not paid for work he submitted and which ACP published, Penders has long since abandoned those claims for breach of contract – certainly he has pled no claims for breach of contract in this case.[4] Any claim by Penders that he maintains viable copyright infringement claims due to non-payment by ACP for work published is a red-herring. ACP has provided Penders with records of payment, and specifically pointed out and produced documents to show payment for any specific work on which Penders has sought proof of payment. We have had this conversation with counsel many times, and repeatedly requested that they tell us what works, if any, they allege Penders was not paid for. To date, the only specific work for which Penders has claimed non-payment, ACP has produced documentation showing such payment. D.E. 1, Ex. D-I.

### b. <u>To the extent the Works are not works made-for-hire, Penders assigned all right, title and interest to ACP.</u>

To the extent that any of the Works do not qualify as works made-for-hire, Penders assigned "any right, title and interest" in "any past, pending or future contributions" to ACP, "including all copyrights." SOF ¶ 41-43. The assignment clauses found in both the Contractor's Agreement and Licensed Comic Books IC Agreement are unambiguous as to the ownership of copyright. Both Agreements state, in part, "Contractor will and hereby does assign to [ACP] any right, title and

---

[4] In New York, the Statute of Limitations on a claim for breach of contract is six years. N.Y. C.P.L.R. § 213(2). In general, the limitations period begins to run when the cause of action accrues. N.Y. C.P.L.R. § 203(a). A cause of action for breach of contract ordinarily accrues and the limitations period begins to run upon breach. See Ely-Cruikshank Co. v. Bank of Montreal, 81 N.Y.2d 399, 599 N.Y.S.2d 501, 615 N.E.2d 985, 986 (1993). The plaintiff need not be aware of the breach or wrong to start the period running. See id. 599 N.Y.S.2d 501, 615 N.E.2d at 987. *See also,* Guilbert v. Gardner, 480 F.3d 140, 149-50 (2d Cir. 2007).

interest he/she has or may obtain therein, including all copyrights … and other proprietary rights." SOF ¶ 41-43. (emphasis added).

In fact, an agreement entered into by ACP and another artist in 1996 with identical language and terms has previously been enforced by Hon. Kaplan of this Court. *See DeCarlo,* 258 F. Supp.2d at 332, fn 107. In *DeCarlo,* the Court held that the 1996 agreement entered into by ACP and DeCarlo "conveyed to ACP any rights that DeCarlo had in any of the comic strips and pages that he previously had submitted to Archie" because DeCarlo had "assigned to ACP any of his past, pending or future contributions … to the Works or Properties." *Id.* (internal quotes omitted). The contract language of the agreement in *DeCarlo* cited by Hon. Kaplan mirrors the language found in the Contractor's Agreement signed by Penders in this case right down to the cited paragraphs (paragraphs 1 and 19). SOF Ex. A of Ex. 4; SOF Ex. B of Ex. 4.

For the foregoing reasons, the Court should grant summary judgment in favor of ACP on ACP's Claim 1 for declaratory judgment of non-infringement and Penders all of Penders counterclaims for declaratory judgment and infringement.

### 2. ACP is Entitled to Summary Judgment on its Claim for Declaratory Judgment that Penders' Copyright Registrations Should Be Held Invalid and Ordered Canceled Because Penders is Not the Owner of the Works.

This Court may properly order Penders to cancel his registrations with the U.S. Copyright Office:

> [W]hen a court is convinced that a registration should be canceled, it should hold the registration invalid, and order the holder of the certificate to request the Copyright Office to cancel the registration. Such an action does not require an affirmative action by the Copyright Office. If the holder of the certificate fails to request cancellation by the Copyright Office, that party may be held in contempt. (There is no reason to believe the Copyright Office will refuse to honor such a request.)

5 Patry on Copyright § 17:108. The Copyright Office will cancel registration where "[i]t is clear that no registration should have been made because the work does not constitute copyrightable subject matter or fails to satisfy the other legal and formal requirements for obtaining copyright." 37 CFR 201.7(b)(1).

Only the owner of a copyright or of any exclusive right in a particular work may register the work for copyright with the U.S. Copyright Office. 17 U.S.C. § 408(a). A "copyright owner" is defined in the Copyright Act as, "with respect to any one of the exclusive rights comprised in a copyright … the owner of that particular right." 17 U.S.C. § 101. Since Penders is not the owner of any rights in any of the Works, he is not entitled to register a claim of copyright in those Works. 17

U.S.C. § 408(a).  It is therefore clear that the registrations are invalid and the Court should order Penders to cancel all registrations in the Works.

### 3. ACP is Entitled to Summary Judgment on its Breach of Contract Claims Because Penders Breached the ACP-Penders Agreements by Claiming Ownership of the Works and Challenging ACP's Rights to the Works.

In order to prove breach of contract in New York, four elements must be proven: "(1) the existence of an agreement, (2) adequate performance of the contract by the [claimant], (3) breach of contract by the [accused], and (4) damages."  Stadt v. Fox News Network LLC, 719 F. Supp.2d 312, 318 (S.D.N.Y. June 22, 2010) citing Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (citation omitted).

