# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARCHIE COMIC PUBLICATIONS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> KENNETH W. PENDERS, II, <br> a/k/a KEN PENDERS <br><br> Defendant. | Case No.: 10-CV-8858 (RMB) <br><br> Judge: Hon. Richard M. Berman <br><br> **AFFIDAVIT OF VICTOR GORELICK IN SUPPORT OF ARCHIE COMIC PUBLICATIONS' MOTION FOR SUMMARY JUDGMENT** |

I, Victor Gorelick, declare under the pains and penalties of perjury under the laws of the United States of America and the State of New York that the following is true and correct. The following facts are based on my personal knowledge. If called to testify regarding these facts, I could and would so competently testify:

1. I first joined Archie Comic Publications, Inc. ("ACP"), a publishing corporation located in Mamaroneck, NY, in October 1958, more than 50 years ago, as an Art Assistant. Eventually I became Art Director, and Managing Editor, among other roles over the years. In 2008 I was appointed Editor-in-Chief and co-President, and I currently serve in those positions.

2. Relevant to this lawsuit, I held the role of Managing Editor for all of the Sonic the Hedgehog comic books titles, including Knuckles the Echidna and other Sonic related titles (collectively the "Sonic comic book series"), beginning with Sonic the Hedgehog issue no. 4 published in August 1993 and continuing through all issues published until December 2008; this period includes all of time Ken Penders worked as an independent contractor for ACP (except

1

his first two contributions in early 1993). I directed and oversaw all aspects of production of the Sonic comic book series.

3. As Editor-in-Chief of ACP I now direct and oversee production of all ACP comic books – including the Sonic comic book series.

4. I am personally and intimately familiar with Ken Penders' work product and working relationship with ACP.

5. After obtaining the license from Sega in 1992, ACP sought to engage writers to develop stories for this new series; these were to be based on the video game Sega had already produced and distributed. Sega had to approve all scripts and content prior to publication of anything.

6. At ACP's request, Penders along with many other writers submitted multiple plot outlines for possible use in the Sonic comic book series over the years. I, along with ACP's editorial staff, reviewed the submissions and also sent them to Sega as licensor of Sonic the Hedgehog and related characters. Some of the plot outlines were rejected. Of the plot outlines that were not rejected, Sega and ACP would both add comments and instructions. The writers, including Penders, then revised the outlines according to the instructions they were given and then resubmitted to ACP. Over the years, the number of revisions varied, and sometimes we got exactly what we asked for, but generally there would be at least some editorial and creative direction given to the writer, and particularly to Ken Penders, until the story accurately portrayed what ACP and Sega wanted. When ACP and Sega were both satisfied, the outline would be approved and storyboards would be created, sometimes the writers submitted their scripts in storyboard form.

7. I say that the direction for Ken Penders was particular, because he (as contrasted to most other writers) always wanted to go in a different direction than we did; and, we generally had to reign him in and re-direct his efforts. I believe this is the reason Penders wrote in his blog about how he felt hand-cuffed by ACP and that he could never exercise true creative freedom. But, this is how it worked.

8. Next the script would be sent to an artist to be penciled. The Editor would assign the script to an artist to pencil the script. After penciling came dialogue, lettering, inking, and finally coloring. At each stage the story had to be approved by ACP and Sega. Again, ACP controlled which employee or independent contractor was given each of these tasks.

9. Penders always knew that ACP had ultimate control over the Sonic comic book series. ACP would send Penders letters and faxes telling them what changes needed to be made in order to be approved. ACP also told Penders the parameters they were to work within including total page count, characters to be used, and general story plotlines and themes. If stories were submitted that ACP or Sega did not approve of, for any reason, it would be rejected or sent back with comments and editorial for resubmission.

10. In December 1996 I received documents via mail from Ken Penders. Included in the mailing was a fully executed Revised Newsstand Comic Independent Contractor's Agreement ("Contractor's Agreement") signed by Edward G. Spallone ("Ed Spallone"), then Vice President of Finance at ACP, and counter-signed by Ken Penders as well as a fully executed Licensed Comic Books Independent Contractor's Agreement ("Licensed Comic Books IC Agreement") signed by Ed Spallone and counter-signed by Ken Penders.

11. I recall that Ed Spallone had signed a number of Contractor's Agreements and Licensed Comic Books IC Agreements in 1996 on behalf of ACP in his capacity as Vice President of Finance.

12. Upon receipt of the Contractor's Agreement and Licensed Comic Books IC Agreement (collectively "ACP-Penders Agreements") from Ken Penders, I made multiple photocopies of the agreements and circulated copies of the documents to relevant departments, such as the accounting office in order to allow for payments to Ken Penders. I also placed a copy of the ACP-Penders Agreements in ACP's files where a multitude of similar documents typically stored in the ordinary course of business. I affirm that the ACP-Penders Agreements attached as Exhibit B and C to the Spallone Affidavit are true and accurate copies of the original documents I received from Penders in the mail, and that these are true and accurate copies of the agreements that I located in ACP's files, in the place where they should have been found, in files with various other agreements with other independent contractors, such as those agreements which are attached as Exhibit A to the Spallone Affidavit.

