UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARCHIE COMIC PUBLICATIONS, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>KENNETH W. PENDERS, II, )<br>p/k/a/ KEN PENDERS, )<br>)<br>Defendant. )<br>_____X | Case No.: 10-cv-08858 (RMB)<br><br>**Electronically Filed**<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFF ARCHIE COMIC PUBLICATIONS, INC.'S
<u>LOCAL RULE 56.1 STATEMENT</u>**

Plaintiff Archie Comic Publications, Inc. ("ACP") respectfully submits this statement that sets forth, in separately-numbered paragraphs meeting the requirements of Local Rule 56.1, a concise statement of each material fact as to which there is no genuine issue to be tried.

1.   Archie Comic Publications, Inc. was founded in 1939 by Maurice Coyne, Louis Silberkleit, and John L. Goldwater and has grown into one of the most successful, longest running brands in the history of the comic industry. ACP is best known for its series of comics featuring the fictional characters created by its founders: Archie Andrews, Betty Cooper, Veronica Lodge, Reggie Mantle and Jughead Jones. *See* Affidavit of Jon Goldwater attached as Ex. 1 at ¶ 2.

2.   ACP's comic enterprise has developed robustly over the years and now includes many additional characters and comics outside of the characters first created some seventy years ago, including comic books featuring licensed properties. *Id.* ¶ 3.

3.   As of this filing, ACP has sold over 1.5 billion (1,500,000,000) comics, which are published in a dozen foreign languages with worldwide distribution. *Id.* ¶ 4.

1

4. ACP has its principal place of business in Mamaroneck, NY. *Id.* ¶ 1.

5. In 1992, ACP entered into a licensing relationship with Sega of America, Inc. ("Sega"), ("1992 Sega Agreement"), to produce, among other things, comic books which feature Sega's popular character SONIC THE HEDGEHOG, and all related ancillary characters, such as KNUCKLES THE ECHIDNA ("Sonic Comic Book Series"). The 1992 Sega Agreement requires Sega's approval for all licensed work. *Id.* ¶ 5.

6. Under the terms of the agreement with Sega, as amended, ███████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████ *See* 1992 ACP-Sega Agreement attached as Ex. A of Ex. 1; 1998 Amendment to ACP-Sega Agreement attached as Ex. C of Ex. 1.

7. This license was renewed repeatedly through December 31, 2010, when it expired. Throughout the last quarter of 2010 and into autumn 2011, Sega and ACP endured protracted negotiations over a new license to Sonic properties. ACP operated without a written license for nearly 10 months in 2011. Ex. 1 at ¶ 5.

8. ACP now has a ███████████████████████████████████████ ████████████ and ACP now also maintains digital distribution rights to the Sonic properties for comic books and graphic novels. *Id.* ¶ 6; *see* ACP-Sega 2011 Agreement attached as Ex. B of Ex. 1.

9. ACP's current agreement with Sega also calls for ACP ███████████████ ████████████████████████████████████ Ex. 1 ¶ 19; Ex. B of Ex. 1.

10. To create the Sonic Comic Book Series, ACP commissions writers and artists to write a plot outline of the proposed story. ACP and Sega review the plot outline submitted by

2

each artist and approve or reject the outlines. *See* Affidavit of Victor Gorelick attached as Ex. 2 at ¶ 6.

11. Artists whose plot outlines are approved by ACP and Sega are and always were paid for their contributions in their entirety. Artists are not typically paid for any plot outlines that are rejected. Ex. 1 at ¶¶ 8-9; Ex. 2 at ¶¶ 13-14, 17; Affidavit of Mike Pellerito attached as Ex. 3 at ¶ 8, 12, 14; Affidavit of Ed Spallone attached as Ex. 4 at ¶ 17.

12. For most approved plot outlines, ACP and Sega each provide instructions and comments to the artist of varying substance depending on how close the plot outline reflects what ACP and Sega wanted. Ex. 2 at ¶¶ 6, 9; Ex. 3 at ¶ 11.

