UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARCHIE COMIC PUBLICATIONS, INC., <br><br> *Plaintiff,* <br><br> vs. <br><br> KENNETH W. PENDERS, II, *a/k/a* KEN PENDERS <br><br> *Defendant.* | Case No.: 10-CV-8858 (RMB) <br><br> Judge: Hon. Richard M. Berman <br><br> AFFIDAVIT OF KENNETH W. PENDERS II IN SUPPORT OF PENDERS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT |

I, Kenneth W. Penders II, declare under penalty of perjury:

1. I make this declaration in Support of Defendant Penders' Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment. I have personal knowledge of the following, and if called as a witness I could and would testify competently thereto.

2. I am a California citizen presently residing at 12147 Woodley Avenue, Granada Hills, California 91344-2846.

3. I have been a professional commercial and technical illustrator since 1974.

4. Sometime during the fourth quarter of the year 1975, at the age of 17 I signed my first contract, committing myself to four years of active service with the United States Air Force, fully cognizant of the responsibilities and I obligations I was entering into.

5. From March 6, 1976 through December 14, 1979, I served as a technical illustrator in the United States Air Force, during which period I produced charts, graphics and text slides used in briefings to the Joint Chiefs of Staff, members of both Houses of Congress,

Foreign Heads of State, and the President of the United States. On certain occasions, I received letters of commendation from senior officials for this work.

6.  I first began during the late '70's submitting work featuring my original creations to various independent publishers that were starting up at the time as a result of the sales of comic books sold through what was referred to as the Direct Market, which referred to specialty shops that sold primarily comic books and related subject matter.

7.  Among these creations were QUASAR, a sci-fi adventure which was a co-creation with Mark Manhart, and JANUS, a spy adventure in which I was the sole creator. Both of these projects were completed and initially scheduled for publication in the CHARLTON BULLSEYE series published by CHARLTON COMICS in 1981.

8.  Charlton was a CT-based publisher which I dealt with via mail and telephone.

9.  I subsequently met writer/artist Rich Buckler at a comic book convention in Boston, MA, where I was living at the time. I showed him several story pages and character designs for my creation THE FALCON ELITE.

10. Rich told me he was packaging material which would be published in a line of books he had contracted to produce with ACP using their stable of superhero characters as the main attraction. He expressed interest in using my creation THE FALCON ELITE as a back-up series in one of the books.

11. Rich told me my series would be allotted ten pages per issue, so I proceeded to work on reconfiguring the format of the material I produced, which was initially formatted for the 20 to 22 page standard that was generally used by comic book publishers for a 32-page format book.

12. I initially produced six ten page segments, and was assisted by Emil Novak with the ink work. The series was announced in an article published by AMAZING HEROES in their September 1982 issue.

13. I subsequently received a phone call from Rich Buckler explaining the original plans had collapsed and that he now had too much material to work with, so my series was being placed on the back burner. I did not have a contract with either Rich or ACP, so I was not paid for this work.

14. I traveled during the summer of 1986 to NYC to meet with editors at various publishing companies.

15. Editors at the two major companies – DC Comics and Marvel – expressed interest in my work.

16. During that time, I also submitted samples of my work via mail in the expectation of landing an assignment was Archie Comics. I sent in a sample penciled page featuring the Archie characters to editor Victor Gorelick.

17. I received a rejection letter from Victor on Archie stationary along with the return of my original artwork.

18. Since September, 1986, I have been a freelance writer and illustrator in a variety of mediums, including in the comic book industry.  During that time, I have worked as a freelance writer and artist for a number of different publishers in the comic book industry, including DC Comics, Marvel Comics, Image Comics, Archie Comic Publications, Hero Comics, Entertainment Publishing, Now Comics, Eclipse Comics, Malibu Comics and Disney.

19. During my career in the comic book industry I have worked on many different titles and properties, including stories involving characters owned by the comic book companies

themselves, and stories involving licensed properties such as "Star Trek," "Star Trek: The Next Generation," "Star Trek: Deep Space Nine," "The Man From U.N.C.L.E.," "Advanced Dungeons and Dragons," and "Green Hornet".

20. Each time I submitted myself for an assignment to an editor at any of these companies, I was provided with a document that specified exactly what work I was to perform, how many pages of work I was required to do, what I would be paid per page, what rights I was transferring to them, as well as what other royalties I would be paid and rights I would retain. This document would always be issued at the time I was given the assignment, which I would be instructed to sign and return. None of the documents I ever received for any of these assignments was ever signed by any company representative first. I would always be instructed to sign and return, and a counter-signed copy, either a carbon sheet or a 2nd duplicate contract I also signed, would be returned.

