Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARCHIE COMIC PUBLICATIONS, INC., <br><br> *Plaintiff,* <br><br> vs. <br><br> KENNETH W. PENDERS, II, <br> *alk/a* KEN PENDERS <br><br> *Defendant*. | Case No.: 10-CV-8858 (RMB) <br><br> Judge: Hon. Richard M.Berman <br><br> DECLARATION OF MICHAEL LOVITZ IN SUPPORT OF PENDERS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT |

I, MICHAEL LOVITZ, declare under penalty of perjury:

1)      I am an attorney admitted *pro hac vice* to practice before this Court and am a partner in the law firm of Lovitz IP Law PC, which firm had served as legal counsel to Ken Penders in this matter. I make this declaration in Support of Defendant Penders' Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment. I have personal knowledge of the matters set forth in this declaration and, if called upon to do so, could and would testify competently as to the matters set forth herein.

2)      Prior to October, 2011, Lovitz IP Law PC represented Mr. Penders in the instant matter, and conducted discovery and related investigations on Mr. Penders behalf.

3)      On October 14, 2010, prior to the filing of this suit by ACP, I corresponded with counsel for ACP and requested the originals of the agreements ACP alleges were signed by Mr. Penders be made available at opposing counsel's office for inspection. This was important to us because we wanted to test the ink on any documents ACP claimed to be original as well as test the ink on any copies of such originals.

4)      In a letter dated October 27, 2010, ACP's counsel responded to this request by advising me that ACP was unable to locate the documents. Now was ACP's counsel willing to produce the documents copied in order to create exhibits A and B attached to ACP's Complaint in this Action.

5)      Subsequent to the filing of this Action, plaintiff was served on June 15, 2011 with a Demand for Inspection requesting original copies of both the Revised Newsstand Comic Independent Contractor's Agreement and the Licensed Comic Books Independent Contractor's Agreement (exhibits A and B to the Complaint).

6)      On July 18, 2011, counsel for ACP served Plaintiff's Response and Objection to Defendant's Demand of Inspection (attached hereto as Exhibit A), wherein Plaintiff objected to the demand as "irrelevant", and stated that the originals had been lost or destroyed, that ACP had located copies of the originals, and that copies of these copies had previously been produced to Defendant's counsel and submitted as exhibits to the Complaint.

7)      Despite repeated requests, ACP refused to grant Defendant access to these documents.  If given the opportunity to inspect even the first copies of the documents, forensic document experts would be able to test the ink on the copies to determine its age.  ACP's refusal to allow us to inspect their documents or provide us with an original or even a copy of an original created during the time period in question left us with no evidence to give to a document forensics expert.

8)      During the course of my representation, and as a part of our investigation of the facts concerning this matter, I had the opportunity to interview Mr. Edward Spallone, former Vice President of Finance at Archie Comics Publications ("ACP") on several occasions during August, 2011.  Speaking with Mr. Spallone was very important since his was the signature on behalf of ACP on the contracts alleged to have been signed my Mr. Penders, and I believed he would provide insight into the activities of ACP in connection with those contracts.

9)      I was eventually able to locate Mr. Spallone at the offices of Marvel Comics, and arranged to speak with him by telephone concerning the contracts and ACP.  I took notes during our discussions concerning Mr. Spallone's responses to my questions.

10)     At the start of our first conversation, Mr. Spallone initially expressed some concern that he might be called to testify at trial, explaining that he had signed an agreement with Archie at the time his employment ended, which such agreement he believed may place limitation on his ability to speak negatively about Archie or about the events that led to his departure from Archie.  However, Mr. Spallone expressed willingness to continue our conversation and allowed me to ask him questions regarding his recollections concerning his duties while at ACP, the contracts, his signatures and related events.

11)     Mr. Spallone confirmed that he had been Vice President of Finance for ACP.  Mr. Spallone stated that, in general, he did not know or directly deal with the creative or editorial staff.

12)     Mr. Spallone stated that as VP of Finance, he had no involvement with, and was not responsible for, editorial agreements such as the "Revised Newsstand Comic Independent Contractor's Agreement" or the "Licensed Comic Books Independent Contractor's Agreement," and never signed such agreements on behalf of ACP, with the exception of one event.

13)     During these interviews, Mr. Spallone explained that there had been a problem discovered in 1996 concerning ACP's contracts with its artists, writers and other creators.  Specifically, Mr. Spallone stated that it was ACP's routine to store contracts in a box in the company's on-site warehouse.  Further, during the time he was VP of Finance, he was aware that ACP routinely hired short-term employees to work in the warehouse; however, ACP learned that one or more of those employees had proven to be either untrustworthy or incompetent.  In the

fall of 1996, ACP discovered that all (or a majority) of the creator agreements housed in the ACP warehouse had been destroyed when the box containing the contracts was discarded by one of the short-term warehouse employees.