As to the first element, the existence of the ACP-Penders Agreements has been well established for purposes of this Motion.  See supra.

As to the second element, ACP fully performed under the ACP-Penders Agreements by paying Penders a "fixed sum" for "each assignment that is completed on time (time being of the essence) and in a manner that is acceptable to Archie ...."  SOF ¶ 45.  ACP also promised and delivered to Penders future work.  SOF ¶ 18, 48; SOF Ex. A of Ex. 4.

The method by which Penders received payment is also without dispute.  ACP would periodically send Penders blank invoices to be signed and returned to ACP.  SOF ¶ 48.  ACP would fill out a signed invoice for each Work Penders contributed to that was approved and published.  SOF ¶ 48.  Penders would then receive payment from ACP pursuant to the work he performed.  SOF ¶ 49.  Penders received payment from ACP in this form throughout the course of the parties' working relationship.  SOF ¶ 49-53.  Penders never voiced any objections to this method of receiving payment or ever claimed that he was due money for published works he claimed ACP did not pay him for – and the parties operated under this structure for more than a decade.  SOF ¶ 50.

The consideration flowing from ACP to Penders under the ACP-Penders Agreements was more than legally sufficient to support the conveyance of all interest in all Works from Penders to ACP, including those Works which were submitted to ACP and paid for prior to the time the agreements were executed ACP paid Penders for this work and promised Penders future work; indeed, ACP kept Penders fully engaged for nearly a decade after the agreements were executed. The promise of future work is sufficient consideration to support the conveyance even where no future work is actually conducted between the parties.  Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc., 08 CIV. 1533 KBF JCF, 2011 WL 6817709 (S.D.N.Y. Dec. 28, 2011) ("the fact that a promise of future work does not materialize does not eliminate that promise as

23

sufficient consideration to support a contractual bargain—i.e., it is well settled that an exchange of promises is sufficient to satisfy the legal requirement of consideration." (citations omitted)).

In *Marvel*, a case recently decided by this Court, a similar agreement was also held valid and enforceable and the court found that all works submitted to marvel by the artist prior to and after execution of the work for hire agreement in that case was supported by valid consideration in the form of marvel's promise of future work for the artist.  In that case, no work was ever even actually performed, and the court nonetheless found that the contract was valid, legally enforceable and that all works submitted by the artist to Marvel were subject to the agreement.  *Id.*  Here, by contrast, not only was Penders promised payment for the Works he submitted and which were approved by ACP, he was in paid for those Works, *and* ACP also promised and delivered future work to Penders.  SOF ¶ 19.  There should be no question that ACP provided valid consideration to Penders under the ACP-Penders Agreements for the conveyance of all Works he submitted (whether before or after execution of the agreements in 1996) and which were approved by ACP, in two forms: 1) payment from ACP; and 2) the promise of future work.

As for the third element, Penders breached the ACP-Penders Agreements by claiming ownership of the Works, registering copyright in the Works, and otherwise taking actions inconsistent with, limiting or challenging ACP's exclusive rights in the Works.  SOF ¶ 44.  In addition, Penders has now publicly announced his intention to use the Works for his own personal benefit despite the agreements which state that Penders will not "(a) use any of the Properties or reproduce any of the Works, (b) prepare works that are substantially similar to any of the Properties or Works or (c) prepare works that parody the Properties or Works."  SOF  Ex. B of Ex. 4; Ex. C of Ex. 4.  Each of these actions constitutes a breach of the ACP-Penders Agreements.

Lastly, ACP has been damaged as a direct and proximate result of Penders' breaches of the ACP-Penders Agreements. ██████████████████████████████████████████████████ and public statements regarding ownership and future exploitation of the Works has cast doubt on ACP's rights and harmed its relationship with Sega.  SOF Ex. 1 ¶ 19; Ex. A of Ex. 1; Ex. B of Ex. 1.

### 4.  The Court should grant summary judgment in favor of ACP on each of Penders' counterclaims.

Lastly, the Court should then also enter judgment in favor of ACP on Penders' counterclaims for declaratory relief and copyright infringement.  If the Court finds the ACP-Penders Agreements valid and enforceable, Penders' counterclaims for declaratory judgment and copyright infringement cannot survive summary judgment in favor of ACP.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court should grant ACP's motion for summary judgment on its claims for declaratory judgment (Claims 1 and 2) and breach of contract (Claims 3 and 4) as well as Penders' counterclaims for declaratory judgment (Counterclaim 1) and copyright infringement (Counterclaims 2 through 4).

Respectfully submitted,

DISERIO MARTIN
O'CONNOR & CASTIGLIONI LLP

By: _____

Matthew C. Wagner
mwagner@dmoc.com
Scott Harrington
sharrington@dmoc.com
Jonathan R. Longobardi
jlongobardi@dmoc.com
DISERIO MARTIN
O'CONNOR & CASTIGLIONI, LLP
50 Main Street, Suite 1000
White Plains, NY 10606
Dated: February 6, 2012                    (914) 684-0090 Tel