13. To the best of my recollection Penders was paid for every contribution he made to the Sonic comics that were approved and published by ACP – in fact, he was paid for work which ACP approved, but never published. There were a few submissions which were simply rejected, for which Penders was not paid any money and which ACP does not claim any right to.

14. The only time Penders ever approached me with regard to additional payment was in 1997 when he asked me whether he would be paid for reprinted issues of the Sonic comic books. I informed him that ACP would not be paying him reprint fees. I told Ken that his agreement did not provide for reprint fees and he was not entitled to them. Ken never approached me again regarding reprint fees. It is my distinct recollection that Ken Penders, like

all the independent contractors who signed these work-for-hire agreements with ACP and worked on the Sonic comic series, was never paid any royalties for reprints or any other fees over and above the fixed sum he was paid when he submitted his work to ACP. This is because he was never, and is not, entitled to any such additional fees under the agreements he signed with ACP.

15. With regard to receiving payment for their contributions, some independent contractors and writers in particular, such as Ken Penders, would typically be sent a number of blank invoices to be signed and returned to ACP, which they would sign and return to me, which I would fill in after I had approved a story.

16. Penders was sent blank invoices and returned them with his signature the same as ACP's other independent contractors would.

17. I, along with the other Editors of the Sonic comic book series over the years, handled the invoicing for Penders work. Penders often asked me to check on the status of his payments for certain work, if a check had been mailed out, that kind of thing. I kept the ledger of payments. Penders never, not once, in twelve years, ever complained that ACP didn't pay for a work that he submitted and was published. If he had, I would have seen to it that he was paid for his work. But, the fact is, he never complained, because ACP paid him for all work he submitted which was approved – and even for some which was approved but never published.

18. In December 2008 I spoke with Ken Penders via telephone. He asked me about the work-for-hire agreements he signed with ACP. I informed him that I did not know at that particular moment where the agreements were. At no point in the conversation did Penders ever state a belief that he owned any of rights or copyrights in the contributions he made to the Sonic comics, and at no point did I ever state that ACP did not have any agreements with him. This is

5

simply untrue. I told him I would get back to him. But, frankly, I was in no hurry to get back to Penders. His departure from ACP was not terribly friendly, and I had other things I needed to tend to. There was illness and death at the executive levels in ACP at that time.

19. Soon after the phone conversation, I remember Penders emailed me again requesting the work-for-hire agreement he signed with ACP. Penders then followed up with three more emails to me at various points in December 2008 and January 2009; in each email Penders said he would like a copy of the work-for-hire agreement he signed with ACP. Attached hereto as Exhibit A are true and accurate copies of the emails from 2008 and 2009; these are business records of ACP. At no point in any of the emails did Penders ever state a belief that he did not have any agreements with ACP, or that he thought he owned any rights or copyrights in the contributions he made to the Sonic comics.

20. I want to make it very clear that I never, at any time, told Mr. Penders that he had no agreements with ACP. To the contrary, and as Mr. Penders' emails request, I had to locate the agreements he did sign. Since it was so long ago, I did not have those agreements at the ready. Mr. Penders asked us for copies of the agreements, and, through our lawyers, we gave them to him.

21. In 2010 I searched the files of ACP for the original wet signature ACP-Penders Agreements. I searched all places where such records were kept in the normal course of business at ACP. Despite my best efforts I was unable to find the original wet signature ACP-Penders Agreements.

22. However, during my search I did find duplicates of the agreements where they were supposed to be. The duplicates were found among a large number of similar agreements with other various artists – many of which were signed and dated November 25, 1996 by Ed

6

Spallone. The duplicates were found in ACP's files where duplicate copies of agreements with independent contractors were typically kept. I confirm that the ACP-Penders Agreements found during my search in 2010 are true and exact copies of the original wet signature ACP-Penders Agreements I received from Ken via mail in late 1996.

23. I forwarded each of the emails mentioned above to Mike Pellerito, President of ACP, on or around July 29, 2011. I understand that these emails were provided to our counsel and produced to Defendant with the numbers ACP00814-ACP00819. A copy of these email chains is attached as Exhibit A.

24. The emails attached as Exhibit A are true and exact copies of the records from ACP's network servers kept in the ordinary course of business. These are business records of ACP.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed February 3, 2012 at Westchester, New York.

_____
Victor Gorelick

NOTARY BELOW:

DEBORAH J. MONSERRATE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MO6057563
Qualified in Putnam County
My Commission Expires 4-23-15

7