13. Instructions and comments from ACP and Sega have ranged from removal or addition of characters, visual material, dialogue, and story concepts to page or panel limitations. Ex. 2 at ¶¶ 5-6, 8-9; Ex. 3 at ¶ 11.

14. Certain plot outlines have been approved by ACP and Sega without substantive comments but, nevertheless, all plot outlines submitted have always been required to be approved by ACP before moving forward with the publication process. *Id.*

15. The plot outlines are one of many steps in the Sonic Comic Book Series publication process. Artists are engaged to produce the plot outline, penciling, dialogue, lettering, inking, and coloring of the comic. Ex. 2 at ¶ 8; Ex. 3 at ¶¶ 9, 11; *see* ACP Sonic Artists Spreadsheet attached as Ex. 5.

16. ACP and Sega control the content and publication of the Sonic Comic Book Series and have had such control at all times. Ex. 1 at ¶¶ 13-14; Ex. 2 at ¶¶ 6-9; Ex. 3 at ¶¶ 9-11; Ex. 6 at 73; Ex. 9.

17. From 1993 to 2005, Defendant Kenneth W. Penders, II ("Ken Penders") worked for ACP as an independent contractor and developed for ACP, stories, scripts, artwork, and other original creative expressions fixed in tangible form (individually a "Work" and collectively "Works") as contributions to the Sega Comic Book Series. *See* Deposition transcript of Ken Penders attached as Ex. 6 at 136-137.

18. Penders was paid in full for his work. Ex. 2 at ¶¶ 13-14, 17; Ex. 3 at ¶ 12; Ex. 4 ¶ 17; Ex. 6 at 33, 74, 96, 144.

19. Penders was first approached in 1993 to contribute to the Sonic Comic Book Series by Mike Kanterovich, another writer who was contacted by ACP to submit story proposals for the Sonic Comic Book Series. Ex. 6 at 46.

20. Penders and Kanterovich worked together on plot outlines jointly submitted to ACP which outlined possible story ideas. *Id.*

21. ACP and Sega reviewed these submissions and rejected some and approved others after comment and instructions. Ex. 2 at ¶¶ 6-9; Ex. 3 at ¶¶ 10-11.

22. Penders and Kanterovich would then prepare visual layouts for the approved submissions which would go through yet another review by ACP and Sega. Ex. 6 at 32-33.

23. ACP and Sega's instructions, comments, and suggestions would in turn be provided to Penders and Kanterovich who would revise the visual layouts in accordance with ACP and Sega's instructions. *Id.* at 38-42.

24. Penders was informed that ACP and Sega had to approve every story proposal before it was published. Ex. 2 at ¶¶ 5-9; Ex. 3 at ¶¶ 10-11; Ex. 6 at 32-33, 47-48, 60, 72-74, 97.

25. Once the final visual layouts were approved, ACP would engage various artists to pencil, write dialogue, letter, ink, and color the layouts. Ex. 1 at ¶¶ 13-14; Ex. 2 at ¶¶ 6, 8; Ex. 3 at ¶¶10-11; Ex. 5.

26. Penders would often provide the visual layouts and written dialogue while penciling, lettering, inking, and/or coloring would be performed by other artists engaged by ACP. Ex. 2 at ¶¶ 6, 8-9; Ex. 3 at ¶¶10-11; Ex. 5.

27. The relationship between Penders and ACP was memorialized in written agreements, executed in 1996. Two agreements were executed by the parties: Revised Newsstand Comic Independent Contractor's Agreement ("Contractor's Agreement"); and ACP Licensed Comic Books Independent Contractor's Agreement ("Licensed Comic Books IC Agreement") (the Contractor's Agreement and the Licensed Comic Books IC Agreement collectively referred to as the "ACP-Penders Agreements"). Ex. 4 at ¶¶ 6-12, 14-16; Contractor's Agreement attached as Ex. B of Ex. 4; Licensed Comic Books IC Agreement attached as Ex. C of Ex. 4.

28. The Contractor's Agreement was signed by Ed Spallone, Vice President of Finance, on behalf of ACP and dated November 25, 1996, and counter-signed by Ken Penders personally and dated 12 December 1996. Spallone also hand-wrote Penders name in the opening paragraph of the document. Spallone signed two copies of the Contractor's Agreement. *Id.* at ¶¶ 6-12, 14, 16 and Ex. B; Ex. 2 ¶ 11.