21. Until I began submitting material to ACP for consideration, whenever I submitted work to an established publisher, I always received a contract for each individual assignment. If I penciled and inked a story, I received a separate contract for each service provided, even though the work was for the same story.

22. On projects in which I was a co-creator, I retained my rights to the work I created. I would not list a sole copyright credit as others had copyright claims to their contributions towards the final product as well.

23. After my experience of working with Paul Howley on THE MAN FROM U.N.C.L.E. during the timeframe of 1987 through 1988, in which I produced the bulk of the work of the series, I began to explore the possibility of licensing a property such as Paul had done.

24. Prior to my initial submissions to ACP, I was contacted by Don Perlin, who was editing the Nintendo line of comics for publisher Valiant Communications.

25. Don assigned me several feature pages for THE LEGEND OF ZELDA comic book series, which was based on the hit video game of the same name.

26. On information and belief, at some point in time during 1992, Archie Comics obtained a license to publish comic books based on the SEGA video game character "Sonic the Hedgehog."

27. The first Sonic comic book series produced by Archie was a mini-series that was published monthly from November 1992 until February 1993.

28. Starting in May 1993, Archie began publication of an ongoing Sonic comic book series, and later published the Knuckles the Echidna spin-off series, as well as a number of related mini-series including one titled Princess Sally, one-shots and specials (collectively, the "Sonic Comics").

29. In October 1993, my friend Mike Kanterovich came to me, telling me he was approached by Paul Castiglia, the editor at that time of the Sonic Comics, who advised that the current writer for the Sonic Comics might be leaving and Archie was looking for some inventory stories to have on hand as a back-up precaution. Kanterovich told me that Castiglia offered him the opportunity to submit story ideas for potential assignments.

30. Unfortunately for him, Kanterovich knew little or nothing about the character or the comic books, and so he reached out to me because he was aware that I knew a great deal about the character since the "Sonic the Hedgehog" video games, Sonic Comics and "Sonic the Hedgehog" television shows were favorites at that time of my young son Stephen.

31. Kanterovich and I spoke about the Sonic Comic opportunity, and I provided Kanterovich with information on the characters. As our discussions continued, Kanterovich suggested that we work together on story ideas to pitch to Archie for publication in the Sonic Comics.

32. Initially, we prepared and submitted three story ideas to Castiglia for approval during the second half of October 1993. All three stories were submitted by Archie to SEGA for approval, and two of the three were eventually approved by SEGA and Archie.

33. This method of working on a comic book was different than I was used to doing with other publishers. Specifically, rather than receiving a specific assignment, Archie invited us to pitch story ideas, which they would either accept or reject. There was never any obligation on their part to buy our work. Likewise, we were also free to take our work and rework it for submission elsewhere.

34. Unlike my experience of submitting scripts at any other comic book publisher, Castiglia insisted we submit our scripts in full panel page layout form, clearly depicting everything in a rough visual format rather than in normal text format. We were paid no additional money for producing these story layouts, despite the additional time and effort it required, and received no credit or acknowledgement for them in the published works.

35. Once the two story ideas were approved by SEGA and Archie, we worked together on full story scripts for those ideas. The first two stories and a later story authored by me and Kanterovich appeared in issue #11, cover dated June 1994, published in March 1994.

36. Following acceptance of the first group of story ideas, Kanterovich and I began to work on additional story synopses for submission to Castiglia, which additional stories similarly were approved by Archie and SEGA.

37. Shortly thereafter, we met with Castiglia in person for the first time at the Archie Comics offices. During the visit, we bumped into Archie Comics publishers Michael Silberkleit and Richard Goldwater. When Castiglia introduced us, they joked that Kanterovich and I would be the new regular writers for the Sonic Comics.

38. Despite any statements made during that visit, there was at no time any official undertaking by Archie to formalize our working arrangements, and no guarantee of future work for the Sonic Comics.

39. Further, there was no written understanding between Archie and either myself or Kanterovich concerning our freelance work on the Sonic Comics. I was never asked to sign any sort of contract and rather each work was paid for by submission of an invoice for services rendered according to Archie.

40. When Paul Castiglia informed Mike Kanterovich and I that because of the accounting system Archie used, we could not split the billing for our work. Only one of us could invoice a voucher. This resulted in Mike and I agreeing that I should represent the business interests for the both of us.