14)     Although no one knew precisely the date when the contracts had been discarded or destroyed, Mr. Spallone said that the loss of these contracts was discovered in the fall of 1996 after the "Sabrina, the Teenage Witch" television series debuted on the ABC network.  The television show was based on the Sabrina the Teenage Witch comic book character, which character had been created by writer George Gladir and artist Dan DeCarlo in 1962.

15)     Because the "Sabrina" television series had quickly proven to be very popular, Mr. Spallone explained that ACP was extremely concerned once they discovered they no longer had any of the signed creator contracts, and therefore no documentation to prove ACP's ownership of the Sabrina character.  As a result, Mr. Spallone explained that ACP decided they needed to secure a new, signed "Newsstand Comic Independent Contractor's Agreement" from Mr. Gladir in order to confirm their ownership of the Sabrina character.

16)     Mr. Spallone stated that, although the primary purpose for sending out these contracts was to get George Gladir to sign away his interests in Sabrina the Teenage Witch character, ACP wanted to hide their true intentions in hopes of avoiding having to pay Mr. Gladir any compensation or royalty for the television series based on his character.

17)     Mr. Spallone stated that ACP therefore created a "Revised" version of the "Newsstand Comic Independent Contractor's Agreement," which he was asked to sign on the company's behalf.  Mr. Spallone stated these "Revised Newsstand Comic Independent Contractor's Agreement" were sent to approximately thirty (30) of ACP's freelancers, primarily those working on the "core" Archie titles (i.e., those comics involving the "Archie" universe of characters such as Archie, Betty, Veronica, Reggie, Jughead, Sabrina, Josie and the Pussycats, to name a few).

18)     Mr. Spallone explained that these documents were the only creator contracts that he was ever asked to sign while working at ACP.  Because he was not familiar with the creative or editorial freelancers, Mr. Spallone was not able to recall the names of any of the freelancers to whom he sent contracts, other than Mr. Gladir.

19)     During these interviews, Mr. Spallone specifically told me that he did not recall sending Mr. Penders a contract in 1996, or ever receiving one in return from him.

20)     Mr. Spallone stated that he did not know which, if any, of the freelancers had returned signed copies of the agreements to ACP, as they were not returned to him.

21)     The only person who Mr. Spallone said he knew specifically had or had not signed a copy of the November 1996 agreement was George Gladir, who never signed the contract.  Mr. Spallone explained that the reason Mr. Gladir did not sign the agreement was because Mr. Spallone had contacted Mr. Gladir directly to advise him of ACP's plan to avoid compensating Mr. Gladir for the "Sabrina, the Teenage Witch" television program by having him sign the new contract.

22)     As a result of the warehouse problems, Mr. Spallone said that following these events in November 1996, ACP became extremely diligent in securing and maintaining the originals of all contracts to avoid the possibility of loss occurring again in the future.

23)     Mr. Spallone had additional conversations with Defendant's counsel in late 2011. On Thursday, December 15, 2011, Phillip Daman, current trial counsel for Mr. Penders, called me to tell me that he had just interviewed Mr. Spallone over the phone and that he was very surprised and shocked when during that phone interview, Mr. Spallone told him that he only sent out one form of agreement –not two- on behalf of ACP and that he never signed any "Licensed Comic Books Independent Contractor's Agreement" on behalf of ACP.

24)     The fact that Mr. Spallone never signed any "Licensed Comic Books Independent Contractor's Agreement" documents is consistent with the document production of ACP in response to Defendant's discovery requests. Specifically, in response to Defendant's request for copies of "Licensed Comic Books Independent Contractor's Agreement" signed by creators working on the SONIC THE HEDGEHOG comic books, ACP responded that they would produce "a representative sampling" of such documents. See attached Exhibit C at pp. 21-22.

25)     ACP has produced no "Licensed Comic Books Independent Contractor's Agreement" documents other than the document purportedly signed by Mr. Penders and attached to the Complaint.

26)     In reviewing the documents produced by ACP in response to Defendant's discovery requests, the copy of the "Revised Newsstand Comic Independent Contractor's Agreement" prepared for George Gladir and produced by ACP did not include a signature page, and appears to have no health insurance election language. See ACP00122-00128, attached hereto as Exhibit B.

27)     A review of the Gladir contract reveals that his document differs from all of the other "Revised Newsstand Comic Independent Contractor's Agreement" documents signed by Mr. Spallone. The Gladir contract is the only "Revised Newsstand Comic Independent Contractor's Agreement" signed by Mr. Spallone that had the independent contractor's name and address typed into the first page (ACP00122). The Gladir contract is also the only "Revised Newsstand Comic Independent Contractor's Agreement" produced by ACP which contains language specifically directed to any particular ACP character, namely "SABRINA" in Sections 12, 14 and 18 (ACP00124-00125). Further, the Gladir contract is the only "Revised Newsstand Comic Independent Contractor's Agreement" that excuses both ACP and its licensees from any obligation to credit the independent contractor's contributions to any ACP properties.

I, Michael Lovitz, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed at Beverly Hills, California on March 6, 2012.

Michael L. Lovitz

Lovitz Declaration, Page 4