29. The Licensed Comic Books IC Agreement was also signed by Ed Spallone, Vice President of Finance, on behalf of ACP and dated November 25, 1996, and counter-signed by Ken Penders personally and dated 12 December 1996. Spallone also hand-wrote Penders name

5

in the opening paragraph of the document. Spallone signed two copies of the Contractor's Agreement. Ex. 2 at ¶ 11; Ex. 4 at ¶¶ 6-12, 15-16 and Ex. C.

30. Spallone submitted the ACP-Penders Agreements, along with many other similar agreements to be sent to other independent contractors, to ACP's business office. Ex. 4 at ¶¶ 12, 16.

31. ACP's business office then mailed two copies of the ACP-Penders Agreements to Penders with a cover letter instructing Penders to counter-execute the documents and return one copy to ACP and keep one for his files. *Id.*

32. In December 1996, Victor Gorelick, Editor-in-Chief of ACP, received one copy of the ACP-Penders Agreements counter-signed and dated by Penders via mail. Ex. 2 at ¶ 10.

33. Gorelick photocopied the fully executed ACP-Penders Agreements, as was standard practice for ACP at the time, circulated copies to ACP's accounting office, and placed a copy in ACP's files alongside other similar agreements counter-signed by other independent contractors as such documents were typically stored in the ordinary course of business. *Id.* at ¶ 12.

34. The ACP-Penders Agreements were part of a larger effort at ACP to ensure that all independent contractors had signed a group health insurance program ("GHIP") election. Ex. 4 at ¶¶ 5-6.

35. The Contractor's Agreement contains a GHIP election term at ¶ 35. Ex. B of Ex. 4.

36. The terms of the Contractor's Agreement is identical to previous agreements ACP had with its independent contractors in all ways except for the GHIP election term which was added to the 1996 Contractor's Agreement. Ex. 4 at ¶ 6.

37. Penders admits he received a health care election document from ACP. Ex. 6 at 186-187.

38. The ACP-Penders Agreements each contain language stating that all contributions (past, pending and future contributions) by Penders are works made-for-hire owned by and for the benefit of ACP. Ex. B of Ex. 4 at ¶ 18; Ex. C of Ex. 4 at ¶ 7.

39. The Contractor's Agreement states, "Contractor represents that all of his/her contributions to any Properties or Works have been commissioned by Archie and prepared at the request and expense of Archie and that all past, pending and future contributions of Contractors to the Works and Properties are and shall be Works for Hire owned by and for the benefit of Archie." Ex. B of Ex. 4 at ¶ 18.

40. Licensed Comic Books IC Agreement ¶ 7 includes substantially similar language to Contractor's Agreements ¶ 18. *Id.*; Ex. C of Ex. 4 at ¶ 7.

41. The ACP-Penders Agreements also contain language stating that, to the extent that any contribution does not qualify as a work made for hire, Penders assigns to ACP any right, title and interest he may have or obtain including all copyrights and other proprietary rights to all contributions (past, pending and future contributions). Ex. B of Ex. 4 at ¶ 19; Ex. C of Ex. 4 at ¶ 7.

42. The Contractor's Agreement states, "To the extent that any past, pending or future contributions by Contractor to the Works or Properties do not qualify as a Work for Hire, Contractor will and hereby does assign to Archie any right, title and interest that he/she has or may obtain therein, including all copyrights … and other proprietary rights. Contractor will sign, upon request, any documents needed to confirm that any specific Works or Properties are Works for Hire, to effectuate the assignment of his/her rights in any Works or Properties to Archie

and/or to obtain copyright, trademark and/or patent protection for any of the Works or Properties." Ex. B of Ex. 4 at ¶ 19.

43. Licensed Comic Book IC Agreement ¶ 7 includes substantially similar language to Contractor's Agreement ¶ 19. *Id.*; Ex. C of Ex. 4 at ¶ 7.