41. Mike Kanterovich never submitted an invoice. Instead, I would invoice ACP for the work and pay Mike for his half upon receipt of payment.

42. In early 1994, Castiglia was promoted at Archie and thus replaced as editor on the Sonic Comics by Scott Fulop.

43. One of the first assignments offered to us by Fulop was to write a story introducing the "Knuckles the Echidna" video game character into the Sonic Comics continuity, intended to be a try-out for such character.

44. The Knuckles story appeared in issue #13, cover dated August 1994, published in May 1994. Although SEGA was initially skeptical of the idea, the story proved popular. Eventually, I would be given the chance to script and illustrate many more stories featuring the Knuckles character, eventually leading to a Knuckles mini-series and then a full monthly Knuckles comic book series that continued for nearly 3 years. I was placed in charge of the character's storylines during the entire length of time I submitted material to the Sonic series.

45. In or around March, 1994, I convinced Fulop to allow the Sonic Comics to more closely align with the "Sonic the Hedgehog: The Animated Series" Saturday morning cartoon series, which series aired on ABC from September 1993 until May 1995.

46. As a result of this change, the stories in the Sonic Comics took a new direction, introducing new characters and new worlds. Additionally, the stories were structured to establish and build an ongoing logic and continuity. The series also began to use a new format, namely book-length stories and eventually multi-issue storylines.

47. In late 1994, Kanterovich advised me he was no longer interested in working on every one of the Sonic Comics stories, and so I began to work on solo scripts for the Sonic Comics. Although we continued to collaborate on stories, I began to write solo stories with increasing frequency.

48. In addition, in mid-1995, I began to provide full pencil artwork for the Sonic Comics, at first for covers and then interior artwork.

49. At all times through this period, I was working for Archie as a freelancer with no contract. The only Archie-generated documents that were being signed by me that pertained to the work I created were pay vouchers and checks which I endorsed.

50. None of the Archie pay vouchers contained any legal language, or made any reference to ownership or transfer of copyright rights in the materials that I was producing for the Sonic Comics.

51. Additionally, none of the checks that I received from Archie in payment for my work contained any legal language concerning copyright rights or a transfer of my rights to Archie.

52. The only other Archie Comics document that I was asked to sign in 1996 was a group health care election document whereby I elected to waive group health care coverage. The health care election document was a single page document that did not include any other legal language, nor was it numbered to be a portion of a longer document. The document I received had not yet been signed on behalf of Archie Comics.

53. Because the manner in which Archie Comics treated the submission of creative works was entirely different than any other comic book publisher for whom I had worked, I understood that there was no transfer of my rights in the stories I pitched, whether or not they were accepted by Archie Comics for publication. As a result, my enthusiasm for working on the Sonic Comics continued to grow as I introduced new concepts, story ideas and characters, all of which I believed I owned as their creator.

54. In the summer of 1995, Fulop advised me that both the Saturday morning animated series and the syndicated weekday Sonic animated television series were being cancelled. Because comic books licensed from another media (such as television) historically were cancelled within 8-12 months once the original media was no longer in the public spotlight, Fulop told me that Archie expected the Sonic comic book series would be cancelled within the next year.

55. Undeterred, I continued to innovate with my work on the Sonic Comics, creating additional new characters and storylines, including perhaps the most renowned storyline for the entire series titled "Endgame", which appeared in issues 47-50. This storyline was initially conceived as the last story in the series, featuring the character's final battle against his greatest enemy.

56. Despite Archie's fears, however, the Sonic Comics proved to be the exception to the licensed comic book rule, and actually saw sales increase after the animated shows were taken off the air. As a result, I rewrote the original conclusion of the "Endgame" story thereby allowing the series to move forward rather than terminating.

57. I continued to work on the Sonic the Hedgehog comic book series and related titles until late 2005. My last story for the Sonic Comics appeared in issue 159, published in early 2006.

58. After August, 1996, I no longer submitted visual layouts for every script. From that point forward, I supplied layouts only for the KNUCKLES and occasional SONIC cover designs, and only two stories, one which was published in SONIC #143, the other in SONIC #159. Layouts in those two cases were rendered solely for pay purposes as I rendered the complete art to both stories, as well as doing the lettering.

59. Sometime in 1997, ACP reprinted the very first Knuckles story Mike Kanterovich and I collaborated on in a book called SONIC FIRSTS.

60. When I learned about it, I spoke first with my editor Justin Gabrie, who said I would have to deal with ACP Managing Editor Victor Gorelick concerning the matter of being paid royalties. When I inquired to Victor about the royalties which I believed I was owed, he

informed me it was not ACP policy to pay royalties.  At that time, and having put ACP on notice as to my claim, I decided it was not worth the expense to pursue the matter further.