44. The ACP-Penders Agreements also both contain language stating that Penders will not take any action "that is inconsistent with or that limits or challenges Archie's exclusive right to exploit" the Works and/or Properties that Penders "will not use" the Works and/or Properties "in any manner without [ACP]'s prior written consent." Ex. B of Ex. 4 at ¶ 20; Ex. C of Ex. 4 at ¶ 8.

45. The Contractor's Agreement further states, "Contractor's full and complete compensation for each assignment that is completed on time (time being of the essence) and in a manner that is acceptable to Archie, will be a fixed sum based on a rate to be mutually agreed upon (e.g., page rate, hourly rate, etc.). Contractor's bills should be submitted on the form attached to this Agreement. Contractor will not be entitled to royalties, to income derived from licensing or merchandising, or to additional compensation for the creation of new Properties. Reprint fees will be paid at Archie's sole discretion." Ex. B of Ex. 4 at ¶ 5.

46. Penders continued to contribute to the Sonic Comic Book Series until 2005 when Penders informed ACP of his intentions to part ways. Ex. 6 at 137 (ln. 20-21).

47. Penders had contributed to many issues of the Sonic Comic Book Series, including reprints, and these were all logged by ACP in the ordinary course. Ex. 5.

48. Penders submitted invoices to ACP for payment of his fee for each of these contributions. Ex. 1 at ¶ 9; Ex. 2 at ¶ 15-17; Ex. 3 at ¶ 14; Ex. 4 at ¶ 16; Ex. 6 at 149-53.

49. Penders was paid by ACP for each invoice he submitted and for all works approved and published by ACP. Ex. 2 at ¶17; Ex. 3 at ¶16; Ex. 4 at ¶ 12, 14.

50. Penders never expressed any issue or concern with receiving payment from ACP in this method or form. Ex. 2 at ¶ 17; Ex. 3 at ¶ 14; Ex. 6 at 149-153.

51. ACP began reprinting certain issues of the Sonic Comic Book Series in 1997, first in paper form and later digitally. Ex. 2 ¶ 14; Ex. 6 at 130.

52. In 1997 Penders approached Gorelick, then Managing Editor of Sonic Comic Book Series, regarding the possibility of payment for reprinted materials Penders contributed to and was informed by Gorelick that he was not entitled to reprint fees under his agreements with ACP. Ex. 2 at ¶14; Ex. 6 at 130-33, 138-39.

53. At no point in time during Penders' twelve year working relationship with ACP, including his 1997 conversation with Gorelick, did Penders inform ACP of his belief that he retained any rights – including copyrights – in the Works. *Id.* ¶__. Ex. 2 at ¶¶ 18-19; Ex. 3 at ¶13; Ex. 6 at 145-46.

54. Throughout the remainder of Penders' working relationship with ACP there was no further discussion of reprint fees or potential copyright infringement between Penders and ACP after Penders' conversation with Gorelick. Ex. 2 at ¶¶ 14, 18-19; Ex. 3 at ¶ 13; Ex. 6 at 138, 145-46.

55. In December 2008 Gorelick spoke with Ken Penders via telephone. Penders asked Gorelick about the work-for-hire agreements he signed with ACP and Gorelick informed him that he did not know at that particular moment where the agreements were. At no point in the conversation did Penders ever state a belief that he owned any of rights or copyrights in the contributions he made to the Sonic comics. At no point did Gorelick ever state that ACP did not

have any agreements with Penders. Gorelick told Penders he would get back to him. Ex. 2 at ¶ 18; Amended Answer and Counterclaims (D.E. 27) at Counterclaims ¶ 61-62.

56. Soon after the phone conversation, Penders emailed Gorelick again requesting the work-for-hire agreement he signed with ACP. Penders then followed up with three more emails at various points in December 2008 and January 2009; in each email Penders said he would like a copy of the work-for-hire agreement he signed with ACP. At no point in any of the emails did Penders ever state a belief that he did not have any agreements with ACP, or that he thought he owned any rights or copyrights in the contributions he made to the Sonic comics. Ex. 2 at ¶ 19; Ex. A of Ex. 2; D.E. 27 at Counterclaims ¶ 63.