61. During my many years of working for comic book companies such as Marvel Comics and DC Comics, I came to understand the industry-standard method undertaken by publishers working with freelancers on company-owned and licensed titles.

62. Specifically, freelancers were advised in advance by those companies that they were being hired to produce creative works on a "work made for hire" basis, and that any work created and submitted to the publisher (each a "Work") was understood to be "work made for hire".  Once each Work (or portion thereof) was completed and submitted to the publisher that had commissioned the work, a creator was required to sign a voucher for payment, and that voucher (or at one time the backs of the paychecks) contained agreement language whereby the creator confirmed that (i) the Work which had been created was a "work made for hire" and (ii) in the event such Work did not qualify as a "work made for hire," the creator was thereby assigning all copyright rights in such Work to that publisher.

63. At no time while I worked on the Sonic comic books did Archie follow this manner of doing business.

64. When I first submitted story ideas to Castiglia in 1993, there was no discussion with him or anyone else at Archie concerning the issue of ownership or the concept of "work made for hire".  This was understandable since there was no guarantee that any of my story ideas would be accepted by Archie and SEGA for use in the Sonic Comics.  In fact, a number of my story ideas were rejected.

65. Additionally, the pay vouchers used by Archie and which I signed and submitted for payment for each of the Sonic Comic stories I worked on contained no legal language whatsoever.

66. Neither the payment vouchers nor the checks issued by Archie contained any language pertaining to copyright, ownership, assignment, transfer or "work made for hire". Nor did any correspondence concerning any of my story ideas or the approvals for the same refer to such terms or language.

67. Further, none of the artwork returned to me between 1995 and 2006 contained any copyright notice or copyright language stamped on them to indicate ownership by any entity other than the creator(s) of such artwork, namely, me. It was only after I ceased working on the Sonic Comics that artwork was returned to me containing any copyright notice or copyright language stamped on the back.

68. I have also conversed with numerous creators involved in the first few years of publication of the Sonic Comics and I have been advised by each of these creators that they had never been asked to execute any "work made for hire" agreements nor asked to sign any assignment documents.

69. In the fall of 2008, I became aware of a video game produced under license from SEGA titled "SONIC CHRONICLES: THE DARK BROTHERHOOD" which contained and/or referenced a number of my characters, settings and stories from the Sonic Comics (hereinafter, the "Infringing Game").

70. After seeing that my characters and other intellectual property were being used without my permission, I consulted with an attorney about my rights and any possible remedies relating to the Infringing Game.

71. I came to understand that in order to seek remedies through the courts, it would be necessary to obtain copyright registrations for my works. In November 2008, I therefore began the process of compiling the information and materials necessary to undertake the registration of my numerous Sonic Comics works.

72. Before undertaking these Copyright Office filings, I wanted to make absolutely certain of my position as the owner of all rights in the works I created which were published in the Sonic Comics.

73. To make certain of my position as owner of all rights in the works I created which were published in the Sonic Comics in connection with these applications, I telephoned Victor Gorelick, editor-in-chief of Archie Comics, in December 2008. During that conversation, I requested that Archie (i) return to me original artwork still in its possession, and (ii) provide me with copies of any agreement I may have signed with Archie Comics relating to any of the freelance work I did for them. Gorelick told me that no such documents existed.

74. During the entire time this phone conversation took place, Bernadette Shahin was standing right next to me so she could also hear everything that was said.

75. Following our December 2008 telephone conversation, I reached out to Gorelick several more times by e-mail and telephone seeking written confirmation that no documents existed, but Gorelick never provided the requested written confirmation, nor returned my original art to me.

76. With Gorelick's confirmation that there were no agreements between myself and Archie Comics which impacted on my ownership of all copyrights in the works I created for the Sonic Comics, I proceeded with the copyright application filings.

77. On April 21, 2010, after all 52 works had been refiled, William Briganti of the US Copyright Office notified me via telephone that he would be sending out letters to both Sega and ACP, notifying them of my filings.

78. He told me Sega and ACP would have 30 (thirty) days to respond. He also said that if either challenged my claims, the Copyright Office would not register my claims.

79. On May 21, 2010, I received email from Briganti. He wrote that since neither ACP or Sega challenged my claims in the allotted time, the Copyright Office would proceed on June 1st to begin filing my registrations, and that the Certificates of Registration would be mailed out to me shortly after that.