57. Gorelick never informed Penders that he had did not have an agreement, written or otherwise, with ACP. Gorelick, per Penders' email requests, undertook to locate the agreements Penders signed. Ex. 2 at ¶¶ 18-20.

58. Gorelick forwarded the emails to Mike Pellerito, President of ACP, on or around July 29, 2011. These emails were provided to ACP's counsel and produced to Defendant as ACP00814-ACP00819. *Id.* at ¶¶ 23-24; Ex. 3 at ¶18.

59. Penders does not dispute the authenticity of the emails produced as ACP00814-ACP00819. Ex. 6 at 187, 189.

60. Soon after the email exchange, Penders began filing for copyright registration in the Works with the U.S. Copyright Office. D.E. 27 at Counterclaims ¶ 64.

61. None of the asserted registrations were registered within five years after first publication of the subject work. Complaint (D.E. 1) at Ex. J.

62. None of the asserted registrations include a statement that the subject work was made for hire. *Id.*

63. The asserted registrations are based upon false statements in Penders' applications wherein he claims to have written transfer agreements from certain co-authors. Penders admits he did not have written transfer agreements from co-authors prior to filing the applications. Ex. 6 at 201-206.

64. Penders made no effort to seek copyright registration in any of the Works prior to 2008 when he began preparing his 2009-10 applications for registration with the Copyright Office. Ex. 6 at 131, 136.

65. In July 2010, Penders, by and through counsel, sent a demand letter to ACP informing ACP that it had infringed various copyrights owned by Penders and threatening legal action. D.E. 1 at Ex. D.

66. Upon receipt of this demand letter, Gorelick, assisted by Jon Goldwater and Mike Pellerito, searched the files of ACP for the original wet signature ACP-Penders Agreements. All places where such records were kept in the normal course of business at ACP were searched. Despite reasonable business efforts by ACP personnel, ACP was unable to locate the original wet signature ACP-Penders Agreements. Ex. 1 at ¶ 15; Ex. 2 at ¶¶ 21-22; Ex. 3 at ¶¶ 15-17.

67. During the search Gorelick was able to locate duplicates of the agreements where such documents were kept in the normal course of business. The duplicates were found among a large number of similar agreements with other various artists – many of which were signed and dated November 25, 1996 by Ed Spallone. The duplicates were found in ACP's files where duplicate copies of agreements with independent contractors were typically kept. Ex. 2 at ¶¶ 21-22; Ex. 3 at ¶¶ 15-17.

68. The duplicate ACP-Penders Agreements were immediately provided to ACP's counsel who in turn sent copies of the documents to Penders' counsel and demanded Penders cease and desist his actions as they violated the ACP-Penders Agreements. *Id.*

69. Correspondence was exchanged between counsel for months wherein Penders continued his charge of infringement and threats of initiating suit. D.E. 1 at Ex. D-I.

70. Penders has authenticated hundreds of documents containing his signature, among them are military documents, bankruptcy filings, and invoices for payments received from ACP. Ex. 6 at 12, 16, 17, 21-22, 147-49; Composite exhibit of Penders authenticated signatures attached as Ex. 7.

71. Penders has no evidence whatsoever to support his claim that his signatures on the ACP-Penders Agreements are forgeries. Ex. 6 at 188-89.

72. Penders has stated he does not recall signing the ACP-Penders Agreements. Ex. 6 at 188-89.

73. Every work in the Sonic Comic Book Series contains a clear copyright notice. Copyright notice attached as Ex. 8.

                                        Respectfully submitted,

                                        DISERIO MARTIN
                                        O'CONNOR & CASTIGLIONI, LLP

                       By: _____
                                        Matthew C. Wagner
                                        mwagner@dmoc.com
                                        Scott Harrington
                                        sharrington@dmoc.com
                                        Jonathan R. Longobardi
                                        jlongobardi@dmoc.com
                                        DISERIO MARTIN
                                        O'CONNOR & CASTIGLIONI, LLP
                                        50 Main Street, Suite 1000
                                        White Plains, NY 10606

Dated: February 6, 2012                  (914) 684-0090 Tel