80. I have reviewed the documents attached to the Complaint as Exhibit A and Exhibit B and do not believe them to be authentic for a number of reasons. First and foremost, the signatures are not authentic and cannot be authentic, since I never signed any such documents. Second, I have no record of ever receiving documents in 1996 from Archie, nor any recollection of the same. Third, I have no copies of these signed documents in my records – when I receive a document that has already been signed by the other party, it is my normal business practice to make a copy of the fully-executed agreement before returning the document to them.

81. Furthermore, I would never have signed a document that had blanks, such as those found in Exhibit B. Additionally, while I did receive a waiver of group medical insurance, that waiver was a single page document and had no additional pages or legal language concerning ownership or transfer of rights.

82. These documents are also suspect because they were not previously produced. First, when I requested copies of any contracts or documents, I was told none exist. Then during

the copyright application process, the Copyright Office sent a notice to Archie Comics and SEGA advising them of my copyright claims, but Archie took no steps to object to the applications, and failed to provide the Copyright Office with copies of any agreements that would dispute my ownership. This was confirmed to me via e-mail on May 21, 2010 by William J. Briganti, Assistant Chief of the Visual Arts and Recordation Division at the Copyright Office.

83. I never knowingly signed either of the documents attached to the complaint as Exhibits A and B.

84. My discussions with other creators that worked on the either the Sonic Comics or other licensed comic book series for Archie Comics, such as the Teenage Mutant Ninja Turtles series, reveals that all or most of the freelance creators who worked on the Sonic Comics during the period when I worked for Archie Comics did not sign work-for-hire agreements with Archie Comics.

85. Before, during and after my association with ACP, I have been involved with the creation of a number of properties designed for eventual release in either print, film or digital format. These projects have never been initiated by any publisher, but rather from a desire to establish my own property in the marketplace.

86. The first such project was an ongoing series THE FALCON ELITE which I created, wrote and illustrated back in 1982.

87. When independent comic publishers were looking for creator-owned submissions, among those I submitted the work to for publication was Rich Buckler, who had just been hired to revive ACP's stable of super hero characters under their Red Circle banner. Rich decided he wanted to use my series in a back-up slot in one of the books, and announced his intent to do so in a news article released to one of the industry trade publications, AMAZING HEROES, which

was printed in the September 1982 issue. I had produced six ten-page stories for this effort before I was told that plans been changed and there was no room for my series. I was not paid for this work as no written agreement had been signed at that point.

88.     Other projects in which my work would be considered a start-up business aimed at being released in multiple formats include but are not limited to: ROAD BUDS, STEVIE'S WHEELS, COLONY SIX CARA and THE MAN WITHOUT A COUNTRY. All were self-initiated projects which I've brought on Larry Houston to help me develop at least two – ROAD BUDS and STEVIE'S WHEELS for either live or animated film projects.

89.     The stories I sold to ACP for use in the KNUCKLES THE ECHIDNA series featured elements I was planning to use in the COLONY SIX CARA project, which involved the adventures of a young teen cast on a far off world. I put off using the material for this project and incorporated elements into the KNUCKLES series because (a) I needed something to develop the series with as there was no material in the Sega game featuring the character that would allow for any interesting story to be told, and, more importantly, (b) since I had no contract with ACP at the time I developed the material,  ACP would have no claims to the material once I retrieved it for later use in my own projects, as I designed the series to be a fully functioning universe even with the absence of any Sega material.

90.     After I left ACP, I went to work as a storyboard artist for the television series KING OF THE HILL, which was creatively very unsatisfying. I subsequently had a conversation with Bernadette Shahin, who suggested from that point forward I work solely on developing my own projects for the marketplace.

91.     Since that time, I have worked on my own self-initated projects, two of which - THE LOST ONES and THE REPUBLIC - are films in various stages of development. THE

REPUBLIC is currently in the post-production stage. I have released a 15-minute preview episode which can be viewed on the home page of my website. Another project, THE LARA-SU CHRONICLES, is a work that takes material that I initially developed for COLONY SIX CARA, ported it over for use in the KNUCKLES series and now reconfigured the material yet again, removing the Sega elements from the work but retaining the fully functioning universe.

92.  I never signed the Revised Newsstand Comic Independent Contractor's Agreement or the Licensed Comic Book Independent Contractor's Agreement with Archie Comics that they claim are valid documents.

I, Kenneth W. Penders II, declare under penalty of perjury, that the foregoing is true and correct.

Executed on March 6, 2012.                    *[signature: Kenneth W. Penders]*